IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                      **Civil Action No. 5:05-cv-202**

ROBERT V. GILKISON;
PEIRCE, RAIMOND & COULTER,
P.C., a Pennsylvania Professional Corporation a/k/a
ROBERT PEIRCE & ASSOCIATES, P.C., a Pennsylvania
Professional Corporation; ROBERT PEIRCE, JR.; LOUIS A.
RAIMOND; MARK T. COULTER; and RAY HARRON, M.D.;

        Defendants.

## AMENDED COMPLAINT

    **NOW COMES** the Plaintiff, CSX Transportation, Inc., hereinafter "CSXT", by and through counsel, and for its Amended Complaint against the Defendants Robert Gilkison; Peirce, Raimond & Coulter, P.C., Robert N. Peirce, Jr., Louis A. Raimond, Mark T. Coulter, and Ray Harron, M.D. avers and states as follows:

## NATURE OF THE ACTION

1. The defendants listed herein are well-organized and financed asbestos personal injury attorneys and medical experts who have orchestrated a scheme to inundate CSXT and other entities with thousands of asbestosis cases without regard to their merit.

2. Due to the sheer volume of claims filed as well as the number of claimants included in any one particular lawsuit CSXT and others were unable to adequately defend or even evaluate the merits of each claim on an individual basis. Instead, in an effort to alleviate the stress placed on the judicial system by these mass filings, CSXT was forced to engage

in a large scale mediation process with only limited information provided by the claimants' own attorneys.

3.   This case arises from the successful efforts of the defendants to deliberately fabricate and prosecute objectively unreasonable, false and fraudulent asbestosis claims against CSXT. Specifically, the defendants orchestrated an asbestosis screening process deliberately intended to result in false positive diagnoses and then knowingly prosecuted claims against CSXT with no basis in fact. As will be explained more fully below, this conduct violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and also supports claims for common law fraud and conspiracy.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims herein arise under the laws of the United States, pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c) because the claims herein seek recovery for violations of 18 U.S.C. §1962, and pursuant to 28 U.S.C. §1332 because the action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.   This Court also has subject matter jurisdiction over the common law claims asserted herein pursuant to 28 U.S.C. §1367(a), because those claims are so related to the claims arising under the law of the United States that they form part of the same case or controversy.

6.   This Court is a proper venue for this action under 28 U.S.C. §1391(a)(2) because a substantial part of the acts and omissions giving rise to this dispute occurred within this judicial district and division.

7. The out-of-state Defendants further listed herein are also subject to this Court's jurisdiction pursuant to the provisions of West Virginia Code § 56-3-33(3) as their actions within this State caused tortious injury to plaintiff, CSXT.

## PARTIES

8. Plaintiff CSXT is and was at all times relevant herein a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Jacksonville, Florida.

9. Defendant Peirce, Raimond and Coulter, P.C. ("the Peirce firm"), is and was at all relevant times herein a Pennsylvania Professional Corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

10. At all times relevant herein the Peirce firm was registered to conduct and did conduct business in the State of West Virginia under the name Robert Peirce and Associates, P.C. or as Peirce, Raimond and Coulter, P.C.

11. Robert N. Peirce, Jr. ("Peirce") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 104 Fair Acres Drive, Sewickley Pennsylvania 15143.

12. Louis A. Raimond ("Raimond") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 1604 Fieldstone Lane, Sewickley, Pennsylvania 15143.

13. Mark T. Coulter ("Coulter") is and was at all times relevant herein a citizen and resident of Monroeville, Allegheny County, Pennsylvania, with his principal mailing address being 2079 Ramsey Road, Monroeville, PA 15146.

14. The individual defendants Peirce, Raimond and Coulter are hereinafter referred to collectively as the "lawyer defendants."

15. The lawyer defendants were at all relevant times herein partners, members or shareholders of the Peirce firm.

16. Defendant Robert V. Gilkison ("Gilkison") is and was at all times relevant herein a citizen and resident of Maysville, Mason County, Kentucky, with his principal mailing address being 838 Fleming Road, Maysville, Kentucky.

17. Defendant Gilkison was a former employee of CSXT and at all relevant times herein an employee of the Peirce firm and was upon information and belief acting at all relevant times within the course and scope of his employment for the Peirce firm.

18. Upon information and belief Defendant Ray Harron, M.D. is and was at all times relevant herein a citizen and resident of Bridgeport, Harrison County, West Virginia, with his principal mailing address being 901 West Main Street, Bridgeport, West Virginia 26334.

## BACKGROUND AND FACTS APPLICABLE TO THE RICO COUNTS

19. The Peirce firm initiates and prosecutes lawsuits against railroad carriers, including CSXT, on behalf of current and former employees alleging various personal injuries and occupational illnesses, including asbestosis.

20. Beginning in early 1990s, the lawyer defendants, collectively and in concert, embarked upon a calculated and deliberate strategy to participate in and to conduct the affairs of the Peirce firm through a pattern and practice of unlawful conduct, including bribery, fraud, conspiracy, and racketeering.

21. Specifically, the lawyer defendants gained access to potential clients through unlawful means, retained clients and procured medical diagnoses for them through intentionally

unreliable mass screenings, prosecuted clients' claims using dishonest, fraudulent, and deceptive tactics and, ultimately, fabricated and prosecuted asbestosis claims with no basis in fact.

## I.    Access to Potential Clients Through Improper and Unlawful Means

22. Some or all rail labor unions confer "Designated Legal Counsel" status on select lawyers and then advise their members to use them.  Designated status is highly desirable for attorneys because it permits them or their representatives to attend union meetings and solicit clients.

23. In the years prior to this lawsuit, some or all of the lawyer defendants enjoyed designated counsel status with one or more rail labor unions and explicitly advertised this fact in connection with their screenings.  *See* Advertisement for Screening attached hereto as ***Exhibit A.***

24. In 2003, it became known that certain rail labor officials had been accepting unlawful cash payments from attorneys in exchange for designated counsel status.  As a result of this scheme, the federal government indicted and convicted multiple union officials, including former union president Charles L. Little, who pled guilty to federal racketeering charges.

25. On December 8, 2003, an article in the Pittsburgh Tribune-Review linked defendant Peirce and Mr. Little, stating that Peirce "gave thousands of dollars in cash to transportation union officials who played a role in helping him attract legal work from union members." *See* Article attached hereto as ***Exhibit B***.

26. Further, defendant Peirce himself explicitly admits contributing a total of $15,000.00 in cash to Little's various election campaigns.  Defendant Raimond also admits contributing

$5,000.00 to Mr. Little's campaigns.  *See* Relevant Discovery Responses attached hereto as ***Exhibit C***.

27. In addition to these payments, the lawyer defendants also utilized retired railroad employees, many of whom formerly worked for CSXT, as "runners" or "investigators" to lure railroad workers to their mass screenings.

28. A majority, if not all, of these runners/investigators had left employment claiming varying degrees of disability and were receiving disability payments from the Railroad Retirement Board.

29. The lawyer defendants caused the Peirce firm to pay these runners/investigators calculated sums to ensure that they remained eligible for federal retirement benefits, and then further fraudulently compensated them through "fringe benefits" and "off the books" reimbursements.

