**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:05-cv-202 |
| | ) | |
| ROBERT V. GILKISON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CSX TRANSPORTATION, INC.'S MOTION *IN LIMINE* TO EXCLUDE**
**EXPERT TESTIMONY FROM DOCTOR ARTHUR L. FRANK, M.D.**

Comes now Plaintiff, CSX Transportation, Inc. ("CSXT"), by and through its counsel,

pursuant to Federal Rules of Evidence 403 and 702 and submits this Motion to *In Limine* to

Exclude Expert Testimony From Arthur L. Frank, M.D.

**INTRODUCTION**

To justify their conduct in this case, the Lawyer Defendants selected a medical expert,

Dr. Arthur Frank, whose own opinions in asbestos litigation were recently excluded for being

"**scientifically incoherent**" and based on "**no recognizable methodology**." *See In re Asbestos*

*Litig., Certain Asbestos Friction Cases Involving Chrysler LLC* (hereinafter "*In re Asbestos*

*Litig.*"), Oct. Term No. 0001 at 53-54 (Pa. Ct. Common Pleas, Phila. Sept. 24, 2008) (emphasis

added) (Exhibit 1).  In his report and deposition testimony in this case, Dr. Frank lived up to his

reputation for offering *ipse dixit* opinions and observations beyond his training and expertise.

In particular, three aspects of Dr. Frank's testimony should be excluded.  First, Dr.

Frank's opinions about the reasonableness of the Lawyer Defendants' actions are inadmissible

because he is not qualified to opine on the reasonableness of attorney conduct and his opinions

lack any reliable basis in fact.  Second, Dr. Frank's opinions concerning CT scans are

inadmissible because, by Frank's own admission, he is untrained and unqualified to render such opinions and, in any event, they are unreliable. Third, Dr. Frank's ultimate conclusion – "that it is not unreasonable for a physician to reach a conclusion that Mr. Baylor *could be thought to have developed* asbestosis" – is inadmissible because it is unreliable (i.e., based on "**no** recognizable methodology" whatsoever) and, more fundamentally, meaningless expert-speak that is not helpful to the trier of fact. (*See* Frank Expert Report (April 2, 2009) at 1 (Exhibit 2).)

## ARGUMENT

Pursuant to Rule 702 of the Federal Rules of Evidence, testimony based on scientific, technical or other specialized knowledge is admissible only if it is:

> 1) based upon sufficient facts or data;
> 2) the product of reliable principles and methods; and,
> 3) the reliable application of the principles and methods to the facts of the case.

It is the obligation of trial courts to act as "gatekeepers" to "ensure that any and all scientific testimony is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Expert opinion is reliable only when "the reasoning or methodology underlying the testimony is scientifically valid" – courts must guard against "subjective belief or unsupported speculation." *Id.* at 590-94. "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should be excluded. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)).

Although the Supreme Court in *Daubert* outlined four guidelines for assessing reliability – (1) whether the theory can be (and has been) tested empirically; (2) whether the theory has been published or subjected to peer review; (3) the known rate of error and the standards which control the technique's operation; and (4) whether the theory is generally accepted, *Daubert*, 509

U.S. at 593-94, the inquiry is "flexible" and a trial court enjoys broad discretion. *See Kumho Tire*, 526 U.S. at 141-42; *see also Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995). Ultimately, the objective is to "make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Cooper*, 259 F.3d at 200 (quoting *Kumho Tire*, 526 U.S. at 152). The "particular factors will depend upon the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

Expert opinion also must "fit" the facts of the case, i.e., be "helpful" to the trier of fact. *Daubert*, 509 U.S. at 591. In this regard, the Fourth Circuit has observed:

> In determining whether the evidence meets the second prong of the [*Daubert*] test – that is, whether the evidence will be helpful to the trier of fact – the Supreme Court warned that throughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as FRE 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

*United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995). In the Supreme Court's own words:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert*, 509 U.S. at 595 (citations omitted). "[P]roffered expert evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261.

Importantly, the "proponent of the proposed expert testimony must establish its admissibility by a preponderance of proof." *Bourne v. E.I. DuPont De Nemours & Co.*, 189 F. Supp. 2d 482, 494 (S.D. W. Va. 2002). As will be explained in greater detail below, the Lawyer Defendants cannot meet this burden because Frank's legal and medical opinions are (1)

unreliable, (2) largely beyond his expertise and based on insufficient facts, and (3) unhelpful to the trier of fact.

## I.   DR. FRANK SHOULD NOT BE PERMITTED TO OFFER LEGAL OPINIONS BECAUSE THEY ARE BEYOND HIS EXPERTISE AND NOT BASED ON SUFFICIENT FACTS.

Dr. Frank's legal opinion – that the Lawyer Defendants acted reasonably in filing Mr. Baylor's suit – must be excluded for two reasons. First, he is not qualified to assess the propriety of lawyer conduct. Second, even if he were qualified, his opinion is pure conjecture without any reliable basis in fact.

