IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                      Civil Action No. 5:05-cv-202

ROBERT V. GILKISON, *et al.*,

        Defendants.

## PLAINTIFF, CSX TRANSPORTATION, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE OPINIONS AND REPORTS OF DOCTORS JAMES W. BALLARD, ROY P. JOHNSON AND HENRY K. SMITH

Comes now Plaintiff, CSX Transportation, Inc. ("CSXT"), by and through its counsel, pursuant to Federal Rules of Evidence 403 and 702 and submits this Motion *In Limine* to Exclude the Opinions and Reports of Doctors James W. Ballard, Roy P. Johnson and Henry K. Smith (the "Asbestos Associates doctors"), who were retained by Asbestos Associates of Hattiesburg, Mississippi (also known as the Deakle Law Firm) to generate medical evidence in litigation unrelated to Mr. Baylor's claim against CSXT.[1]

### INTRODUCTION

The opinions and reports of the Asbestos Associates doctors should be excluded as manifestly unreliable and, to the extent they are deemed relevant at all, confusing and misleading. Dr. Ballard's B reads have been described as "def[ying] all statistical logic and

---

[1] CSXT previously moved to strike these opinions and reports as hearsay and undisclosed expert testimony and fully incorporates those arguments here. (*See* Doc. No. 573.) If the Court grants CSXT's previously-filed motion to strike, the opinions and reports of Drs. Ballard, Johnson and Smith should necessarily be excluded from trial as well and the Court need not reach this motion. It should also be noted that Defendants have tentatively agreed not to introduce the opinions of Ballard and Johnson at trial. However, the Lawyer Defendants have refused to withdraw those opinions from the Court's consideration on summary judgment, which remains pending. In that vein, the *Daubert* arguments outlined here provide an additional basis to strike the opinions of Drs. Ballard and Johnson (and Smith) from consideration on summary judgment. *See Ruffin v. Shaw Indus.*, 149 F.3d 294, 296 (4th Cir. 1998).

medical and scientific evidence" and he now consistently pleads the Fifth rather than defend his methodology. *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 609 (S.D. Tex. 2005). Dr. Johnson, in turn, substantially relied on Ballard's unreliable findings and Dr. Smith confessed to utilizing unreliable methods – taking "the liberty" to perform a "composite" B read of two admittedly inadequate x-rays. (Smith Dep. 151-152 (May 4, 2009) (Exhibit 1).) Moreover, the opinions of the Asbestos Associates doctors are based on a different x-ray than the June 11, 2003 film at issue in this case and were not known to the Lawyer Defendants when they filed Baylor's claim. As such, whatever minimal probative value they may have is far outweighed by the risk of unfair prejudice and juror confusion.

## BACKGROUND

I.   **THE ASBESTOS ASSOCIATES DOCTORS ARE PRODUCTS OF THE SAME UNRELIABLE ENTREPRENEURIAL MODEL UTILIZED BY THE LAWYER DEFENDANTS.**

The Lawyer Defendants admit that the Asbestos Associates doctors were not Mr. Baylor's health care providers, but rather doctors hired by lawyers for the purpose of generating evidence in connection with litigation. (*See, e.g.*, Lawyer Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. No. 537) at 3 (emphasis added) ("Drs. Smith, Ballard and Johnson **were giving their opinions for a . . . law firm** representing Mr. Baylor concerning claims against entities other than CSX.").) Specifically, it appears that Mr. Baylor attended a mass screening conducted by Asbestos Associates on February 26, 2002. Thereafter, Asbestos Associates sent Mr. Baylor's screening x-rays to Dr. James W. Ballard of Birmingham, Alabama, who purportedly rendered a B read on April 7, 2002. Asbestos Associates then obtained what purports to be an "Asbestos Evaluation" from Dr. Roy P. Johnson of La Vergne, Tennessee on March 31, 2003. Over five

years later, on June 24, 2008, Asbestos Associates obtained a second B read from Dr. Henry K. Smith of New Cumberland, Pennsylvania.