## II.   Retention of Clients and Procurement of Medical Diagnoses Through Deliberately Unreliable Mass Screenings

30. As noted above, the lawyer defendants routinely utilized mass screenings to retain railroad employees as clients and procure medical diagnoses – particularly of asbestosis – for them.

31. Asbestosis, also known as pneumoconiosis, is a chronic inflammatory medical condition affecting the parenchymal tissue of the lungs caused by long-term, heavy exposure to asbestos.  The National Institute of Occupational Safety and Health (NIOSH) maintains a standard protocol for the interpretation of chest x-rays to determine pneumoconiosis caused by asbestos exposures. NIOSH administers a specialized examination for those who wish to learn the NIOSH protocol.  Physicians who pass the examination, referred to as B-Readers, visually analyze opacities and record their findings and interpretations on

standard International Labor Organization, "ILO" forms.   Although asbestosis is a
restrictive lung disorder which usually entails pulmonary function testing, most
asbestosis litigation begins with a B-Reader assigning a positive score on an ILO form
after reviewing a patient's x-rays and determining the physical presence of scarring
caused by prolonged inhalation of asbestos.

32. As will be explained below, the lawyer defendants supervised all aspects of the Peirce
firm's asbestosis screenings and deliberately orchestrated them so as to maximize the
likelihood of false positive diagnoses.

33. Specifically, the lawyer defendants actively solicited attendance to the screenings using
interstate mailings and advertisements.   In many instances, the identities of the persons
solicited were obtained from the unlawful practices described above.

34. Additionally, the lawyer defendants purposefully hired unreliable x-ray technicians such
as James Corbitt to conduct the screenings.   Corbitt is a convicted felon who habitually
disregarded and violated state laws governing the use of x-ray equipment and produced
chronically underexposed x-rays.

35. The lawyer defendants also deliberately hired unreliable doctors such as Dr. Ray Harron
to "read" the x-rays for signs of asbestosis.   Defendant Peirce admits to selecting Dr.
Harron because of his willingness to read unusually large numbers of x-rays at a time.
Further, the lawyer defendants compensated Harron on a per x-ray, as opposed to hourly,
basis, thereby enhancing his financial incentive to read as many x-rays as possible
without regard to established medical protocols.

36. Furthermore, Dr. Harron identified asbestosis in approximately 97.5% of the x-rays he
read for the Peirce firm since 2000.   *See* Email dated January 27, 2006 from Robert Potter,

former defense counsel for the Peirce firm, to J. David Bolen attached hereto as ***Exhibit D***. Based upon information and belief, the lawyer defendants knew of this rate and continued to utilize Dr. Harron specifically because of it, despite their knowledge or reckless disregard of the fact that it far exceeded the occurrence of asbestosis not only in the general population, but also in high-risk populations such as shipyard workers.

A.    James Corbitt

37. Defendant Peirce first hired James Corbitt and his company, U.S. X-Ray, Inc., to conduct screenings in approximately January 1993.  *See* Letter dated December 29, 1997 from James Corbitt addressed to Mr. Robert "Bob" Peirce, attached hereto as ***Exhibit E***. Although Corbitt initially continued to work for other firms and businesses, by the late 1990s, he worked almost exclusively for the Peirce firm.  This trend continued until approximately 2004, when Corbitt ceased participating in Peirce firm screenings.  *See* Deposition of James Corbitt taken November 17, 2006 (hereinafter "Corbitt Depo."), p. 80, line 3-p. 81, line 13, relevant portions attached hereto as ***Exhibit F***.

38. Corbitt conducted screenings using a mobile x-ray unit mounted in a GMC straight truck, the back of which he had divided into a waiting room and a second room where the x-rays were actually taken and processed.  *See **Exhibit F***, p. 95, line 23-p. 96, line 12.

39. In 1972, Corbitt earned a two-year degree as a radiologic technologist from Vanderbilt University's School of Allied Professions in Nashville, Tennessee.  Upon graduation he registered with the American Registry of Radiologic Technologists (AART).

40. On May 12, 1993, Corbitt pled guilty in the United States District Court for the Northern District of Ohio Eastern Division to violations of 18 U.S.C. § 641 (Theft of Government Property) and 26 U.S.C. § 7206(1) (Fraud and False Statements). *See* Plea Agreement in

_United States of America v. James R. Corbitt, and Toni Corbitt_, U.S.D.C. Northern District of Ohio, Eastern Division, Case Number 5:93CR133A attached hereto as **_Exhibit G_**.

41. On August 12, 1993, the court sentenced Corbitt to 18 months in prison and three years of supervised release and also ordered him to pay $192,641.29 in restitution to the U.S. Department of Health and Human Services. _See_ Court Order attached as **_Exhibit H_**.

42. Thus, for virtually the entire time the lawyer defendants' utilized Corbitt's services, they either knew or recklessly disregarded the fact that he had been convicted of two felonies involving dishonest and moral turpitude.

43. Notwithstanding his felonious criminal record, the lawyer defendants continuously used Corbitt to perform mass x-rays screenings mainly, but not exclusively, across the eastern United States between 1993 and 2004. Moreover, at most, if not all of the screenings he conducted, Corbitt was completely unsupervised.

44. Corbitt admits that he did not have any licenses or certifications aside from his AART registration when he began conducting screenings for the defendants. _See **Exhibit F**_ at p. 115, line 11-p. 116, line 10.

45. Thus, Corbitt pervasively violated the laws of virtually every state in which he operated on behalf of the Peirce firm. These laws generally require radiologic technologists and their equipment to be licensed by the state health board.

46. For example, in Virginia, where Corbitt admittedly performed screenings on a regular basis, it is "unlawful for a person to practice or hold himself out as practicing as a radiologic technologist or radiologic technologist, limited, unless he holds a license as such issued by the Board [of Health]." _See_ Va. Code Ann. § 54.1-2956.8:1. Furthermore,

"All X-ray machines shall be registered with the Board of Health, and inspected and certified as meeting the standards established pursuant to its regulations. The inspections shall be conducted periodically on a schedule prescribed by the Board." *See* Va. Code Ann. § 32.1-229.1. Finally, pursuant to 18 Va. Admin. Code § 85-101-100(A), "All services rendered by a radiologic technologist shall be performed only upon direction of a licensed doctor of medicine, osteopathy, chiropractic, or podiatry."

47. Corbitt failed to comply with each of these provisions while conducting screenings on behalf of the Peirce firm in Virginia.

48. In fact, when deposed about his knowledge of and compliance with the licensing requirements of the states in which he was operating, Corbitt invoked his Fifth Amendment privilege against self-incrimination. *See Exhibit F* at p. 117, line 17-p. 119, line 5.

49. Furthermore, at least two states formally disciplined Corbitt for his screening-related conduct during the period in which he regularly worked for the Peirce firm.

50. On August 21, 2001, the Texas Department of Health issued an Emergency Cease and Desist Order prohibiting Corbitt and U.S. X-Ray from operating x-ray equipment within the state until they obtained a certificate of registration for the equipment. *See* Order attached hereto as *Exhibit I*.