### A.   As a medical doctor with no legal training, Frank is not qualified to opine on the reasonableness of lawyer conduct.

Whether a witness is qualified as an expert "can only be determined by the nature of the opinion he offers." *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984). An expert witness "must have 'knowledge, skill, experience, training or education' **in the subject area in which he intends to testify**." *Foster v. Legal Sea Foods, Inc.*, 2008 U.S. Dist. LEXIS 57117, *28 (D. Md. 2008) (quoting Fed. R. Evid. 702) (emphasis added); *see also Goodwin v. MTD Prods.*, 232 F.3d 600, 609 (7th Cir. 2000) (holding that "engineer was not qualified to give an expert opinion concerning the nature, scope, or cause of an eye injury" because he had "neither a medical degree nor any medical training, and an individual with a degree in mechanical engineering is not qualified to give expert testimony on medical questions, including the cause of an eye injury").

Dr. Frank opines that he "would not find it unreasonable for an attorney to proceed with a case with the history as we have in the case of Mr. Baylor." (Exhibit 2 at 1.) In his report and deposition testimony, Frank offered any number of similar conjectures about the propriety of attorney conduct. (*See, e.g., id.* at 2 ("[I]t would not seem unreasonable to me that an attorney

might proceed with the case of Mr. Baylor based upon the findings."); Frank Dep. 62:18-21 (April 23, 2009) (Exhibit 3) ("[I]n the best interest of his client [a lawyer] better file a lawsuit if that's what the client comes to him for some kind of restitution or help with his medical bills or whatever."); 145:14-16 ("[T]he legitimacy of proceeding with a lawsuit on the basis of two positive x-ray readings seems appropriate."); 146:24-25 ("[T]he lawyers should proceed with filing the case . . .").)

By his own admission, Frank – a medical doctor who focuses in occupational medicine (*see* Exhibit 3 at 101:24–25) – is not qualified to render any such opinions.  Frank repeatedly stated – and indeed, took pains to note – that he is not trained as a lawyer and is not qualified to make legal judgments:

- "I'm certainly not a lawyer and can't make legal judgments." (*Id.* at 19:7-8.)

- "My expertise is not in the law." (*Id.* at 23:19-20.)

- "I'm not a lawyer.  I don't know what legal malpractice would be." (*Id.* at 143:25-144:2.)

- "I can't speak for how lawyers file cases." (*Id.* at 115:14–16.)

Likewise, as one might expect, Frank's curriculum vitae contains no references to legal training of any sort.  (*See* Arthur L. Frank, M.D. Curriculum Vitae (Exhibit 4).)   Under such circumstances, the plain language of Rule 702 mandates that Frank's suppositions be excluded. *See* Fed. R. Evid. 702 (requiring that an expert be qualified by "knowledge, skill, experience, training, or education").   Indeed, one district court in the Fourth Circuit has held that "[i]t is **incredulous to argue** that [a witness] is an expert in [a particular field] in light of her unambiguous statement" that she is not so qualified.  *Scott v. Mid-Atlantic Cable, Installation, LLC*, 2006 U.S. Dist. LEXIS 50767, *8 (E.D. Va. 2006) (emphasis added).  Such is the case here with Dr. Frank, who admits the he "can't make legal judgments."

Unable to escape the fact that Dr. Frank has no legal training or expertise whatsoever, counsel for the Lawyer Defendants contends that Frank should be permitted to testify that he has seen asbestosis cases filed based on evidence purportedly "similar" to Mr. Baylor's – in other words, testify based on his "experience" as a professional expert for hire.  However, this argument fails for two reasons.  First, there is nothing in the record to indicate that the "literally thousands of . . . legal cases," (*see* Exhibit 2 at 1), in which Dr. Frank has served as a paid expert were substantially or even remotely similar to the circumstances of Baylor's claim, i.e., based on:

- Falsified work histories;

- Black market x-rays taken in violation of state law; and,

- Fraudulent B reads manufactured in violation of all known standards and at rates in excess of all known epidemiological evidence.

Second, and more fundamentally, while Dr. Frank may have factual knowledge as to the type of evidence certain lawyers apparently relied on when filing asbestosis claims, he is not qualified to opine whether such conduct was "reasonable" or "unreasonable," as that determination necessarily depends on ethical, procedural and legal standards beyond Frank's expertise.  *See, e.g., Azarkhish v. Office of Pers. Mgmt.*, 915 F.2d 675, 680 (Fed. Cir. 1990) ("[B]ecause they concerned capability to understand and act on legal matters, [the opinions] were beyond the expertise of the physician and psychiatrist, whose expertise is limited to matters within a reasonable degree of medical certainty.").  Accordingly, Frank's legal opinions, no matter how defense counsel characterizes them, must be excluded.

B.     Frank's legal opinion is not based on sufficient facts because he did not assess the evidence Peirce possessed on Mr. Baylor at the time of suit.