As the foregoing geographical hopscotch makes clear, like the Lawyer Defendants, Asbestos Associates generated medical evidence concerning Mr. Baylor using tried and true litigation doctors scattered across the country. Until recently, Asbestos Associates used this evidence in support of claims it filed on Mr. Baylor's behalf with various asbestos bankruptcy trusts. However, shortly before Mr. Baylor's deposition in this case, Asbestos Associates informed counsel for CSXT that it was withdrawing from its representation of Mr. Baylor.

The Lawyer Defendants opted not to depose Drs. Ballard and Johnson in this case, undoubtedly because they knew Dr. Ballard would plead the Fifth Amendment (discussed at greater length below), while Dr. Johnson likely would have revealed his ties with the Peirce Firm (undermining the Lawyer Defendants' prior contention that he had "no affiliation" with them). (*See* Doc. No. 537 at 22.) In particular, nearly one year before Peirce filed Baylor's claim against CSXT, he instructed Baylor to travel to Tennessee to be examined by the same Dr. Johnson employed by Asbestos Associates. (*See* Letter from R. Peirce, Jr. to E. Baylor (March 10, 2005) (Baylor 106) (Exhibit 2).) Given the nature of this correspondence (form letter) and the location of Dr. Johnson's mass examination sessions (Holiday Inn and Radisson), Peirce obviously encouraged his other clients to be examined by Dr. Johnson as well. (*See id.*) Apparently, concluding that it was "safe" to question Dr. Smith, the Lawyer Defendants did depose him, only to reveal that Dr. Smith utilized an unaccepted, unpublished and unreliable methodology when classifying Mr. Baylor's screening x-rays.

## ARGUMENT

Pursuant to Rule 702 of the Federal Rules of Evidence, testimony based on scientific, technical or other specialized knowledge is admissible only if it is:

> 1) based upon sufficient facts or data;
> 2) the product of reliable principles and methods; and,
> 3) the reliable application of the principles and methods to the facts of the case.

It is the obligation of trial courts to act as "gatekeepers" to "ensure that any and all scientific testimony is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Expert opinion is reliable only when "the reasoning or methodology underlying the testimony is scientifically valid," which depends on numerous factors, including:

> 1) whether the theory or technique used by the expert can be, and has been, tested;
> 2) whether the theory or technique has been subjected to peer review and publication;
> 3) the known or potential rate of error of the method used;
> 4) the existence and maintenance of standards controlling the technique's operation; and,
> 5) the degree of the method's or conclusion's acceptance within the relevant scientific community.

*Id.* at 593-94.

Expert opinion also must "fit" the facts of the case, i.e., be "helpful" to the trier of fact.

*Id.* at 591. In this regard, the Fourth Circuit has observed:

> In determining whether the evidence meets the second prong of the [*Daubert*] test – that is, whether the evidence will be helpful to the trier of fact – the Supreme Court warned that throughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as FRE 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

*United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995). In the Supreme Court's own words:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert*, 509 U.S. at 595 (citations omitted). Importantly, the "proponent of the proposed expert testimony must establish its admissibility by a preponderance of proof." *Bourne v. E.I. DuPont De Nemours & Co.*, 189 F. Supp. 2d 482, 494 (S.D. W. Va. 2002).

## I. DRS. BALLARD AND SMITH DID NOT FOLLOW THE MANDATORY METHODOLOGY APPLICABLE TO FEDERALLY CERTIFIED B READERS.

The opinions of Drs. Ballard and Smith that the Lawyer Defendants seek to use consist of B reads of Mr. Baylor's February 2002 Asbestos Associates x-rays. In the Lawyer Defendants' own words, the "NIOSH [National Institute for Occupational Safety and Health] B-reading program is a program designed to standardize the reading of x-rays for pneumoconiosis, including asbestosis, and to ensure the qualifications of individuals who are conducting such readings." (*See* Doc. No. 537 at 3 n.3.) Federal law requires B readers to follow the methodology set forth in the Internal Labour Organization's "Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconiosis" ("ILO Guidelines") (Exhibit 3) as supplemented by NIOSH. *See* 49 C.F.R. §§ 37.50-51. (*See also* Cooper Aff. at ¶ 3 (Exhibit 4); Doc. No. 537 at 5 n.4 ("The standard protocol for the interpretation of chest x-rays to determine pneumoconiosis is the [ILO Guidelines].").)