51. Not only did defendant Peirce continue to use Corbitt and U.S. X-Ray after learning of this Order, he personally paid half of the $10,000.00 fine that the State of Texas imposed on Corbitt. *See Exhibit F* at p. 172, lines 9-17; *see also* Deposition of Robert N. Peirce, Jr. taken May 8, 2007 at, p. 147, lines 5-20, relevant portions attached hereto as *Exhibit J*.

52. On January 30, 2002, the Ohio Director of Health formally denied Corbitt's May 29, 1999 and June 30, 2000 applications for a radiologic license in Ohio based on Corbitt's failure to report his felony convictions on his applications and the Board of Health's conclusion that Corbitt did not possess the good moral character necessary to satisfy the requirements of Ohio law. *See* Order attached hereto as ***Exhibit K***.

53. Corbitt's reckless and unlawful conduct resulted in chronically underexposed x-rays that helped further the lawyer defendants' scheme to defraud CSXT. Specifically, as Corbitt learned in his initial training as an x-ray technician, underexposed x-rays present a distorted view of lung tissue and increase the likelihood of false positive readings. Corbitt was able to produce a steady stream of underexposed films for the lawyer defendants by avoiding the mandatory certification and licensing requirements of the states where he conducted screenings and by avoiding the scrutiny of health regulators. Corbitt's consistently unreliable images gave partial cover to Dr. Harron and aided in the process of producing false positive asbestosis diagnoses.

      B.    Dr. Ray Harron

54. As previously stated, the lawyer defendants not only unlawfully hired technicians such as Corbitt to conduct their screenings, they also retained and compensated the doctors who interpreted the resulting x-rays and determined whether they presented signs of asbestosis.

55. The lawyer defendants most commonly used Dr. Ray Harron to read and interpret the x-rays generated during their screenings. *See **Exhibit J*** at p. 184, lines 6-17. Defendant Peirce selected Dr. Harron based on his willingness to read an unusually high number of x-rays at a sitting and his willingness to be paid on a per x-ray, as opposed to hourly, basis. *Id.*; *See also Id.* at p. 196, line 23-p. 197, line 21.

56. Dr. Harron's misconduct as a so-called B-reader in occupational illness cases is well-documented in Judge Janis Jack's opinion *In re Silica Prods. Liability Litig.*, 398 F. Supp. 2d 563, 567 (S.D. Tex. 2005).

57. In that case, the court confronted Dr. Harron regarding multiple so-called "reversals," or instances in which Dr. Harron first determined that a patient was unimpaired and then later found an impairment even though the condition of the patient's lungs was objectively unchanged. *See Id.* at 607.

58. As a result of this conduct, on April 13, 2007, Dr. Harron entered into an Agreed Order with the State of Texas pursuant to which he agreed not to practice medicine until his license expired and not to renew it thereafter. *See* Order attached hereto as ***Exhibit L***.

59. It is clear that Dr. Harron engaged in precisely the same type of fraudulent conduct while working as a B-reader for the Peirce firm as he did in connection with the silica litigation. Specifically, CSXT has identified no less than nine instances in which Dr. Harron first determined a claimant's x-ray not to have markings consistent with asbestosis, but then later, based on a second x-ray, determined that the patient exhibited signs of asbestosis despite the objectively unchanged condition of the patient's lungs.

60. The names of these individuals, the dates and locations of the relevant x-rays (all taken by Corbitt) and the dates of Dr. Harron's reads are as follows with the ILO forms attached hereto as ***Exhibit M***:

| Name | First X-ray | First Location | First Read | Second X-ray | Second Location | Second Read |
|---|---|---|---|---|---|---|
| Earl Baylor | 8/4/99 | Atlanta, GA | 8/31/99 | 6/11/03 | Augusta, GA | 7/2/03 |
| Ike Bronson | 4/14/00 | Cincinnati, OH | 5/23/00 | 12/12/00 | Cincinnati, OH | 12/28/00 |
| Morris Collier | 4/27/00 | Toledo, OH | 5/30/00 | 7/11/01 | Toledo, OH | 8/8/01 |
| Robert Fisher | 3/16/00 | Nashville, TN | 5/4/00 | 9/27/00 | Nashville, TN | 11/18/00 |
| James Lackey | 4/12/00 | Covington, KY | 5/24/00 | 12/12/00 | Cincinnati, OH | 12/28/00 |
| James Peterson | 8/25/00 | Tallahassee, FL | 9/11/00 | 2/25/03 | Albany, GA | 3/20/03 |
| Gene Sanders | 2/14/00 | Jacksonville, FL | 3/XX/XX (incomplete) | 8/23/00 | Jacksonville, FL | 9/9/00 |

| Willie James Trice | 2/18/00 | Manchester, GA | 3/1X/XX (illegible) | 9/30/00 | Columbus, GA | 11/12/00 |
| Donald Wiley | 4/19/02 | Raceland, KY | 6/28/02 | 6/24/02 | Williamson, WV | 7/16/02 |

61. These nine cases demonstrate that, as in the silica litigation, Dr. Harron either recklessly disregarded or deliberately misrepresented the content of the x-rays he read for the Peirce firm.

62. Furthermore, as noted above, the lawyer defendants knew of Dr. Harron's conduct and continued to utilize him specifically because of it.

### III.   Prosecution of Claims Using Dishonest, Fraudulent and Deceptive Tactics

63. The impropriety of the lawyer defendants' misconduct, however, was not limited to the screening process.

64. Once the lawyer defendants received a positive diagnoses from Dr. Harron or their other doctors, they continued upon a course of intentionally fraudulent and unlawful conduct to ensure that all claims, regardless of their objective merit and validity, were filed and settled.

65. Specifically, the lawyer defendants sent or caused to be sent letters to their clients stating, "It is also important to remember that you never suspected you had asbestosis and/or silicosis until you got the results back from the recent screenings.  This is important because if you tell a doctor, or someone else, that you have thought that you may have had some pulmonary disease for over three years, then the statute of limitations will preclude you bringing a lawsuit and being compensated for your on-the-job exposure at the railroad." *See e.g.*, Letter dated July 15, 1999 from Robert Peirce, Jr. addressed to James F. Blocker attached as ***Exhibit N***.

66. These letters evidence a deliberate scheme by the lawyer defendants to instruct and encourage their clients to testify in a certain manner without regard to the true state of the facts.

67. Furthermore, the lawyer defendants "coached" their clients regarding the sources of their asbestos exposure.  For example, on October 25, 2001, the lawyer defendants, by and through Danielle Daley, the Peirce firm's "Railroad Project Manager," caused a letter to be mailed to Gene R. Sanders stating, in part, as follows: "I am enclosing a 'Sample Questionnaire,' that I filled out, so that you would be able to see examples of how the questions [regarding sources of asbestos exposure] should be answered."  *See* <u>Letter dated October 5, 2001 from Danielle Daley addressed to Gene R. Sanders</u> attached as ***Exhibit O***.