Even assuming that Dr. Frank's history as a paid medical expert qualifies him as an expert on legal standards, an unreasonable assumption to be sure, his opinions must nevertheless

be excluded because they are not based on sufficient facts. *See* Fed. R. Evid. 702 (expert testimony must be based on "sufficient facts and data"). Indeed, if Dr. Frank wishes to opine that the Lawyer Defendants acted reasonably in bringing Baylor's suit, or even that he has seen suits filed based on "similar" evidence, he must – **at a minimum** – have an understanding as to what evidence Peirce possessed on February 21, 2006. However, consistent with his history of ignoring the need for discernable methodologies, Dr. Frank made no attempt to ascertain what evidence Defendant Peirce possessed at the time Baylor's suit was filed. At deposition, Dr. Frank conceded that he didn't "know what was available to [the Lawyer Defendants] on what dates" and further stated, "Frankly, I don't even know what date they filed the lawsuit." (Exhibit 3 at 85:2-8.) Given Frank's admitted lack of knowledge about the information the Lawyer Defendants possessed, he cannot reliably opine whether the Lawyer Defendants were justified in pursuing the case and any such testimony must be excluded. *See, e.g., Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 U.S. Dist. LEXIS 55727, *16 (S.D. W. Va. 2008) ("The Court is not required to accept expert opinions not 'based on sufficient facts'. . ."); *Bridgeman v. Deere & Co.*, 2009 U.S. Dist. LEXIS 57250, *14-18 (E.D. Va. 2009) (excluding opinion as "not based upon sufficient data" where expert failed to consider intervening accident); *Payne v. Wyeth Pharms., Inc.*, 2008 U.S. Dist. LEXIS 106771, *14-15 (E.D. Va. 2008) (opinion not based on sufficient facts where expert was only "provided a small selection of Plaintiff's voluminous medical records").

## II.   DR. FRANK SHOULD NOT BE PERMITTED TO OFFER OPINIONS CONCERNING CT SCANS BECAUSE HE ADMITS HE IS NOT QUALIFIED TO DO SO AND ANY SUCH OPINIONS ARE UNRELIABLE.

Although Dr. Frank is wholly unqualified to interpret Mr. Baylor's CT scan, the Lawyer Defendants asked him to review it subsequent to the issuance of his report and – based on

discussions at the meet and confer conference – apparently will seek his opinions about the CT scan at trial. At deposition, Dr. Frank offered an interpretation of the CT that differs significantly from the evidence possessed by Peirce when he filed the Baylor suit. (*See, e.g.*, Exhibit 3 at 29:5–11 ("What I did notice on [the CT scan] were what I thought were several potential areas of pleural thickening that I saw bilaterally."); 95:14–15 ("The CT to me looks like there are some pleural changes there").) In spite of Dr. Frank's willingness to offer expert opinions on topics beyond his expertise, there can be no question that Rule 702 bars his opinions about Mr. Baylor's CT scan and CT scans in general.

A.   Frank admits he is not trained or qualified to interpret Baylor's CT scan.

Under oath, Dr. Frank repeatedly qualified his opinions by admitting his lack of expertise in CT interpretation:

- "[I] would leave a more appropriate reading of the CT to people who have had the proper training and experience to do so." (Exhibit 3 at 29:9-11.)

- "I've never been properly trained in a manner that I would rely upon my own readings to make diagnostic judgments." (*Id.* at 28:19–21.)

- "[I] would not want to be responsible for a proper conclusion about CT readings." (*Id.* at 29:2–4.)

- "I'm not a trained experienced CT reader . . ." (*Id.* at 33:10.)

The technology for CT scans did not even exist when Frank received his medical training and his lack of CT training since that time is not in dispute. (*See id.* at 28:17–22.) More fundamentally, Dr. Frank explicitly stated at deposition that he would not be able to offer CT interpretations with a reasonable degree of medical certainty. (*See id.* at 95:16–25.)

Accordingly, as in *Scott*, "it is incredulous to argue" that Frank should be permitted to interpret Mr. Baylor's CT scan when Frank "unambiguously" admits that he is not qualified to do so. *See* 2006 U.S. Dist. LEXIS 50767 at *8. Indeed, given that Frank would not "rely upon

[his] own readings to make diagnostic judgments," it defies logic to contend that he should nevertheless be permitted to offer those judgments to the jury in this case. Quite to the contrary, Frank's failure to "employ in the courtroom the same methods that he employs in his own practice provides further support for the . . . conclusion that his testimony [is] unreliable." *Cooper*, 259 F.3d at 203 (citing *Kumho Tire*, 526 U.S. at 152).

   B. <u>Any other opinions Frank may offer concerning CT scans are unreliable.</u>

   Because Frank admits he has no training or expertise with respect to CT scans, he should not only be precluded from interpreting Mr. Baylor's CT, but also from offering opinions regarding CT scans in general. Indeed, the mere fact that a witness may have some general type of expertise, whether it be medicine or engineering or otherwise, does not automatically qualify he or she as an expert in every facet of that field. *See Baldauf v. Davidson*, 2007 U.S. Dist. LEXIS 53925, *9 (S.D. Ind. July 24, 2007) ("Merely possessing a medical degree does not qualify its holder as an expert in all medically related fields."); *Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994) ("A divorce lawyer is no more qualified to opine on patent law questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert."); *Doe v. Am. Med. Sys.*, 96 Fed. Appx. 758, 759 (2d Cir. 2004) (although expert had "substantial engineering credentials," excluding opinions as to particular device where "involvement" with it "almost exclusively consists of his work as an expert witness").