A bedrock principle of the B reader/ILO system is one x-ray/one B read. (*See* Exhibit 4 at ¶ 4.) In other words, B readers complete a separate ILO form, (*see* exemplar ILO form (Exhibit 5)), for each and every x-ray they interpret. (*See* Exhibit 4 at ¶ 4.) Among other reasons, this is because the reader must grade the technical quality of each film on a 1 (Good) to 4 (Unreadable) scale. (*See* Exhibit 5; Exhibit 3 at 3; Exhibit 4 at ¶ 5.) When a reader grades a film at 2 or below, he or she must note all defects that apply. (*Id.*) The ILO Guidelines do not permit a B reader to undertake a single classification of multiple x-rays, particularly when the

reader has determined that each individual x-ray, standing alone, is not adequate to interpret. (*See* Exhibit 4 at ¶¶ 4, 8-10.)

Another bedrock principle of the B reader/ILO system is that readers must evaluate each and every film for signs of all types of pneumoconiosis, not just particular diseases like asbestosis or silicosis. (*See, e.g.*, Exhibit 3 at 1 ("The Classification provides a means of describing and recording systematically the radiographic abnormalities in the chest provoked by the inhalation of dusts. It is used to describe radiographic abnormalities that occur in any type of dust.").) Moreover, in order to ensure accurate classifications:

> A B-reader is supposed to read the film without any knowledge of the patient's disease – to be, in Dr. [Jack] Parker's [former head of NIOSH's B reader program] words – "totally unaware of the suspected occupational or environmental exposure of the person whose film you're classifying."

*In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 627 (S.D. Tex. 2005). This is because:

> Overall bias can occur when readers know the nature of the workplace exposure of the radiographs being classified. Knowledge of exposures can bias readers to recording more or fewer abnormalities or preferentially seeking certain types of abnormality (e.g., rounded opacities for silica-exposed workers versus irregular for asbestos-exposed workers).

*Id.* at 627 n.106.

As will be explained below, the existence of the foregoing established methodology for B readers – prescribed largely by federal law – makes this case relatively simple. Neither Dr. Ballard nor Dr. Smith adhered to the requisite methodology and, as such, their opinions must be excluded as unreliable. Dr. Johnson's opinion, in turn, must be excluded because it necessarily depended on Dr. Ballard's unreliable findings (as well as exhibiting methodological flaws of its own).

**II.    DR. BALLARD'S OPINIONS SHOULD BE EXCLUDED BECAUSE JUDGE JACK PREVIOUSLY FOUND THEM TO BE UNRELIABLE AND BALLARD HAS SINCE CONSISTENTLY PLED THE FIFTH AMENDMENT RATHER THAN EXPLAIN OR DEFEND HIS METHODOLOGY.**

Dr. Ballard has generated B reads for over 10,000 asbestos claims, (*see* CRMC Response, Ex. B (March 2, 2006) (EB 00200 – 00216) (Exhibit 6)), as well as 1,444 silica claims previously pending before Judge Jack in the federal multidistrict litigation. *See Silica*, 398 F. Supp. 2d at 609.   Like Dr. Harron, Dr. Ballard was chastised by Judge Jack for his manifestly unreliable practices, including numerous asbestosis to silicosis reversals. *Id.* Judge Jack also noted the inexplicable consistency of Dr. Ballard's B reads in the silica litigation – he classified 80% of the films at issue as 1/0s and just 1 percent as 1/1 or above. *Id.* at 610.   In the words of former NIOSH B reading chief Dr. Parker:

> [T]he consistency with which these films are read as 1/0 **defies all statistical logic and all medical and scientific evidence** of what happens to the lung when it's exposed to workplace dust.   What again is stunning to me is the lack of variability. **This lack of variability suggests to me that readers are not being intellectually and scientifically honest in their classifications.**

*Id.* (emphasis added).