68. The lawyer defendants also furnished their clients with pre-printed, boilerplate asbestosis diagnosis forms to be signed by their personal physicians.  *See*, *e.g.*, <u>Exemplar Form</u> attached hereto as ***Exhibit P***.  Thus, in many cases, Dr. Harron's reckless or deliberately false B-read of an x-ray illegally procured by Corbitt formed the sole basis of the client's diagnoses and claim, with the client's personal physician simply rubber-stamping the final phase of the lawyer defendants' fraudulent claims manufacturing process.

69. Throughout this process, the lawyer defendants prosecuted the claims with virtually no guidance or communication from their clients.

### IV.   Fabrication and Prosecution of Lawsuits with No Basis in Fact

A.   <u>Objectively Baseless/Bad Faith Claims Arising From Harron's Reversals</u>

70. As noted above, CSXT has identified no less than nine instances in which Dr. Harron first found a patient to be unimpaired and then later, based on a second x-ray, determined

that the patient exhibited signs of asbestosis despite the objectively unchanged condition of the patient's lungs.

71. In each of these nine instances, the lawyer defendants filed or caused to be filed personal injury claims on behalf of the affected individuals. The circumstances and status of these claims are as follows:

    a. On August 1, 2001, the lawyer defendants, by and through defendant Coulter, caused to be filed *Charles Abbott v. CSX Transp., Inc.*, Civil Action No. 01-C-162 (Marshall Co. Cir. Ct.) (Complaint attached hereto as ***Exhibit Q***). This lawsuit asserted claims for personal injuries arising from asbestos exposure on behalf of Ike Bronson (Complaint ¶¶ 89 and 918-929) and James Lackey (Complaint ¶¶ 477 and 918-929). The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States.

    b. On June 26, 2003, by and through an email from Danielle Daley to Bo Bobersky attached hereto as ***Exhibit R***, the lawyer defendants caused Mr. Bronson's claim to be settled for $7,500.00.

    c. On November 17, 2002, by and through Danielle Daley (attached hereto as ***Exhibit S***), the lawyer defendants caused Mr. Lackey's claim to be settled for $12,500.00.

    d. On March 20, 2000 , the lawyer defendants, by and through defendant Coulter, caused to be filed *Ronald Lee Abbott v. CSX Transp., Inc.*, Civil Action No. 00-C-64 (Marshall Co. Cir. Ct.) (Complaint attached as ***Exhibit T***). This lawsuit asserted a claim for personal injuries arising from asbestos exposure on behalf of

Gene Sanders (Complaint ¶¶ 1561 and 2019-2030). The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States. Specifically, the lawyer defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon P.J. Aftoora, 500 Water Street, S/C J-160, Jacksonville, Florida on March 27, 2000 via certified mail. *See* Notice of Service of Process attached hereto as ***Exhibit U.***

e.  On August 1, 2002, by and through a letter from Danielle Daley to Bo Bobersky attached hereto as ***Exhibit V,*** the lawyer defendants caused Mr. Sanders's claim to be settled for $12,000.00.

f.  On May 19, 2003, the lawyer defendants, by and through defendant Coulter, caused to be filed *George E. Abel v. CSX Transp., Inc.*, Civil Action No. 03-C-208 (Harrison Co. Cir. Ct.) (Complaint attached as ***Exhibit W***). This lawsuit asserted claims for personal injuries arising from asbestos exposure on behalf of James Petersen (Complaint ¶¶ 860 and 1370-1380) and Donald Wiley (Complaint ¶¶ 1215 and 1370-1380). The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States.

g.  The claims of Misters Petersen and Wiley remain active and unresolved.

h.  On May 19, 2003, the lawyer defendants, by and through defendant Coulter, caused to be filed *Shirley Amos v. CSX Transp., Inc.*, Civil Action No. 02-C-93 (Marshall Co. Cir. Ct.) (Complaint attached as ***Exhibit X***). This lawsuit asserted claims for personal injuries arising from asbestos exposure on behalf of Morris

Collier (Complaint ¶¶ 19 and 1370-1380). The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States.

i.  On September 18, 2003, by and through an email from Danielle Daley to Bo Bobersky (attached hereto as *Exhibit Y*), the lawyer defendants caused Mr. Collier's claim to be settled for $25,000.00.

j.  On February 21, 2006, the lawyer defendants, by and through Robert Daley, caused to be filed *Charles S. Adams v. CSX Transp., Inc.*, Civil Action No. 06-C-72 (Harrison Co. Cir. Ct.) (Complaint attached as *Exhibit Z*). This lawsuit asserted a claim for personal injuries arising from asbestos exposure on behalf of Earl Baylor (Complaint ¶¶ 13 and 255-266). The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States. Specifically, the lawyer defendants, by and through Robert Daley, caused the Complaint and Summons to be served upon CSXT's registered agent, Corporate Service Company, on May 18, 2006 via certified mail. *See* Notice of Service of Process attached hereto as *Exhibit AA*.

k.  Mr. Baylor's claim remains active and unresolved.

l.  On November 1, 2001, the lawyer defendants, by and through Edward S. Cook, caused to be filed *Robert E. Fisher v. CSX Transportation, Inc.*, Civil Action No. 01-A-114450-0 (Gwinnett Co. Sup. Ct.) attached hereto as *Exhibit BB*. This lawsuit asserted a claim for personal injuries arising from asbestos exposure on behalf of Robert Fisher. The filing of this lawsuit and service of the Summons

and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States. The lawyer defendants later caused this lawsuit to be dismissed without prejudice, but continued to prosecute the claim against CSXT.

m. On October 13, 2003, by and through an email from Danielle Daley to Bo Bobersky attached as *Exhibit CC*, the lawyer defendants caused Mr. Fisher's claim to be settled for $7,000.00.

n. On November 9, 2001, the lawyer defendants, by and through Edward S. Cook, caused to be filed *Willie J. Trice v. CSX Transportation, Inc.*, Civil Action No. 01-A-11772-0 (Gwinnett Co. Sup. Ct.) (attached hereto as *Exhibit DD*). This lawsuit asserted a claim for personal injuries arising from asbestos exposure on behalf of Willie Trice. The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved or reasonably contemplated the use of the mails and/or wires of the United States. The lawyer defendants later caused this lawsuit to be dismissed without prejudice, but continued to prosecute the claim against CSXT.

o. On July 22, 2004, by and through an email from Danielle Daley to Heath Weldon (attached as *Exhibit EE*), the lawyer defendants caused Mr. Trice's claim to be settled for $10,000.00.

72. At the time the lawyer defendants filed or caused these claims to be filed, they knew or recklessly disregarded the fact that the subject individuals did not have asbestosis and that there existed no good faith basis in fact for the claims, making the claims objectively unreasonable.

73. Thus, the lawyer defendants were not merely passive instruments in the prosecution of these claims. Instead, they actively fabricated them using a screening process intentionally designed to generate false positive diagnoses.

74. Indeed, as outlined above, the lawyer defendants actively solicited the clients' attendance at the screenings, deliberately hired unreliable technicians and doctors to produce the diagnoses on which the claims were based, coached testimony, provided the clients with preprinted, boiler plate forms to be signed by their personal physicians confirming their diagnoses and, lastly, handled the prosecution of the claims with virtually no guidance or direction from the clients, all the while intending to profit from their illegal conduct to the detriment of CSXT.