   Moreover, even putting aside Dr. Frank's lack of qualification regarding CT scans, or perhaps precisely because of it, he is simply incapable of offering reliable opinions on this topic. Rather, his testimony constitutes "nothing more than *ipse dixit* – bare conclusions without reliable support." *Stolting v. Jolly Roger Amusement Park, Inc.*, 37 Fed. Appx. 80, 83 (4th Cir. 2002).

For instance, Dr. Frank seeks to opine that Mr. Baylor's screening x-rays were "better, or at least as good as CT scans for the assessment of parenchymal changes" – i.e., where asbestosis occurs in the lung – even though he acknowledges **the generally accepted scientific consensus is that CT scans are better than x-rays for the diagnosis of asbestosis**. (*See* Exhibit 2 at 1; Exhibit 3 at 36:16-19; 63:14-17.) Frank admits that he has never personally studied or tested his theory concerning x-rays and CTs, nor can he point to any published literature that supports it. (*See* Exhibit 3 at 33:12-36:11.) Rather, his opinion is based solely "**upon [his] own experience which is, in fact, somewhat limited**." (*Id.* at 32:11–24 (emphasis added).) Dr. Frank's response to the literature indicating that CT scans are superior to x-rays is illustrative:

> **If I did more research on the topic, I might end up agreeing with that specific part of it. Then again, I can't really comment on this. I don't have enough experience with HRCTs [high resolution CT scans, like Baylor's] or CTs to tell you this statement is one I can or can't agree with.** I have to take it as their view, but just because the American Thoracic Society has a consensus statement that doesn't mean I agree with every aspect of it. **I just don't know enough to have enough professional experience to mention or discuss intelligently that last sentence I read if it's correct or not.**

(*Id.* at 64:24-65:18 (emphasis added).) Frank also opines in his report that "there seems to be as much variability" in reading CT scans as in reading chest x-rays, but again concedes that he is not "aware of that being reported anywhere" and "it's not an area [he has] studied." (*Id.* at 37:8-17.)

Simply put, "A court will not credit an expert witness who testifies to no customs of the trade, refers to no literature in the field, and does not identify relevant principles, but merely gives his own subjective opinion," which is exactly what Frank has done (or failed to do) here. *Foster*, 2008 U.S. Dist. LEXIS 57117 at *30; *see also Holesapple v. Barrett*, 5 Fed. Appx. 177, 180 (4th Cir. 2001) (holding that "making an 'opinion' judgment based entirely on what he considers to be his experience, together with having reviewed the depositions . . . presents an

almost perfect example of an *ipse dixit* opinion"); *C&O Motors Inc. v. GMC*, 2007 U.S. Dist. LEXIS 54388, *16 (S.D. W. Va. 2007) ("At his deposition, Walker acknowledged that he did not rely on any treatises, expert reports, or books in formulating his lost profits analysis . . . it is quite plain that Walker's method . . . fails to comport with *Daubert*."). Frank's opinions concerning CT scans do not comport with **any** of the *Daubert* factors or any other indicia of reliability and, as such, must be excluded. *See* 509 U.S. at 593-94.

### III.   FRANK'S ULTIMATE MEDICAL OPINION – "THAT IT IS NOT UNREASONABLE FOR A PHYSICIAN TO REACH A CONCLUSION THAT MR. BAYLOR *COULD BE THOUGHT TO HAVE DEVELOPED ASBESTOSIS*" – IS MEANINGLESS, UNHELPFUL AND UNRELIABLE.

As an initial matter, it is important to note the opinions that Dr. Frank will **not** be offering in this case. First, Dr. Frank will not be opining that Mr. Baylor *actually has* asbestosis. (*See, e.g.*, Exhibit 3 at 25:19-20 (emphasis added) ("Again, I – **I didn't say that he had asbestosis**."); 112:18-113:8 (stating that he would be unwilling "to testify to a reasonable degree of medical certainty that Mr. Baylor has asbestosis" based on the medical evidence in Peirce's possession at time Baylor's suit was filed).) Second, he will not be opining that it would be reasonable for another physician to *actually diagnose* Mr. Baylor with asbestosis – in other words, for a physician to conclude that asbestosis is the *probable*, rather than merely a *possible*, cause of Baylor's symptoms. In fact, Dr. Frank will not even opine that Mr. Baylor's June 11, 2003 screening x-ray evidences asbestosis at a 1/0 profusion as Harron and Breyer concluded. To the contrary, Frank classified the film as a 0/1, i.e., **negative** for pneumoconiosis. (*See id.* at 89:12-15.) Nor will Frank opine that Harron is a reasonable or reliable B reader. (*Id.* at 87:7-88:17.) Again, quite to the contrary, Frank explicitly testified that he personally would **not** rely on Harron's B reads today. (*Id.*)