Furthermore, contrary to the ILO and NIOSH guidelines, Dr. Ballard classified x-rays with full knowledge of the disease(s) he was expected to find. *See id.* at 609-610.   (*See also* Letter from J. Farragut to J. Ballard (May 1, 2001) (Exhibit 7); Letter from J. Zadeh to J. Ballard (July 8, 2002) (Exhibit 8).)   He even went so far as to brazenly note in correspondence to his lawyer-clients:

> Re: 5 ILO Exams (Asbestosis Only)

> Per your request, these are being read for asbestosis only.   If your office needs b-readings for silicosis, then I will be happy to accommodate you.

(*See* Letter from J. Ballard to A. Pope (Oct. 10, 2002) (Exhibit 9).)  **This is not accepted or reliable B reading practice**.  As with Harron, Judge Jack concluded that Dr. Ballard's B reads were "manufactured for money." *Silica*, 398 F. Supp. 2d at 635.

Rather than defend his "methodology," Dr. Ballard has consistently asserted his Fifth Amendment privilege against self-incrimination when confronted regarding his B reading practices, including in response to subpoenas issued in the silica litigation (*see* Opp'n to Mot. to Compel Regarding James W. Ballard, M.D., *In re Silica Prods. Liab. Litig.*, MDL 1553 (Exhibit 10)), the federal multidistrict asbestos litigation (*see* Mot. to Quash Subpoena or in the Alternative Mot. for Protective Order, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL 875 (Exhibit 11)), and the W.R. Grace bankruptcy proceedings (see Mot. to Quash Subpoena or in the Alternative Mot. for Protective Order, *In re W.R. Grace & Co.*, Case No. 01-1139 (Exhibit 12).)  *See also In re Deposition Subpoena served upon James W. Ballard*, 2006 U.S. Dist. LEXIS 51311 (N.D. Ala. 2006).   Most recently, Ballard pled the Fifth before Congress, refusing to "certify that . . . each of the diagnosis that [he] made in this litigation are accurate and made pursuant to all medical practices, standards, and ethics." (*See* Tr. House Hr'g, 109th Congress (March 8, 2006) (relevant portions Exhibit 13).)  In fact, counsel for CSXT is unaware of **any** instance in which Dr. Ballard has defended his litigation B reading methodology since Judge Jack's opinion, nor are we aware of any court that has found his litigation B reads to be reliable or admissible.  To the contrary, when the district judge presiding over the federal asbestos MDL scheduled a *Daubert* hearing for Dr. Ballard, all but one of the plaintiffs who were still relying on his B reads voluntarily dismissed their cases.  (*See* Exhibit 11.)[2]  Likewise, an Ohio judge

---

[2] It appears that the defendants have filed renewed motions to dismiss and requests for *Daubert* hearings as to the sole plaintiff who did not voluntarily dismiss his claim.

presiding over hundreds of asbestosis claims administratively dismissed all cases based on Ballard B reads because "it appears . . . that Dr. James Ballard [is] currently unlikely to testify at any hearing or trial in these matters." (*See* Order (March 22, 2006), Cuyahoga County Asbestos Cases, Special Docket 73958, Cuyahoga County, Ohio (EB 0028) (Exhibit 14).) And as with Harron, Ballard's B reads are no longer accepted by asbestos bankruptcy trusts. (*See* Asbestos Bankruptcy Trusts' Policy Notices (EB 00002 – 00027, 00169 – 00179) (collectively attached as Exhibit 15).)