75. In short, the filing and prosecution of these nine claims constituted a deliberate effort by the lawyer defendants to defraud CSXT.

**COUNT 1: CIVIL RICO AGAINST THE LAWYER DEFENDANTS**

76. That the Plaintiff realleges the allegations set forth in paragraphs 1 through 75 as if set forth verbatim herein.

77. The Peirce firm constitutes an enterprise engaged in or the activities of which affect interstate commerce for purposes of 18 U.S.C. § 1962(c).

78. The lawyer defendants, who were at all relevant times employed by or associated with the Peirce firm, directly conducted and participated in the business and affairs of the Peirce firm through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

79. Specifically, the defendants devised and implemented a scheme to defraud CSXT and/or to obtain money by false pretenses by fabricating, filing and prosecuting the nine objectively baseless personal injury claims described in paragraphs 1 through 75.

80. Pursuant to West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law, by filing and prosecuting these claims, the lawyer defendants represented to CSXT that there existed a colorable and good faith basis for the claims, when in fact they knew or recklessly disregarded that there existed no such basis and that their clients did not suffer from asbestosis.  Furthermore, the lawyer defendants specifically intended CSXT to rely on their representations and settle the claims.

81. In furtherance of this scheme, the lawyer defendants repeatedly used or caused their agents to use the mails and wires, including but not limited to, the specific instances identified in paragraphs 63 through 75.

82. Additional specific uses of the mail and wires in furtherance of the lawyer defendants' scheme include:

   a. Letter dated August 13, 2003 from Danielle Daley addressed to Bo Bobersky referencing a settlement conference to be held on October 28, 2003 at the Hilton-Knoxville Airport in Knoxville, TN (attached as *Exhibit FF*).   This conference involved some of the nine claims listed in paragraph 60.  Furthermore, the letter specifically indicates that "Lou" would be attending, providing further evidence of defendant Raimond's direct involvement in the lawyer defendants' fraudulent scheme.

   b. Letter dated August 13, 2003 from Dr. Ray Harron addressed to Robert F. Daley regarding asbestosis diagnosis of Morris L. Collier (attached as *Exhibit GG*).

83. Each of the acts described or referred to in paragraphs 63 through 75 and 82 constitutes a violation of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) and is therefore a predicate act of racketeering activity under 18 U.S.C. § 1961(1).

84. These predicate acts are related in that they shared the same or similar purposes, results, participants, victims, methods of commission and were otherwise interrelated by distinguishing characteristics and were not isolated events. Specifically, each predicate act was committed in furtherance of the lawyer defendants' deliberate scheme to fabricate asbestosis claims through their purposefully unreliable screening process and then defraud CSXT by prosecuting the claims with the full knowledge that there existed no good faith basis in fact for them. More particularly, each act either related to or involved the retention of a one of the nine claimants listed in paragraph 60, the procurement of their asbestosis diagnosis or the prosecution and settlement of their claims. The predicate acts were not isolated events, but rather regular and integral steps in furtherance of the lawyer defendants' scheme to defraud CSXT through objectively baseless personal injury claims.

85. Further, the predicate acts were continuous in that they occurred on a regular basis since 2000 and impacted at least seven different civil actions pending in four different court systems in West Virginia and Georgia.

86. Accordingly, the lawyer defendants' criminal acts of mail and wire fraud constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

87. Finally, although CSXT disputed the subject claims, it reasonably relied on the lawyer defendants' representations that the claims had *some* good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law.

88. By reason of the lawyer defendants' violations of 18 U.S.C. § 1962(c), CSXT was injured in its business and property. Specifically, the lawyer defendants' violations of § 1962(c)

caused CSXT to expend substantial money and resources to defend and settle the deliberately fabricated claims outlined in paragraph 60, and 71-75 that should never have been filed in the first place.

## COUNT 2: CIVIL RICO CONSPIRACY
## AGAINST THE LAWYER DEFENDANTS AND HARRON

89. That the Plaintiff realleges the allegations set forth in paragraphs 1 through 88 as if set forth verbatim herein.

90. As outlined above, beginning in the early to mid 1990s, the lawyer defendants and Harron (hereinafter collectively referred to as "the conspirators") entered into an agreement to conspire to violate 18 U.S.C. § 1962(c) by devising and implementing a scheme to defraud CSXT by fabricating, filing and prosecuting objectively baseless personal injury claims against it, including the nine claims described in paragraphs 60, and 71-75. At all relevant times, each conspirator knew of and participated in this scheme through specific overt acts intended to further its objective of defrauding CSXT.

91. Specifically, defendants Peirce and Raimond orchestrated and implemented the screening process outlined above, which they specifically intended to attract potential clients and manufacture false positive asbestosis diagnoses for them. *See Exhibit J* at p. 133, line 11-p. 135, line 23. In furtherance of this objective, they deliberately hired technicians and doctors such as Corbitt and Harron who they knew to be unreliable and whom they believed would maximize the likelihood of false positive diagnoses. *See Id.* and at p. 196, line 23-p. 197, line 3; *see also Exhibit F.* at p. 80, p. 80, lines 3-7 and *Exhibit E.*

92. Dr. Harron, in turn, agreed to read unusually high numbers of x-rays with reckless or deliberate disregard for their true content with the full knowledge that the lawyer defendants intended to file personal injury claims based on his diagnoses. Harron further

understood that the purpose of his diagnoses was to mislead CSXT and cause it to settle objectively baseless claims.

93. Further, the lawyer defendants agreed that one or all of them, particularly defendant Coulter, would cause personal injury claims to be filed based on these false diagnoses. Additionally, they each agreed to assist in the prosecution of these claims through the transmission of misleading communications to clients, participation in settlement negotiations with CSXT and other fraudulent means.

94. Finally, some or all of the lawyer defendants agreed to share the fees and settlement monies generated by the objectively baseless claims they manufactured and prosecuted. *See Exhibit J* at p. 24, line 7-p. 25, line 1.

95. The foregoing concerted conduct by the lawyer defendants and Harron constitutes a violation 18 U.S.C. § 1962(d). This violation caused CSXT to be injured in its business or property, specifically, by forcing CSXT to expend substantial money and resources to defend and settle the deliberately fabricated claims outlined in paragraphs 60, and 71-75 that should never have been filed in the first place.

## COUNT 3: COMMON LAW FRAUD AGAINST THE LAWYER DEFENDANTS

96. That the Plaintiff realleges the allegations set forth in paragraphs 1 through 95 as if set forth verbatim herein.

97. As previously explained, by filing or causing to be filed each of the nine fabricated personal injury claims described in paragraphs 60, and 71-75, the lawyer defendants represented to CSXT that there existed some good faith basis in fact for the claims when, in reality, they knew no such basis existed. Moreover, the lawyer defendants specifically intended CSXT to rely on these representations and settle the claims.

98. Although CSXT disputed the subject claims, it reasonably relied on the lawyer defendants' representations that the claims had *some* good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure and Professional Conduct and ultimately settled the claims.