A.      Frank's medical opinion is meaningless and unhelpful to the trier of fact.

Unable or unwilling to offer any of the foregoing opinions, which might actually be of consequence in this case, Dr. Frank instead opines "that it is not unreasonable for a physician to reach a conclusion that Mr. Baylor *could be thought to have developed* asbestosis." (Exhibit 2 at 1 (emphasis added); *see also*, *e.g.*, Exhibit 3 at 99:6-8) (emphasis added) ("[I]t's not unreasonable to think that the diagnosis for asbestosis *should be entertained*.").) **This opinion is meaningless**.  In effect, Frank is saying it would not be unreasonable for a physician to conclude that asbestosis *might* be – one of many – *possible* explanations for Baylor's symptoms.  (*See*, *e.g.*, Exhibit 3 at 25:19–26:7 ("I didn't say that [Mr. Baylor] had asbestosis.  I simply said . . . the findings on the PFTs were consistent with asbestosis . . . That would not exclude other causes.") 26:8-9 (acknowledging that "restrictive [lung] findings could be consistent with many other factors").)  Aside from being facially suspect in light of Frank's own refusal to opine that Baylor actually has asbestosis, *see Myers v. Reason*, 2007 WL 445347 (N.D. W. Va. 2007) (Stamp), this "opinion" simply is not helpful to the trier of fact in this case.  **The relevant question is not whether a reasonable doctor might have *considered* asbestosis, but rather whether a reasonable doctor might have *settled* on asbestosis as the most likely diagnosis for Mr. Baylor in 2006.**  As the Supreme Court explained in *Daubert*, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility," which is absent with respect to Frank's oddly-worded opinion here.  509 U.S. at 591-92.

The inadmissibility of Frank's "possibility thesis" is reinforced by Fourth Circuit case law questioning or excluding expert causation opinions which speak to mere possibilities rather than reasonable probabilities.  *See*, *e.g.*, *Miller v. Mandrin Homes*, Ltd., 305 Fed. Appx. 976, 980

(4th Cir. 2009); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972-74 (4th Cir. 1990); *Heaps v. General Motors Corp.*, 2006 U.S. Dist. LEXIS 95876, *14–15 (D. Md. 2006). In *Heaps*, the court excluded the plaintiff's expert ("Mr. Turner")'s opinion regarding the alleged defective condition of the plaintiff's car, reasoning:

> [T]he opinion offered by Mr. Turner is speculative. Instead of opining that the car's intermittent failure to start *is* indicative of a manufacturing defect, Mr. Turner opines that this condition 'can be indicative of a defect in materials and workmanship.' . . . **By merely opining that it is *possible* that Plaintiff's car is defective, Mr. Turner is engaging in speculation and conjecture with respect to whether the car is *in fact* defective. As a result, Mr. Turner's opinion would not assist the trier of fact to understand the evidence in this case or to determine facts in issue.**

*Heaps*, 2006 U.S. Dist. LEXIS 95876 at *14–15 (emphasis added). Similarly, this Court recently excluded medical causation testimony where the expert dismissed alternative diagnoses while refusing to offer any diagnostic opinion of his own. *See Myers*, 2007 WL 445347 at *1.

Frank's opinion in this case bears marked similarity to the speculations excluded in *Heaps* and *Myers*. Frank opined in his report that "it is not unreasonable for a physician to reach a conclusion that Mr. Baylor *could be thought to* have developed asbestosis." (Exhibit 2 at 1.) Like the experts in *Heaps* and *Myers*, Frank never stated – and in fact, expressly disclaimed – that *he* believes, with a reasonable degree of medical certainty, that Baylor *did* develop asbestosis in 2006. *See, e.g.*, Myers, 2007 WL 445347 at *1 (granting motion to "prohibit Dr. Dave David from testifying that plaintiff . . . did not have endometriosis . . . because Dr. David was unable to give such an opinion in response to a direct question in his deposition."). "By merely opining that it is *possible* that" a doctor might have considered a diagnosis of asbestosis, Frank "is engaging in speculation and conjecture with respect to whether [Baylor] *in fact*" had asbestosis and whether a doctor would in fact have diagnosed the same. *See Heaps*, 2006 U.S. Dist. LEXIS 95876 at *14-15. Frank's doublespeak speculation is not only unhelpful, but

potentially bewildering to the trier of fact and should be excluded under Rules 702 and 403. *See Westberry*, 178 F.3d at 261 ("[P]roffered expert evidence that has a greater potential to mislead than to enlighten should be excluded.").