In sum, there is simply no evidence that Dr. Ballard's litigation B reads are anything other than what Judge Jack concluded – "manufactured for money" and contrary to "all statistical logic and medical and scientific evidence." *Silica*, 398 F. Supp. 2d at 610, 635. Dr. Ballard's habitual invocation of the Fifth Amendment, which justifies an adverse inference that his responses would have been unfavorable, only reinforces the conclusion that his methodology was and is manifestly unreliable. *See, e.g., Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 183-184 (4th Cir. 2002) ("Finally, Aboud's assertion of her Fifth Amendment privilege provides additional, and quite substantial, support for the determination that Aboud engaged in a pattern of racketeering activity.") Indeed, even if the Court were inclined to afford Ballard the benefit of the doubt and conclude that his opinions are even potentially reliable, CSXT could not subject him to "vigorous cross-examination" as envisioned by the Supreme Court in cases of "shaky" testimony. *Daubert*, 509 U.S. at 596. As such, there can be no question that Ballard's opinions must be excluded from this case.

III.   **DR. JOHNSON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NECESSARILY BASED ON BALLARD'S UNRELIABLE B READ AND ARE METHODOLOGICALLY UNSOUND IN THEIR OWN RIGHT.**

Although not sufficient, radiographic findings such as a B read are essential to rendering a diagnosis of asbestosis.[3]   Accordingly, Dr. Johnson's opinion that Mr. Baylor "has asbestosis" necessarily depended on Dr. Ballard's B read, which renders Johnson's diagnosis unreliable as well.  (*See* R. Johnson Report (March 31, 2003) (PEIRCE EB 0566 – 0567) (Exhibit 17) ("Based on Mr. Baylor's . . . abnormal chest x-ray . . . read by Dr. James W. Ballard . . .").)  Indeed, Judge Jack confronted precisely the same dynamic in the silica litigation and excluded the opinions of Dr. Barry Levy, a so-called "diagnosing doctor," largely because they rested upon the flawed B reads of Ballard and Harron.  *See Silica*, 398 F. Supp. 2d 563, 638-639; *see also Hoffman v. Monsanto Co.*, 2007 U.S. Dist. LEXIS 77975, *24-25 (S.D. W. Va. 2007) (noting that expert's testimony was "fundamentally flawed" because it relied on the analysis of another expert who had already been excluded).

Dr. Johnson's opinion that Mr. Baylor "has asbestosis" is also inadmissible because it is evident from the face of his report that he did not perform a reliable differential diagnosis.

> A differential diagnosis is a standard scientific technique of identifying the cause of a medical problem by determining the possible causes for the patient's symptoms **and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely**.

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (emphasis added).  Here, Dr. Johnson's report clearly states: "This examination is for the purpose of determining asbestos-related disease, and is not intended to be a comprehensive examination for all medical

---

[3] *See* Am. Thoracic Society, *Diagnosis and Initial Management of nonmalignant Diseases Related to Asbestos* (Dec. 12, 2003) at 695 ("The clinical evaluation of nonmalignant asbestos-related disease should consider subjective

conditions." (*See* Exhibit 17.)   In other words, Dr. Johnson was specifically looking for asbestos-related disease and did not consider other potential causes for Baylor's apparent symptoms. This is not a reliable methodology – "if an expert utterly fails to consider alternative causes . . . a district court is justified in excluding the expert's testimony." *Cooper*, 259 F.3d at 202.

## IV.   DR. SMITH'S OPINIONS SHOULD BE EXCLUDED BECAUSE HE "TOOK THE LIBERTY" TO PERFORM A "COMPOSITE" B READ OF TWO ADMITTEDLY INADEQUATE X-RAYS IN VIOLATION OF ALL KNOWN B READING CONVENTIONS.