99. As a proximate result of the lawyer defendants' intentional and fraudulent misrepresentations and CSXT's reasonable reliance thereon, CSXT suffered damages in the amount of the money it spent to defend and settle the fabricated claims.

**COUNT 4: CIVIL CONSPIRACY AGAINST
THE LAWYER DEFENDANTS AND HARRON**

100. That the Plaintiff realleges the allegations set forth in paragraphs 1 through 99 as if set forth verbatim herein.

101. The lawyer defendants and Harron agreed to combine through concerted action to unlawfully defraud CSXT as outlined in Counts 1, 2, and 3 above.

102. As a proximate result of this conduct, CSXT suffered damages in the amount of the money it spent to defend and settle the fabricated claims.

**BACKGROUND AND FACTS APPLICABLE TO THE MAY/JAYNE INCIDENT**

103. The Plaintiff realleges the allegations set forth in paragraphs 1 through 102 as if set forth verbatim herein.

104. The defendant Peirce Firm, initiates and prosecutes lawsuits against various railroad carriers, including CSXT, on behalf of current and former employees alleging various personal and occupational illnesses, including asbestosis.

105. The Peirce firm frequently utilizes a screening process to identify those current and former employees of CSXT who may present an asbestos claim against their employer.

106.  The information produced at these Pierce Firm sponsored and run screenings has been used in the litigation and settlement negotiations of thousand of asbestos claims brought by the Peirce firm on behalf of railroad workers against CSXT.

107.  Under case management orders implemented by the West Virginia Mass Litigation Panel, CSXT and the employees represented by the Peirce Firm were required to undergo an early mediation process in an attempt to settle most claims.

108.  Pursuant to this Order, the Court required the Peirce firm to produce various materials to CSXT prior to mediation.   These materials include a chest x-ray, a report from a radiologist and a questionnaire completed by the claimant providing CSXT with certain basic information about the claim. *See* Mediation Order Governing Railroad Cases dated September 6, 2001, attached hereto as *Exhibit HH*.

109.  Pursuant to these same orders, CSXT was required to rely upon the information submitted by the claimants and their attorneys as it was prohibited from engaging in its own discovery to ascertain if the allegations made by the claimants and their counsel were correct. *Id.* at ¶¶11, 13.

110.  On or about May 19, 1999, a CSXT employee named Danny Jayne attended and was examined at a screening for asbestosis conducted by the Peirce firm. At this screening, a chest x-ray was taken of Mr. Jayne.

111.  On or about July 6, 1999, Defendant Dr. Ray Harron, a radiologist retained by the Peirce firm, examined the x-ray of Mr. Jayne and issued a report noting irregularities that he asserted were consistent with asbestosis.

112.  As a result of the information produced at this screening, the Peirce firm filed a lawsuit pursuant to the Federal Employers' Liability Act, 45 U.S.C. §51, *et seq.*, on behalf of

Jayne and others styled, *Ronald Lee Abbott, et al., v. CSX Transportation, Inc.*, Civil

Action Number 00-C-64, filed on March 20, 2000, in Marshall County, West Virginia.

113.   Prior to November 14, 2002, pursuant to the Court's scheduling orders referenced above

the x-ray taken of Mr. Jayne at the 1999 screening was presented to CSXT by the Peirce

firm as part of a settlement package.

114.   On or about November 14, 2002, CSXT settled with Mr. Jayne as to his claims in *Ronald

Lee Abbott, et al., v. CSX Transportation, Inc.*, Civil Action Number 00-C-64, for the

sum of Seven Thousand dollars ($7,000.00).

115.   In early 2000, another CSXT employee, Ricky May, became aware of a screening for

asbestosis to be conducted by the Peirce firm on or about June 13, 2000 in Huntington,

West Virginia.

116.   Prior to this June 13, 2000 screening, Mr. May had previously attended an asbestosis

screening conducted by what is upon information and belief to be the Peirce firm and

tested negative for asbestosis.

117.   Prior to the June 13, 2000 screening Mr. May and defendant Robert Gilkison were

discussing the upcoming screening wherein Defendant Gilkison suggested to Mr. May

that he should get someone who had previously tested positive for asbestosis to sit for his

exam and thus be able to file a claim against CSXT.

118.   Per the instructions of defendant Gilkison, Mr. May asked Mr. Jayne to appear on his

behalf at the June 13, 2000 Peirce firm screening.

119.   Defendant Gilkison and Mr. May's sole purpose in asking Mr. Jayne to appear at the

asbestosis screening was to obtain a chest x-ray fraudulently to be used to support Mr.

May's asbestos claim.

120. Defendant Gilkison, Mr. May and Mr. Jayne did appear at the June 13, 2000 asbestos-screening exam conducted by the Peirce firm in Huntington, West Virginia.

121. At the June 13, 2000 screening defendant Gilkison was working on behalf of the Pierce Firm overseeing and assisting with the screening process and was thus acting as an employee, agent or representative of the Peirce firm.

122. At this exam Mr. Jayne with the assistance of Defendant Gilkison represented himself to be Mr. May for the purposes of obtaining a chest x-ray.

123. It is upon information and belief that Defendant Gilkison used his position as an investigator/runner and employee, agent and representative of the Peirce firm to facilitate Mr. May's fraud.

124. It is upon information and belief that the defendant Peirce firm employed various former railroad employees, including defendant Gilkison as runners/investigators and that Mr. Gilkison's purpose at the June 13, 2000 screening, was to facilitate the screening process.

125. By his own admission, defendant Gilkison was aware of the fact that Mr. Jayne was there to impersonate Mr. May and facilitated such impersonation.

126. Defendant Gilkison had prior knowledge of Mr. May's desire to have someone impersonate him for purposes of obtaining an x-ray as he had discussed the fraudulent scheme with Mr. May prior to his arrival at the screening.

127. It is upon information and belief that defendant Gilkison while working within the scope of his employment allowed Mr. May to complete various forms and authorizations for the release of information with knowledge that Mr. Jayne would be sitting for the x-ray exam.

128.    At no time during the course of this screening, or any other screening, did the employees of the Peirce firm require any participant, including Mr. Jayne and Mr. May, to show a valid drivers license or in any other way verify their identification.

129.    It is upon information and belief that these asbestosis screenings were conducted: (1) without sufficient protocols to ensure that the individuals attending the screening where in fact whom the individual claimed to be; (2) were run and directed by employees who had a financial incentive to get as many individuals as possible to the screenings; (3) were conducted in such a manner as to foster fraudulent claims against CSXT; and (4) that no steps were taken by the Peirce firm to ensure that true and accurate claims were being presented to CSXT.

130.    On or about July 23, 2000, Dr. Ray Harron read the x-ray represented to be that of Mr. May – but which in fact was an x-ray of Mr. Jayne -- and noted findings of irregularities that he asserted were consistent with asbestosis.

131.    It is upon information and belief that following being advised of the positive screening results that Mr. May approached defendant Gilkison as an employee of the Peirce firm and stated that he was having second thoughts regarding the fraud and requested that defendant Gilkison contact someone at the Peirce firm about dismissing his case.