      B.    <u>Frank's methodology, to the extent discernible at all, is unreliable.</u>

      Aside from being irrelevant and unhelpful, Frank's "possibility thesis" presents yet another fundamental problem – how does one assess the methodology used to render an opinion that is not really an opinion at all? For instance, there are well-established standards with respect to the rendering of actual medical diagnoses, *see Cooper*, 259 F.3d at 200, but Frank offers no such diagnosis in this case. Rather, he simply opines as to what some hypothetical doctor might reasonably conclude is a *possible* diagnosis among many. This is essentially an un-testable hypothesis, which renders it highly suspect, if not *per se* inadmissible. Indeed, where "the court cannot definitively conclude that th[e] technique or theory can be or has been tested," expert opinion does not even "offer itself to formal challenge," but rather must be excluded as "simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." *Hoffman v. Monsanto Co.*, 2007 U.S. Dist. LEXIS 77975, *13 (S.D. W. Va. 2007). Such is the case with Frank's medical opinion here – it cannot be admitted when the only evidence of its reliability is Frank's own *ipse dixit*. *See, e.g., Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005) ("We are not obliged to credit [an expert's] say-so supporting his own reliability."). Moreover, even as Frank attempts to insulate his ultimate opinion from methodological scrutiny, it is clear that each step on which it relies is not based on sound science or reliable principles. The three most glaring examples are discussed below.

1.   <u>There is no basis whatsoever for Frank's decision to completely "ignore" Baylor's negative CT scan in formulating his opinion that it "would not be unreasonable" for some hypothetical doctor (other than himself, who expressly disavows any diagnostic opinions in this case) to conclude that Baylor "could be thought to have asbestosis."</u>

Frank's medical opinion necessarily hinges on his contention that it is appropriate to "ignore" Mr. Baylor's negative CT findings in rendering a diagnosis:

> Q: My question is whether it is appropriate to ignore that CT scan in diagnosing Mr. Baylor?
>
> A: I think it can be ignored if you have two reports of plain chest films that were read, you know separately from each other . . . two different radiologists or "B" readers who gave a reading. I think in good faith, you could say I'm going to take that over a CT scan.

(Exhibit 3 at 151:3-13.) However, when asked whether he could point to "any peer-reviewed literature to support the opinion" that it is appropriate to diagnose asbestosis in the face of a completely normal CT scan, Frank responded quite plainly: "**No, I can't because I don't know**." (*Id.* at 82:8-20 (emphasis added).) This is the very antithesis of "scientific knowledge" as envisioned by the Supreme Court in *Daubert*. *See* 509 U.S. at 589-90 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."). Indeed, not only did Frank "ignore" modern high resolution diagnostic imaging which the scientific community deems superior to plain film x-rays for diagnosing asbestosis, he cannot point to a single authority which supports this purported "methodology."

Moreover, Frank's litigation-driven opinion that it is appropriate to "ignore" high resolution CT imaging when diagnosing asbestosis appears to be contrary to his own clinical practice. Frank testified that a CT would be useful when "coming at this from the one on one perspective where he as a practicing chest doctor has a patient in front of him who says, I need to

[be] really, really sure that this is or isn't asbestosis; I'm going to do another test." (Exhibit 3 at 77:4–16.) Frank further acknowledged that experienced x-ray readers can disagree "and a CT may help you sort it out." (*Id.* at 56:3–4.) Yet, when faced with conflicting x-ray readings and asked for an accurate opinion regarding asbestosis *in this case*, Frank disregarded Baylor's CT scan and instead relied upon Baylor's x-rays only – x-rays which Frank acknowledged may have exhibited exaggerated markings due to film underexposure (*id.* at 92:7–8), and under-inflation of Baylor's lungs (*id.* at 92:25–93:2), and which may have been difficult to read because of Baylor's obesity (*see id.* at. 76:10–11). As before, Frank's failure to "employ in the courtroom the same methods that he employs in his own practice provides further support for the . . . conclusion that his testimony [is] unreliable." *Cooper*, 259 F.3d at 203.

Finally, the unreliability of Frank's methodology with respect to Baylor's CT scan is underscored by the candid testimony of Peirce's personal physician and hand-picked mass-examiner, Dr. Cassoff. As the Court may recall, Peirce paid Cassoff over $35,000.00 to travel from Pittsburgh to Columbia, South Carolina to examine Mr. Baylor and 197 other clients in a single day. Consistent with his intent to conceal Baylor's true medical condition, Peirce did not provide Dr. Cassoff with Baylor's CT and, as Peirce undoubtedly hoped, Cassoff diagnosed Baylor and every other client he examined that day as having asbestosis. However, when deposed in this case, Dr. Cassoff testified that had he been aware of Baylor's negative CT scan, he "**probably would not have . . diagnosed him with asbestosis**." (Cassoff. Dep. 64:15-23 (April 24, 2009) (emphasis added) (Exhibit 5).) This is because in his private practice, Dr. Cassoff orders and relies upon CT scans "when an abnormality has shown up on the x-ray which needs further clarification." (*Id.* at 38:25-39:2.) Simply put, not only are Frank's *ipse dixit*

opinions concerning CT scans devoid of scientific support and contrary to his own practice, they are contrary to the opinions of the doctors in this case who he is purportedly evaluating.