During his deposition, Dr. Smith revealed that his June 24, 2008 ILO form and narrative report were based on what he characterized as a "composite" interpretation of **two** different x-rays.  Additionally, he admitted that when viewed independently, he could not have interpreted either film – in other words, he performed a single B read of two admittedly inadequate x-rays:

> Q:   Do you think you would have been able to form an adequate B-Read on just one of those films?
>
> A:   **No. No**, I think I would have had problems with that.
>
> Q:   Because it doesn't show the whole lung?
>
> A:   That's correct. Oh, definitely for that reason. Just that reason alone, **but let alone the difference in exposure here**. This is a little bit more of a darker one. These are almost too dark too evaluate these upper zones. Here they're okay, but now here these are on the light side.

(Exhibit 1 at 45:23-46:8 (emphasis added).)   In fact, in spite of his claim that he was somehow able to transform two unreadable films into a single, readable image, he later acknowledged:

> They are two different films. They're done at different degrees of inspiration and different exposures.  That's more relatively underexposed, a little bit more overexposed, so it's – **you can't directly compare them**.

---

symptoms as well as objective findings on physical examination, pulmonary function tests, and chest radiographic studies.") (Exhibit 16).

(*Id.* at 150:1-6 (emphasis added).)   Dr. Smith also admitted that performing so-called "composite" B reads of two independently inadequate x-rays is "**not the norm**" and something that he might do just "one percent of the time." *(Id.* at 150:17-151:8 (emphasis added).)

As with Ballard, this is a relatively simple case – Dr. Smith did not adhere to the mandatory ILO/B reader methodology, which requires that each x-ray be classified individually and that only technically adequate x-rays be classified. (*See, e.g.,* Exhibit 4 at ¶¶ 3-6, 8.)   In fact, Dr. Smith further violated B reading protocol by failing to note – on either the ILO form or his narrative report – the defects in the two films on which his purported "composite" read was based.   As illustrated below, his on-the-fly attempt to explain away this deficiency only reinforces the impropriety and unreliability of his methodology:

> Q. And am I correct that on the film quality, you did not ---it says if not a grade 1, and you have these films marked as grade 2, mark all boxes that apply. And you have underinflation marked, which we've discussed.
>
> A. Uh-huh (yes).
>
> Q. But you do not have overexposed or underexposed marked.
>
> A. I guess you could have said well, one's under and one's over, but that's ambiguous when you have it in the same thing.   It's usually one or the other, **but in this case, I took the liberty to make it a composite looking at the two in conjunction and coming up with that impression**.***
>
> Q. [A]bsent a situation where we have the benefit like we do now of talking to you, a person looking at this form wouldn't know that --- well, they wouldn't know that you made this opinion based on two x-rays; would they?
>
> A. Probably not, no.
>
> Q. Okay.   And they wouldn't know that one x-ray was overexposed and one was underexposed; would they?
>
> A. ***[T]hat's correct.
>
> Q. **But you agree that when it's a film quality of less than one, which you've marked, it says if not grade 1, mark all boxes that apply; correct?**
>
> A. **It does say all boxes, yes.**
>
> Q. And if we were sitting here today --- or when you went back through these films with Mr. Berardinelli and you were contemporaneously completing your

form, would you mark overexposed or underexposed or would you leave the form as it was?

A.    Again, I don't think it would reflect if you say over and underexposed on the same one. Well, which one is it? Somebody would take the approach like well, it can't be both, is that a typo or something? So --- .***

A.    And again, in my narrative, perhaps I could have been a little more stating that --- what did occur here, but I don't think I did, which --- .

Q.    Right. And that's a good point. We do have the narrative here. But again, we have no --- and again, the narrative is where you kind of have your --- you're actually writing words or ---

A.    Yeah.

Q.    --- or perhaps dictating them? **But again, there's no notation that this was a composite read of two x-rays.**

A.    **No, it didn't.**

Q.    **Or that one of those was what you've described as overexposed and one is underexposed?**

A.    **I didn't go into that, no.**

(Exhibit 1 at 151:16-154:18 (emphasis added).) The significance of the above-quoted testimony is obvious – there was no way for Dr. Smith to record the technical flaws in two x-rays on a single ILO form because that **is not accepted or permissible practice**.