132.    In fact defendant Gilkison admits that Mr. May told him of his conduct, but denies that he reported it as it could have cost the Peirce firm union business.

133.    It is upon information and belief that Defendant Gilkison did contact someone at the Peirce firm concerning Mr. May's fraudulent actions and his request to dismiss the case.

134.   Following this discussion between Defendant Gilkison and other employees or agents of the Peirce firm, the lawsuit was not dismissed but was further prosecuted by the Peirce firm and thus the Peirce firm did acquiesce, ratify and affirm the fraudulent conduct.

135.   As a result of the information produced at the June 13, 2000 screening, the Peirce firm filed a lawsuit pursuant to the Federal Employers' Liability Act, 45 U.S.C. §51, et seq., on behalf of Mr. May and others styled, *Charles Abbott et al., v. CSX Transportation, Inc.*, Civil Action Number 01-C-162M, filed August 1, 2001, in Marshall County, West Virginia.

136.   The x-ray produced at the June 13, 2000 Peirce firm screening, and purported to be that of Ricky May, was presented to CSXT on behalf of Mr. May by the Peirce firm as part of a settlement package.

137.   On December 31, 2002, CSXT settled with Ricky May as to his claims in *Charles Abbott et al., v. CSX Transportation, Inc.*, Civil Action Number 01-C-162M, for the sum of Eight Thousand dollars ($8,000.00).  CSXT did so, among other reasons, in reliance on the chest x-ray represented to be that of Ricky May, and without knowing that the x-ray was not that of Mr. May but was in fact the x-ray of Mr. Jayne.

138.   The x-ray provided by the Peirce firm on behalf of Ricky May in the settlement of his claims with CSXT did not accurately depict his physical condition because the chest x-ray was actually the x-ray of Mr. Jayne.

139.   Neither Mr. May, nor the defendants Gilkison or the Peirce firm disclosed to CSXT before or at the time of the settlement of Mr. May's claims that the x-ray offered on his behalf was in fact not his chest x-ray.

140.   CSXT was not aware of this deception, and could not reasonably have been aware of this deception, until years later.

141.   The two x-rays in question, taken at the two Peirce firm screenings referenced above, were compared scientifically.  Both have been determined to depict the same person, Mr. Jayne.

142.   At the time of the pendency of their lawsuits against CSXT, Mr. Jayne, Mr. May, Defendants Gilkison and the Peirce firm knew or should have known that CSXT would be required to rely upon the seemingly genuine facts presented in settlement packages, including the x-rays created at the Peirce firm screenings and provided to CSXT by the Peirce firm.

143.   It was, at all pertinent times, a matter of public record – documented in the Court's case management procedures referenced above -- that an x-ray was a precondition to mediation discussions regarding settlement of asbestos claims.

## COUNT 5: FRAUD AS TO DEFENDANT ROBERT GILKISON AS TO THE MAY/JAYNE INCIDENT

144.   The Plaintiff realleges the allegations set forth in paragraphs 1 through 143 as if set forth verbatim herein.

145.   It is upon information and belief that Robert Gilkison, an employee, agent or representative of the Peirce firm, was present in his official capacity at the June 13, 2000 screening.

146.   As described above it is upon information and belief that Robert Gilkison using his knowledge as an employee, agent or representative of the Peirce firm advised Mr. May of a scheme by which Mr. May would be able to assert a fraudulent asbestosis claim against CSXT.

147.   It is upon information and belief that Defendant Gilkison while working as an employee, agent or representative on behalf of the Peirce firm saw Mr. Jayne impersonating Mr. May and took no steps to stop such conduct from occurring and in fact actively encouraged the fraudulent conduct.

148.   It is upon information and belief that Defendant Gilkison talked with Mr. May at the June 13, 2000 screening exam concerning the alleged fraudulent scheme and took no steps to stop such conduct from occurring;

149.   It is upon information and belief that defendant Gilkison allowed Mr. May to fill out certain forms and authorizations for use in connection with a potential asbestos claim while allowing Mr. Jayne to sit for the x-ray at issue.

150.   Defendant Gilkison's fraudulent conduct was material to Plaintiff's decision to settle the asbestos claims brought by Mr. May in *Charles Abbott, et al. v. CSX Transportation, Inc.*

151.   CSXT relied on the false information produced by Mr. May at the screening in its decision to settle the asbestos claim brought on his behalf.

152.   The actions of the Defendants damaged plaintiff CSXT in the amount of the settlement entered with Ricky May; by incurring costs and expenses to discover the nature and the extent of this fraud; by incurring the costs of the defense of Mr. May's claim; by incurring costs and expenses to ascertain whether other claims presented by the Peirce firm on behalf of other FELA litigants are similarly fraudulent; and in other respects.

## COUNT 6: FRAUD AS TO THE PEIRCE FIRM AS TO THE MAY/JAYNE INCIDENT

153.   The Plaintiff realleges the allegations set forth in paragraphs 1 through 152 as if set forth verbatim herein.

154.    As noted above on June 13, 2000, the Peirce firm held an asbestos screening conducted

by their employees and agents to evaluate individuals employed by plaintiff CSXT for

asbestos exposure.

155.    Contractors employed by the Peirce firm administered x-rays to those in attendance to

enable the Peirce firm to determine whether or not the individuals examined presented a

potential claim related to asbestos exposure.

156.    Current and former CSXT employees were made aware of the screening conducted by

the Pierce Firm through newspaper advertisements, the Peirce firm's website, and direct

mailings based on union membership lists.

157.    As noted above, Mr. May learned of the screening and, upon the advice of the Peirce

firm's employee, Robert Gilkison, sent Mr. Jayne to the screening to pose as him for

purposes of obtaining a positive x-ray result in hopes of pursuing litigation against CSXT.

158.    As the party organizing the screening for the purpose of obtaining clients for litigation

against Plaintiff, the Peirce firm was in the position to ensure that the persons evaluated

at the screening were who they purported to be and had a duty to do so.

159.    Despite this opportunity for the Peirce firm to know of the fraud on the part of their

clients, Mr. Jayne, claiming to be Mr. May, was able to participate in the screening

conducted by employees and agents of the Peirce firm and to create false information

used by Mr. May in his claims against CSXT.

160.    It is upon information and belief that defendant Gilkison, who at the time was an

employee of the Peirce firm and present at this exam as part of his employment duties,

was aware that Mr. Jayne was sitting for Mr. May's x-ray and took no steps to stop such

fraudulent behavior from continuing.

161.    It is upon further information and belief that defendant Gilkison as part of his employment duties for the Peirce firm assisted Mr. May and Mr. Jayne in perpetrating this fraud upon CSXT by having and/or allowing Mr. May to fill out certain documents and authorizations while knowing that Mr. Jayne was sitting for the x-ray.

162.    Without the acquiescence and participation of defendant Gilkison as an employee, agent or representative of the Peirce firm Mr. May's fraudulent scheme would not have succeeded.

163.    By virtue of defendant Gilkison's employment with the Peirce firm his actions and knowledge are imputed to his employer as he was working within the scope of his employment, agency or representation when the fraudulent activity occurred and the Peirce firm is therefore liable for his misconduct.