      2.    <u>Frank failed to reliably consider explanations other than asbestosis for Mr. Baylor's restrictive lung disorder.</u>

In the context of linking symptoms to a cause, sound methodology requires a physician to conduct a reliable "differential diagnosis." *Cooper*, 259 F.3d at 200. The Fourth Circuit has defined differential diagnosis as:

> [A] standard scientific technique of identifying the cause of a medical problem by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Id.* (quoting *Westberry*, 178 F.3d at 262). When an expert "utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Id.* at 202. Expert testimony "cannot be reconciled with [*Daubert*'s] reliability mandate" when the expert fails to rule out other causes, because "*Daubert* aims to prevent expert speculation." *Bryte*, 429 F.3d at 477.

In *Cooper*, the Fourth Circuit refused to admit the plaintiff's proffered expert medical causation testimony because the expert summarily rejected alternative explanations for the plaintiff's failed back surgeries. *See* 259 F.3d at 202. The expert opined that a defective pedicle screw caused the plaintiff's surgical failures, but he "did not identify specifically how he had ruled out smoking and other potential causes." *Id.* at 203. The court excluded the testimony, finding that the expert "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method." *Id.* at 200.

Likewise, here, Dr. Frank acknowledged that obesity can cause restrictive disorders (Exhibit 3 at 26:17–19), but summarily dismissed obesity as a cause of Baylor's restrictive disorder because Baylor was not "morbidly obese" (*id.* at 27:9–11). Frank points to no literature to support the proposition that one must be "morbidly obese" in order for obesity to cause restrictive disorders, and indeed admits that he has never studied the subject. (*Id.* at 27:11–12.) As with the doctor in *Cooper*, Frank "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method." 259 F.3d at 200.

Further, a doctor's failure to employ in the courtroom the same methods he employs in his own practice bolsters the conclusion that the expert's testimony is unreliable. 259 F.3d at 200. In *Cooper*, the Fourth Circuit affirmed the exclusion of expert testimony where the expert insisted upon physical examinations in his own practice, but failed to conduct a physical examination of the plaintiff and did not speak with any of the plaintiff's treating physicians before rendering an opinion for the case. *Id.*

In this respect, Frank's testimony is even more unreliable than that of the expert in *Cooper*. Dr. Frank agrees that "[t]he *only* way you get to the diagnosis of asbestosis is to do a differential diagnosis." (Exhibit 3 at 46:22-25 (emphasis added); *see also id.* at 74:25-75:2.) Frank conceded that he had not seen any evidence that any doctor performed a differential diagnosis of Baylor on the question of whether he had asbestosis (*id.* at 113:20-114:4), and he did not know what information doctors Harron and Breyer considered when making their assessments (*id.* at 117:10). He further emphasized in his deposition that he "simply said . . . the findings on the PFTs were consistent with asbestosis . . . That would not exclude other causes." (*Id.* at 25:19-26:7.) In other words, Frank professed differential diagnoses as the *only* way to

diagnose asbestosis, yet gave credence to asbestosis diagnoses while knowing full well that no differential diagnoses were performed.

    3.    <u>Dr. Frank is an unreliable authority on the methodology for diagnosing asbestosis; his own approach, which effectively treats any alleged exposure to asbestos as sufficient to diagnose disease, having been excluded as unreliable.</u>

Given that Frank disregarded Baylor's negative CT scan in favor of a poor quality x-ray he himself read as normal, Frank's opinion ultimately rested on (1) test results for which he failed to rule out alternative causes, and (2) the fact that Baylor had at some point been exposed to some unknown level of asbestos. Frank knew that Baylor worked as a machine operator, but had no knowledge of Baylor's job duties or the frequency or duration of Baylor's asbestos exposure. (*See* Exhibit 3 at 102:19-20.) He stated that workers in many jobs at railroads "don't directly handle asbestos," but "can still be exposed to asbestos," (*id.* at 99:17-20), and continued on to say that, even if Baylor worked in a job that entailed less exposure than other jobs, he "would still have meaningful asbestos exposure." (*Id.* at 103:14-19.)

In essence, then, Frank advances the theory that "each and every breath containing asbestos in an occupational setting" substantially contributes to asbestosis – a theory which Frank proffered, and the Honorable Judge Tereshko properly rejected, in a Pennsylvania state case last year. *See In re Asbestos Litigation, supra.* This non-methodology allows Frank to call virtually any lung abnormality "asbestosis" if a lawyer tells him the patient had exposure to asbestos. Frank's approach has rightly been excluded as not comporting with generally accepted diagnostic methodologies. As such, Dr. Frank is by definition an unreliable source to opine about what a reasonable physician might have diagnosed in Mr. Baylor in 2006.