An analysis of the various factors identified by the Supreme Court in *Daubert* reinforces the unreliability of Smith's methodology. There is absolutely nothing in the ILO/NIOSH Guidelines or anywhere else in the medical or scientific literature suggesting that it is acceptable or permissible to perform a "composite" B read of two (independently inadequate) x-rays and then fail to note the defects present in each x-ray. *See Daubert*, 509 U.S. at 593; (*see also* Exhibit 4 at ¶¶ 9-10). Likewise, there is no evidence that this "technique" has ever been tested or subject to peer review, much less assigned a known or potential rate of error. *See Daubert*, 509 U.S. at 593; (*see also* Exhibit 4 at ¶ 11). In fact, it is difficult to imagine how Smith's practice of performing a single "composite" classification of two different x-rays *even could be tested* because other readers do not know and cannot evaluate to what extent Smith relied on one x-ray

or the other.  In this regard, Smith's failure to disclose – on either the ILO form or in his free-form narrative report – that his classification was based on two x-rays, one of which was overexposed and one underexposed, is highly suspect.

Simply put, Dr. Smith's opinions present the clearest possible *Daubert* scenario – he failed to follow the mandatory methodology prescribed by federal law and there is nothing from any other source remotely suggesting that his "composite" B read of Baylor's x-rays was permissible, acceptable or reliable.  Accordingly, Dr. Smith's opinions must be excluded from this case.

## V.   THE OPINIONS OF THE ASBESTOS ASSOCIATES DOCTORS SHOULD BE EXCLUDED UNDER RULE 403 BECAUSE THEIR MINIMAL, IF ANY, PROBATIVE VALUE IS SUBSTANTIALLY OUTWEIGHED BY THE RISK OF UNFAIR PREJUDICE AND JUROR CONFUSION.

It is well-settled that "[e]ven after the *Daubert* decision, otherwise admissible evidence may be properly excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury." *Dorsey*, 45 F.3d at 816.  In fact, when applying Rule 403 trial courts "exercise more control over experts than over lay witnesses," *Daubert*, 509 U.S. at 595, because "[e]xpert testimony has the potential to be substantially prejudicial because of the 'aura effect' associated with such testimony." *United States v. Lester*, 254 F. Supp. 2d 602, 609 (E.D. Va. 2003).

As noted above, the opinions of the Asbestos Associates doctors are based on a **different** x-ray than the 2003 film classified by Drs. Harron and Breyer which formed the Lawyer Defendants' purported evidentiary basis for filing suit against CSXT.  Accordingly, they shed no light on the accuracy or reasonableness of Harron's and Breyer's classifications.  Indeed, no two x-rays are alike, particularly where the films are differentially distorted by varying levels of over/under exposure, lung inflation and body-positioning, as is the case here with Mr. Baylor's

2002 (Asbestos Associates) and 2003 (Peirce) screening films.  Even assuming Ballard's and Smith's B reads of Baylor's 2002 film were reasonable, that does not mean that Harron's and Breyer's classifications of Baylor's 2003 film were reasonable or accurate.

Of equal, if not greater, importance is the fact that the opinions of the Asbestos Associates doctors were not known to the Lawyer Defendants at the time they filed Baylor's suit against CSXT – they were only brought to the Lawyer Defendants' attention years afterwards. Consequently, that evidence played no role in the Lawyer Defendants' decision to file suit against CSXT in 2006, which is the subject of CSXT's fraud claim.

In light of the above, the opinions of the Asbestos Associates doctors are of minimal, if any probative value, while the risk of unfair prejudice and/or juror confusion is extreme.  Jurors may not appreciate the hugely significant fact that the Asbestos Associates doctors relied on a different x-ray (with its own set of flaws) than did the Peirce doctors.  Jurors also may lose sight of the fact that the Lawyer Defendants did not even know about the reports from the Asbestos Associates doctors until years after Baylor's suit was filed.