164.    The Peirce firm in conducting these screenings knew that any information generated on the potential plaintiffs would be used in subsequent litigation against CSXT and would furthermore be relied upon by CSXT in the handling of claims and in settlement negotiations.  In fact, the Peirce firm's sole purpose for conducting these screenings was to create information for use in claims that it would bring against CSXT.

165.    In generating the information to be used by CSXT in handling its claims, the Peirce firm was under a duty to ensure that the information collected was genuine, especially given CSXT's inability to participate in discovery.

166.    In spite of this duty and the opportunity to ensure the validity of the information created at the screening, the Peirce firm through its employee, agent or representative defendant Gilkison, allowed Mr. Jayne to pose as Mr. May.

167.    Due to the information obtained at the screening, the Peirce firm accepted Mr. May as a client, filed an action on his behalf against Plaintiff, and sent the fraudulent information to CSXT, representing that it was genuine.  Further, after being advised of the fraudulent conduct of Mr. May and Defendant Gilkison the Peirce firm ratified and acquiesced in the fraudulent scheme to the detriment of the Plaintiff.  The end result of this conduct was the settlement of the claim against CSXT from which funds the Peirce firm accepted a portion as attorneys' fees.

*168.*    Plaintiff CSXT relied on the false representations of the Peirce firm in negotiating and entering into the settlement agreement dated November 13, 2002 in *Charles Abbott, et al., v. CSX Transportation, Inc.*

169.    CSXT was reasonable in relying on the misrepresentations of the Peirce firm because the Peirce firm had inundated CSXT with thousands of asbestos claims including Mr. May's group of more than 900 claimants and Mr. Jayne's group of over 2000 plaintiffs.

170.    Under the circumstances created by the Pierce Firm, it would have been impossible for plaintiff CSXT to investigate each claim on an individual basis.

171.    It was reasonable for CSXT to rely on the medical information created at the screenings initiated and controlled by the Peirce firm and/or their agents and employees.

172.    The Plaintiff had no reason to believe that the information was not what the Peirce firm represented it to be because the information was created by professionals who compiled a report for each individual's x-rays.  This report was provided to the Peirce firm, which then sent the report to CSXT as part of its settlement package.

173.   CSXT had no other mechanism by which to assess the validity of the claims presented as at the time Mr. May's case was presented CSXT was under a Court order prohibiting any independent investigation on its behalf as to the validity of the claims.  *See Exhibit HH.*

174.   As noted above, Mr. May had previously attended an asbestosis screening, conducted by what is upon information and belief the Peirce Firm, and tested negative for asbestosis.

175.   It is upon further information and belief that the Peirce firm keeps records of both its positive and negative screening applicants and that due to this record keeping knew or should had known that Mr. May had been through their screening process before and knew or should have known that the x-ray presented by Mr. May was not his own x-ray.

176.   Plaintiff CSXT was damaged by the false and material misrepresentations of the defendant Peirce firm in the amount of the settlement entered with Mr. May.  Further, CSXT was injured by the inclusion of such a known meritless action, which helped to create the mass of litigation that lead to an environment wherein Plaintiff was forced to settle several actions without the opportunity to adequately investigate each individual claim on its merits.

177.   All of the above injuries to CSXT inured to the benefit of the Peirce firm in the form of attorney fees.

178.   The actions of the Defendants damaged plaintiff CSXT in the amount of the settlement entered with Ricky May; by incurring costs and expenses to discover the nature and the extent of this fraud; by incurring the costs of the defense of Mr. May's claim; by incurring costs and expenses to ascertain whether other claims presented by the Peirce firm on behalf of other FELA litigants are similarly fraudulent; and in other respects.

## COUNT 7: PUNITIVE DAMAGES AS TO ALL DEFENDANTS

179.   That the Plaintiff realleges the allegations set forth in paragraphs 1 through 178 as if set forth verbatim herein.

180.   That the Defendants' conduct toward the Plaintiff was intentional, willful, wanton, malicious, and reckless and justifies an award of punitive damages.

**WHEREFORE**, Plaintiff CSX Transportation, Inc. respectfully requests:

1.   That the Court award it a) compensatory damages jointly and severally against the Defendants in an amount sufficient to fully compensate Plaintiff for the injuries sustained as a result of Defendants' fraudulent conduct, b) fees and expenses including attorney fees incurred in the defense of all of the fraudulent claims filed by the Peirce firm, and c) fees and expenses including attorney fees incurred in the previous prosecution of Ricky D. May and Daniel L. Jayne for their actions as described above;

2.   That the Court award it punitive damages in an amount sufficient to deter the Defendants and others from engaging in this conduct in the future;

3.   That CSX Transportation, Inc. recover its court costs and attorney's fees incurred in the preparation and prosecution of this action;

4.   That CSX Transportation, Inc. be awarded treble damages and attorney's fees pursuant to 18 U.S.C. 1964(c).

5.   That CSXT be awarded the costs for establishing a system or protocol to be implemented to ascertain if all other claims filed by the Defendant Peirce firm were in fact for the employee that was actually claiming injury, including the designing and implementation of a program by which each x-ray ever submitted

by the Defendant Peirce firm is compared against every other x-ray to determine if in fact the scheme described above has occurred on other instances and to ensure that the other settlements with litigants represented by the Peirce firm were not fraudulently obtained; award such other and further relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**

        **CSX TRANSPORTATION, INC.**

        By _Marc E. Williams_
            Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
J. David Bolen, Esquire
**HUDDLESTON BOLEN LLP**
611 Third Avenue
P.O. Box 2185
Huntington, WV  25722-2185
(304) 529-6181 (telephone)
(304) 522-4312 (facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

CSX TRANSPORTATION, INC.,

Plaintiff,

v.                                                     Civil Action No. 5:05-CV-202

ROBERT V. GILKISON;
PEIRCE, RAIMOND & COULTER,
P.C., a Pennsylvania Professional Corporation a/k/a
ROBERT PEIRCE & ASSOCIATES, P.C., a Pennsylvania
Professional Corporation; and JOHN DOES

Defendant.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he served the foregoing "*Amended Complaint*" upon the following via electronic filing with the Court's CM/ECF system on the 5th day of July, 2007:

Honorable Frederick P. Stamp, Jr., District Judge
USDC for the Northern District of WV
P. O. Box 791
Wheeling, WV  26003

Daniel R. Schuda, Esquire
**SCHUDA & ASSOCIATES, PLLC**
232 Capitol Street, Suite 200
P.O. Box 3425
Charleston, WV 25335-3425

Stanley W. Greenfield, Esquire
**GREENFIELD & KRAUT**
1040 Fifth Avenue
Pittsburgh, PA 15219

Walter P. DeForest, Esquire
**DEFOREST KOSCELNIK**
 **YOKITIS & KAPLAN**
3000 Koppers Building
Pittsburgh, PA  15219

John E. Gompers, Esquire
**GOMPERS, McCARTHY & McCLURE**
60 Fourteenth Street
Wheeling, WV  26003