This court can and should consider the fact that Frank's theories about asbestosis have previously been excluded. *See Doe 2 v. Ortho-Clinical Diagnostics, Inc*, 440 F. Supp. 2d 465,

471-72 (M.D.N.C. 2006) (endorsing the district court's consideration of the fact that the expert's proffered testimony had been excluded or afforded little weight in cases past). In *In re Asbestos Litigation*, Judge Tereshko excluded Frank's testimony because he "produce[d] scientifically incoherent opinions based upon scientifically incoherent methodologies." *Id.* at 53.  Frank had attempted to disguise his incoherent reasoning by stating that only each and every exposure "above background" could cause asbestosis, *see id.* at 13, but Frank had further opined that "there is no exposure that I have heard about that I wouldn't think could have the potential to cause disease." *Id.* at 25.  Judge Tereshko properly recognized that Frank's theory rested on inductive logic, which is an invalid method for determining cause and effect relationships. *Id.* at 49-50.  The court aptly concluded:

> [T]he complex, confusing and possibly misleading details of scientific testimony do not so readily lend themselves to accurate assessment by even the most discerning jury. Much of such testimony is sophisticated and difficult to comprehend, and an analysis of the scientific validity of the methodologies underlying the testimony is simply beyond the capabilities of most lay persons. Therefore, the gatekeeping role of the court, far from detracting from the jury's function, is in fact essential to it: Scientific methodology and conclusions must initially be scrutinized by the court to ensure that what might appear to the jury to be science is not in fact speculation in disguise. Properly supported scientific evidence, however complex, can then reach the jury for its consideration, while material whose complexity merely hides its unreliability is winnowed out.

*Id.* at 54 n.17 (quoting *Blum* v. *Merrell Dow,* 705 A.2d 1314, 1325 (Pa. Super. 1997)).  This Court should follow suit and exclude Frank's unreliable speculation, because "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## CONCLUSION

In sum, Dr. Frank's opinions about the reasonableness of the Lawyer Defendants' actions are inadmissible because he is not qualified to opine on the reasonableness of attorney conduct and his opinion lacks any reliable basis in fact. Dr. Frank's opinions concerning CT scans are inadmissible because, by Frank's own admission, he is untrained and unqualified to render such opinions and any such opinions are unreliable. Dr. Frank's ultimate medical opinion – "that it is not unreasonable for a physician to reach a conclusion that Mr. Baylor *could be thought to have developed* asbestosis" – is inadmissible because it is unreliable (i.e., based on "**no** recognizable methodology" whatsoever) and, more fundamentally, meaningless expert-speak that is not helpful to the trier of fact.

Wherefore, for the reasons stated above, CSXT respectfully requests that this Court grant its Motion to *In Limine* to Exclude Expert Testimony From Arthur L. Frank, M.D.

**CSX TRANSPORTATION, INC.**

By     /s/ Marc E. Williams    
               Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
J. David Bolen, Esquire
**HUDDLESTON BOLEN LLP**
611 Third Avenue
P.O. Box 2185
Huntington, WV 25722-2185
(304) 529-6181--Telephone
(304) 522-4312—Facsimile

E. Duncan Getchell, Jr., Esquire
Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
**MCGUIREWOODS LLP**
One James Center
901 East Cary Street
Richmond, VA  23219-4030
(804) 775-7873—Telephone
(80) 698-2188—Facsimile

**COUNSEL FOR THE PLAINTIFF
CSX TRANSPORTATION, INC.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                     Civil Action No. 5:05-CV-202

ROBERT V. GILKISON; PEIRCE,
RAIMOND & COULTER, P.C.,
A Pennsylvania Professional Corporation a/k/a
ROBERT PEIRCE & ASSOCIATES, P.C., a
Pennsylvania Professional Corporation:  ROBERT
PEIRCE, JR.; LOUIS A. RAIMOND; MARK T.
COULTER; AND RAY HARRON, M.D.,

        Defendants.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he served the foregoing *"Plaintiff, CSX Transportation, Inc.'s Motion In Limine to Exclude Expert Testimony from Doctor Arthur L. Frank, M.D."* upon the following individuals via electronic filing with the Court's CM/ECF system on the 20th day of August 2009:

Daniel R. Schuda, Esquire
**SCHUDA & ASSOCIATES, PLLC**
232 Capitol Street, Suite 200
P.O. Box 3425
Charleston, WV 25335-3425

Stanley W. Greenfield, Esquire
**GREENFIELD & KRAUT**
1040 Fifth Avenue
Pittsburgh, PA 15219

John E. Gompers, Esquire
**GOMPERS, McCARTHY & McCLURE**
60 Fourteenth Street
Wheeling, WV  26003

Walter P. DeForest, Esquire
**DEFOREST KOSCELNIK
YOKITIS & KAPLAN**
3000 Koppers Building
Pittsburgh, PA  15219

Ron Barroso, Esquire
5350 S. Staples
Suite 401
Corpus Christi, TX 78411

Jerald E. Jones, Esquire
**WEST & JONES**
360 Washington Avenue
P.O. Box 2348
Clarksburg, West Virginia 26302-2348

Lawrence S. Goldman, Esquire
Elizabeth M. Johnson, Esquire
**LAW   OFFICES   OF   LAWRENCE   S.
GOLDMAN**
500 Fifth Avenue, 29th Floor
New York, NY 10110

                                        /s/ Marc E. Williams