Additionally, if the opinions of the Asbestos Associates doctors are admitted, CSXT must be permitted to subject them to "[v]igorous cross-examination" and "presentation of contrary evidence." *Daubert*, 509 U.S. at 596.  In other words, it will necessitate three additional mini-trials on the accuracy and reliability of Drs. Ballard, Johnson and Smith.  Because CSXT likely will not even have the opportunity to question Ballard and Johnson, it will be forced to introduce evidence of the silica proceedings and their aftermath as discussed above.  Given that the underlying facts of this case already involve multiple doctors – Harron, Breyer, Cassoff and Knox – and the parties have formally designated four additional medical experts, admitting the opinions of the Asbestos Associates doctors will almost certainly confuse and overwhelm the

jury and grind the progress of the trial to a halt.  This fact, paired with the tangential evidentiary value of the evidence, necessitates that it be excluded under Rule 403.

**CONCLUSION**

Wherefore, for the foregoing reasons, CSXT respectfully requests that this Court enter an order excluding the opinions and reports of Drs. Ballard, Johnson and Smith from this case.

**CSX TRANSPORTATION, INC.**

By    /s/ Marc E. Williams

Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
J. David Bolen, Esquire
**HUDDLESTON BOLEN LLP**
611 Third Avenue
P.O. Box 2185
Huntington, WV  25722-2185
(304) 529-6181--Telephone
(304) 522-4312—Facsimile

E. Duncan Getchell, Jr., Esquire
Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
**MCGUIREWOODS LLP**
One James Center
901 East Cary Street
Richmond, VA  23219-4030
(804) 775-7873—Telephone
(80) 698-2188—Facsimile

**COUNSEL FOR THE PLAINTIFF**
**CSX TRANSPORTATION, INC.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                         **Civil Action No. 5:05-CV-202**

ROBERT V. GILKISON; PEIRCE,
RAIMOND & COULTER, P.C.,
A Pennsylvania Professional Corporation a/k/a
ROBERT PEIRCE & ASSOCIATES, P.C., a
Pennsylvania Professional Corporation:  ROBERT
PEIRCE, JR.; LOUIS A. RAIMOND; MARK T.
COULTER; AND RAY HARRON, M.D.,

        Defendants.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he served the foregoing *"Plaintiff, CSX Transportation, Inc.'s Motion In Limine to Exclude the Opinions and Reports of Doctors James W. Ballard, Roy P. Johnson and Henry K. Smith"* upon the following individuals via electronic filing with the Court's CM/ECF system on the 20th  day of August 2009:

Daniel R. Schuda, Esquire
**SCHUDA & ASSOCIATES, PLLC**
232 Capitol Street, Suite 200
P.O. Box 3425
Charleston, WV 25335-3425

Walter P. DeForest, Esquire
**DEFOREST KOSCELNIK
YOKITIS & KAPLAN**
3000 Koppers Building
Pittsburgh, PA  15219

Stanley W. Greenfield, Esquire
**GREENFIELD & KRAUT**
1040 Fifth Avenue
Pittsburgh, PA 15219

Ron Barroso, Esquire
5350 S. Staples
Suite 401
Corpus Christi, TX 78411

John E. Gompers, Esquire
**GOMPERS, McCARTHY & McCLURE**
60 Fourteenth Street
Wheeling, WV  26003

Jerald E. Jones, Esquire
**WEST & JONES**
360 Washington Avenue
P.O. Box 2348
Clarksburg, West Virginia 26302-2348

Lawrence S. Goldman, Esquire
Elizabeth M. Johnson, Esquire
**LAW    OFFICES    OF    LAWRENCE    S.
GOLDMAN**
500 Fifth Avenue, 29th Floor
New York, NY 10110


                                              /s/ Marc E. Williams