**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

**CSX TRANSPORTATION, INC.,**

          **Plaintiff,**

**v.**                                      **Civil Action No. 5:05-cv-202**

**ROBERT N. PEIRCE, JR.;
LOUIS A. RAIMOND;
MARK T. COULTER;
and RAY HARRON, M.D.,**

          **Defendants.**

## THIRD AMENDED COMPLAINT

**NOW COMES** the Plaintiff, CSX Transportation, Inc. ("CSXT"), by and through counsel, and for its Third Amended Complaint against the Defendants, Robert N. Peirce, Jr., Louis A. Raimond, Mark T. Coulter, and Ray Harron, M.D., avers and states as follows:

## NATURE OF THE ACTION

1.      The Defendants listed herein are well-organized and financed asbestos personal injury attorneys and purported medical experts who have orchestrated a scheme to inundate CSXT and other entities with thousands of asbestos cases without regard to their merit.

2.      This case arises from the successful efforts of the Defendants to deliberately fabricate and prosecute objectively unreasonable, false and fraudulent asbestos claims against CSXT.

3.      As will be explained more fully below, this conduct violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and also supports claims for common law fraud and conspiracy.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims herein arise under the laws of the United States, pursuant to the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c), because the claims herein seek recovery for violations of 18 U.S.C. §1962, and pursuant to 28 U.S.C. §1332 because the action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.    This Court also has subject matter jurisdiction over the common law claims asserted herein pursuant to 28 U.S.C. §1367(a), because those claims are so related to the claims arising under the law of the United States that they form part of the same case or controversy.

6.    This Court is a proper venue for this action under 28 U.S.C. §1391(a)(2) because a substantial part of the acts and omissions giving rise to this dispute occurred within this judicial district and division.

7.    The out-of-state Defendants further listed herein are also subject to this Court's jurisdiction pursuant to the provisions of West Virginia Code § 56-3-33(3) as their actions within this State caused tortious injury to Plaintiff CSXT.

## PARTIES

8.    Plaintiff CSXT is and was at all times relevant herein a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Jacksonville, Florida.

9.    Defendant Robert N. Peirce, Jr. ("Peirce") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 104 Fair Acres Drive, Sewickley, Pennsylvania 15143.

10.    Defendant Louis A. Raimond ("Raimond") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 1604 Fieldstone Lane, Sewickley, Pennsylvania 15143.

2

11.     Defendant Mark T. Coulter ("Coulter") is and was at all times relevant herein a citizen and resident of Monroeville, Allegheny County, Pennsylvania, with his principal mailing address being 2079 Ramsey Road, Monroeville, Pennsylvania 15146.

12.     The individual Defendants Peirce, Raimond and Coulter are hereinafter referred to collectively as "the lawyer Defendants."

13.     The lawyer Defendants were at all times relevant herein partners, members or shareholders of, or otherwise employed by or associated with, the law firm Robert Peirce & Associates, P.C. ("the Peirce firm"), formerly known as Peirce, Raimond & Coulter, P.C.

14.     The Peirce firm is and was at all times relevant herein a Pennsylvania Professional Corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

15.     At all times relevant herein the Peirce firm was registered to conduct and did conduct business in the State of West Virginia under the name Robert Peirce and Associates, P.C. or as Peirce, Raimond and Coulter, P.C.

16.     Upon information and belief Defendant Ray Harron, M.D. ("Harron") is and was at all times relevant herein a citizen and resident of Bridgeport, Harrison County, West Virginia, with his principal mailing address being 901 West Main Street, Bridgeport, West Virginia 26334.

## BACKGROUND

17.     The Peirce firm initiates and prosecutes lawsuits against railroad carriers, including CSXT, on behalf of current and former employees alleging various personal injuries and occupational illnesses, including asbestosis.

18.     Beginning in the late 1990s, the lawyer Defendants, collectively and in concert, embarked upon a calculated and deliberate strategy to participate in and conduct the affairs of the Peirce firm through a pattern and practice of unlawful conduct, including bribery, fraud, conspiracy, and racketeering.

19.     Specifically, the lawyer Defendants gained access to potential clients through unlawful means, retained clients and procured medical diagnoses for them through intentionally unreliable mass screenings, prosecuted clients' claims using dishonest, fraudulent, and deceptive tactics and, ultimately, fabricated and prosecuted asbestos claims with no basis in fact.   Moreover, the lawyer Defendants deliberately filed the claims they manufactured in mass lawsuits in overburdened courts to deprive CSXT of access to meaningful discovery, which in turn concealed fraudulent claims and leveraged higher settlements based on the threat of mass trials.

**I.**     **THE LAWYER DEFENDANTS' FRAUDULENT CLAIMS MANUFACTURING SCHEME**

     **A.**     **Access to Potential Clients Through Improper and Unlawful Means**

20.     Some or all rail labor unions confer "Designated Legal Counsel" status on select lawyers and advise their members to use those lawyers.   Designated status is highly desirable for lawyers because it permits them or their representatives to attend union meetings and solicit clients.

21.     In the years prior to this lawsuit, one or more of the lawyer Defendants enjoyed designated counsel status with one or more rail labor unions and explicitly advertised this fact in connection with the Peirce firm's screenings.   (*See* Advertisement for Screening (attached as Exhibit A).)

22.     In 2003, it became known that certain rail labor officials had been accepting unlawful cash payments from lawyers in exchange for designated counsel status.   As a result of this scheme, the federal government indicted and convicted multiple union officials, including former union president Charles L. Little, who pled guilty to federal racketeering charges.

23.     On December 8, 2003, an article in the Pittsburgh Tribune-Review linked Defendant Peirce and Mr. Little, stating that Peirce "gave thousands of dollars in cash to transportation union officials who played a role in helping him attract legal work from union

4

members." (*See* Chris Osher, *Testimony Implicates Ex-Official*, Pittsburgh Tribune-Review, Dec. 8, 2003 (attached as Exhibit B).)

24.    Further, Defendant Peirce himself explicitly admits contributing a total of $15,000.00 in cash to Little's various election campaigns.   Defendant Raimond also admits contributing $5,000.00 to Mr. Little's campaigns.   (*See* Def.'s Suppl. Answers to Pl.'s 1st Interrog., No. 2 (attached as Exhibit C).)

25.    In addition to these payments, the lawyer Defendants utilized retired railroad employees, many of whom formerly worked for CSXT, as "runners" or "investigators" to lure railroad workers to their mass screenings.

26.     A majority, if not all, of these runners/investigators had left employment claiming varying degrees of disability and were receiving disability payments from the Railroad Retirement Board ("RRB").

27.    The lawyer Defendants caused the Peirce firm to pay these runners/investigators calculated sums to ensure that they remained eligible for federal retirement benefits, and then further fraudulently compensated them through "fringe benefits" and "off the books" reimbursements.

28.    On February 24, 2011 the United States of America brought a civil action against one of the Peirce firm's former runners/investigators, Robert V. Gilkison, and his wife (collectively "the Gilkisons") "for engaging in a continuing fraudulent scheme through which they attained hundreds of thousands of dollars of disability payments to which they were not entitled." (*See* Complaint, *U.S. v. Gilkison*, Case No. 1:11-cv-112 at ¶ 1 (S.D. Ohio Feb. 24, 2011) (attached as Exhibit D).)

29.    In particular, the complaint alleged:

[The] scheme, which continued for over fifteen years, involved repeated false statements and omissions in communications to the RRB regarding the amount of earnings Mr. Gilkison received from two separate law firms. Despite telling the RRB that he received only $400 a month, Mr. Gilkison received hundreds, if not thousands, of dollars in additional compensation each month. These earnings,

had they been disclosed, would have disqualified Mr. Gilkison from receiving a disability annuity.***

In addition to $400 a month, the Gilkisons also earned the following from Law Firm B during the above-referenced period:
   a. $300-400 monthly relating to Mr. Gilkison's health insurance;
   b. $165-400 monthly relating to Ms. Gilkison's health insurance;
   c. a fully-insured Cadillac, which Mr. Gilkison chose from the dealer and which he used for his primary personal vehicle;
   d. a second fully-insured Cadillac, which Mr. Gilkison chose from the dealer to replace his earlier model and which he used for his primary personal vehicle;
   e. payment for all car expenses, including gas, taxes, tags, oil, maintenance, insurance, tires, and car washes; and
   f. $1,000 each month in cash for "auto allowance" from a three year period.

In addition to his $400 monthly salary, Mr. Gilkison received over $167,000 from Law Firm B in between 1997 and 2005, including over $96,000 for cash expenditures. In addition to the amounts referenced above, Mr. Gilkison's reimbursed cash and credit card expenditures included money for motel rooms, drinks, his home office, his car phone, and tickets for University of Kentucky basketball games and Cincinnati Bengals football games. For example, Mr. Gilkison received payments for $1,422 at the Beau Rivage Resort & Casino in Biloxi, Mississippi; $609 at a seafood restaurant in Williamsburg, Virginia; and $1,181.71 for a purchase at HH Gregg, among other items.

(*Id.* at ¶¶ 2, 31-32.)

   30.   Upon information and belief, "Law Firm B" was the Peirce firm.

   31.   In settlement of the claims brought by the United States, the Gilkisons entered into a "Stipulation and Order of Settlement and Dismissal" whereby they agreed to "the entry of a judgment . . . against them in favor of the United States, in full compromise and satisfaction of the allegations against them as set forth in the Complaint, for the sum of two hundred thousand dollars ($200,000.00)."   (*See* Stip. & Order of Dismissal & Settlement, *U.S. v. Gilkison*, Case No. 1:11-cv-112 at ¶ 2 (S.D. Ohio Feb. 28, 2011) (attached as Exhibit E); Judgment, *U.S. v. Gilkison*, Case No. 1:11-cv-112 (S.D. Ohio Feb. 28, 2011) (attached as Exhibit F).)

**B.      Retention of Clients and Procurement of Medical Diagnoses
Through Deliberately Unreliable Mass Screenings**

32.      As noted above, the lawyer Defendants routinely utilized mass screenings to
obtain former and current CSXT employees as clients and procure medical diagnoses –
particularly of asbestosis – for them.

33.      The lawyer Defendants actively solicited attendance to their screenings using
interstate mailings and advertisements.   In many instances, the identities of the persons
solicited were obtained from the unlawful practices described in Paragraphs 20 – 31.

34.      Asbestosis, also known as pneumoconiosis, is a chronic inflammatory medical
condition affecting the parenchymal tissue of the lungs caused by long-term, heavy exposure to
asbestos.    The National Institute of Occupational Safety and Health (NIOSH) maintains a
standard protocol for the interpretation of chest x-rays to determine pneumoconiosis caused by
asbestos exposures. NIOSH administers a specialized examination for those who wish to learn
the NIOSH protocol.   Physicians who pass the examination, referred to as B-Readers, visually
analyze opacities and record their findings and interpretations on standard International Labor
Organization, "ILO" forms.   Although asbestosis is a restrictive lung disorder which usually
entails pulmonary function testing, most asbestosis litigation begins with a B-Reader assigning a
"positive" score on an ILO form after reviewing a patient's x-rays and determining the physical
presence of scarring caused by prolonged inhalation of asbestos.

35.      As will be explained below, the lawyer Defendants deliberately orchestrated the
Peirce firm's screenings so as to maximize the likelihood that attendees would receive positive
ILO scores regardless of whether they actually exhibited signs of asbestos-related disease.

36.      Moreover, in the rare instances in which screening attendees did not receive
positive scores, the lawyer Defendants encouraged them to continue attending screenings on a
regular basis.   The lawyer Defendants knew and expected that over time the fraudulent doctors

7

they utilized would eventually assign positive scores to virtually all screening attendees regardless of whether those individuals actually exhibited signs of asbestos-related disease.

37.      As part of their scheme to manufacture fraudulent claims, the lawyer Defendants purposefully selected and hired black market x-ray technicians such as James Corbitt to conduct their screenings.   Corbitt is a convicted felon who habitually disregarded and violated state laws governing the use of x-ray equipment and produced chronically substandard x-rays.

38.      The lawyer Defendants also selected and retained doctors like Defendant Harron to review the x-rays from the screenings and to find signs of asbestos-related diseases regardless of whether the attendees actually exhibited signs of those diseases.

### 1.     James Corbitt

39.      Defendant Peirce first hired James Corbitt and his company, U.S. X-Ray, Inc., to conduct screenings in approximately January 1993.   (*See, e.g.*, Quote from Jim Corbitt, U.S. X-Ray, Inc. to Robert Peirce & Associates (Jan. 8, 1993); Letter from James Corbitt to Mr. Robert "Bob" Peirce (Dec. 29, 1997) (collectively attached as Exhibit G).)   Although Corbitt initially continued to work for other firms and businesses, by the late 1990s, he worked almost exclusively for the Peirce firm.   This trend continued until approximately 2004, when Corbitt ceased participating in Peirce firm screenings.   (*See* James Corbitt Dep. 80:3-81:13, Nov. 17, 2006 (relevant portions attached as Exhibit H).)

40.      Corbitt conducted screenings using a mobile x-ray unit mounted in a GMC straight truck, the back of which he had divided into a waiting room and a second room where the x-rays were actually taken and processed.   (*See* Exhibit H   95:23-96:12.)

41.      In 1972, Corbitt earned a two-year degree as a radiologic technologist from Vanderbilt University's School of Allied Professions in Nashville, Tennessee.   Upon graduation he registered with the American Registry of Radiologic Technologists ("AART").

42.      On May 12, 1993 Corbitt pled guilty in the United States District Court for the Northern District of Ohio, Eastern Division to violations of 18 U.S.C. § 641 (Theft of Government

Property) and 26 U.S.C. § 7206(1) (Fraud and False Statements). (*See* Plea Agreement, *United States of America v. James R. Corbitt, and Toni Corbitt*, U.S.D.C. Northern District of Ohio, Eastern Division, Case No. 5:93CR133A (attached as Exhibit I).)

43.    On August 12, 1993 the above-named Court sentenced Corbitt to 18 months in prison and three years of supervised release and also ordered him to pay $192,641.29 in restitution to the United States Department of Health and Human Services.   (*See* Court Order, Aug. 12, 1993 (attached as Exhibit J).)

44.    Thus, for virtually the entire time the lawyer Defendants utilized Corbitt's services, they either knew or recklessly disregarded the fact that he had been convicted of two felonies involving dishonesty and moral turpitude.

45.    Notwithstanding his felonious criminal record, the lawyer Defendants continuously used Corbitt to perform mass x-rays screenings mainly, but not exclusively, across the eastern United States between 1993 and 2004.   Moreover, at most, if not all of the screenings he conducted, Corbitt was completely unsupervised.

46.    Corbitt admits that he did not have any licenses or certifications aside from his AART registration when he began conducting screenings for the lawyer Defendants.   (*See* Exhibit   H 115:11-116:10.)

47.    Thus, Corbitt pervasively violated the laws of virtually every state in which he operated on behalf of the Peirce firm.   These laws generally require radiologic technologists and their equipment to be licensed by the applicable state health board.

48.    For example, in Virginia, where Corbitt admittedly performed screenings on a regular basis, it is "unlawful for a person to practice or hold himself out as practicing as a radiologic technologist or radiologic technologist, limited, unless he holds a license as such issued by the Board [of Health]."   Va. Code Ann. § 54.1-2956.8:1.   Furthermore, "All X-ray machines shall be registered with the Board of Health, and inspected and certified as meeting the standards established pursuant to its regulations. The inspections shall be conducted

9

periodically on a schedule prescribed by the Board."   Va. Code Ann. § 32.1-229.1.   Finally, pursuant to 18 Va. Admin. Code § 85-101-100(A), "All services rendered by a radiologic technologist shall be performed only upon direction of a licensed doctor of medicine, osteopathy, chiropractic, or podiatry."

49.      Corbitt failed to comply with each of these provisions while conducting screenings on behalf of the Peirce firm in Virginia.

50.      In fact, when deposed about his knowledge of and compliance with the licensing requirements of the states in which he was operating, Corbitt invoked his Fifth Amendment privilege against self-incrimination.   (*See* Exhibit H   117:17-119:5.)

51.      Furthermore, at least two states formally disciplined Corbitt for his screening-related conduct during the period in which he regularly worked for the Peirce firm.

52.      On August 21, 2001 the Texas Department of Health issued an Emergency Cease and Desist Order prohibiting Corbitt and U. S. X-Ray from operating x-ray equipment within the state until they obtained a certificate of registration for the equipment.   (*See* Order, Aug. 21, 2001 (attached as Exhibit K).)

53.      Not only did the lawyer Defendants continue to use Corbitt and U. S. X-Ray after learning of this Order, Defendant Peirce personally paid half of the $10,000.00 fine that the State of Texas imposed on Corbitt.   (*See* Exhibit H 172:9-17; *see also* Robert N. Peirce, Jr. Dep. 147:5-20, May 8, 2007 (relevant portions attached as Exhibit L).)

54.      On January 30, 2002 the Ohio Director of Health formally denied Corbitt's May 29, 1999 and June 30, 2000 applications for a radiologic license in Ohio based on Corbitt's failure to report his felony convictions on his applications and the Board of Health's conclusion that Corbitt did not possess the good moral character necessary to satisfy the requirements of Ohio law.   (*See* Order, Jan. 30, 2002 (attached as Exhibit M).)

55.      Corbitt's reckless and unlawful conduct resulted in chronically substandard x-rays that helped further the lawyer Defendants' scheme to defraud CSXT.   Specifically, as Corbitt

learned in his initial training as a radiologic technologist, underexposed x-rays present a distorted view of lung tissue and enhance the ability of unscrupulous radiologists like Defendant Harron to diagnose asbestos-related diseases where none in fact exist.

56.     By obtaining x-rays through black market technicians like Corbitt, the lawyer Defendants were able to produce, at the lowest possible cost, a steady stream of underexposed films for review by Defendant Harron.

### 2.     Defendant Harron

57.     As previously stated, the lawyer Defendants not only unlawfully hired technicians such as Corbitt to conduct their screenings, they also retained and compensated the doctors who interpreted the resulting x-rays and determined whether they exhibited signs of asbestos-related disease.   The lawyer Defendants filed the claims they manufactured based solely on the findings of these doctors.

58.     The lawyer Defendants most commonly used Defendant Harron to read and interpret the x-rays generated during their screenings.   (*See* Exhibit L 184:6-17.)   Defendant Peirce has testified that he selected Harron based on his willingness to read an unusually high number of x-rays at a time and his willingness to be paid on a per x-ray, as opposed to hourly, basis.   (*Id.*; *see also id.* 196:23-197:21.) This arrangement enhanced Defendant Harron's financial incentive to read as many x-rays as possible without regard to established medical protocols.

59.     Based upon information and belief, however, Defendant Peirce and the other lawyer Defendants utilized Harron not only because of his speed and cost, but also because of his willingness to intentionally misrepresent or recklessly disregard the contents of the x-rays he reviewed and to identify signs of asbestos-related diseases where none in fact existed.

60.     Moreover, Defendant Harron understood that the lawyer Defendants would file lawsuits based solely on his findings.

61.     According to the Peirce firm, "since the Peirce Firm began using Dr. Harron to review x-rays until it ceased using him to review x-rays, his rate of positive readings [was] approximately 65%."   (*See* Answers of Def. Peirce firm to Pl.'s 1st Reqs. for Admis., No. 19 (attached as Exhibit N).)   Regardless of the exact percentage of films Harron read as positive for asbestosis, he generated an artificially high number of cases for the lawyer Defendants and knowingly and willingly ensured that healthy individuals would become asbestosis clients of the Peirce firm.

62.     Defendant Harron's misconduct in occupational illness cases was revealed for the first time by the Honorable Janis G. Jack in the federal multidistrict silica litigation. Specifically, on June 30, 2005 Judge Jack issued a scathing 249 page opinion concluding that it was "clear" that Harron and the other doctors, lawyers, and screening companies involved in the silica litigation "were all willing participants" in a "scheme" to "manufacture [diagnoses] for money."   *In re Silica Prods. Litig.*, 398 F. Supp. 2d 563, 635-36 (S.D. Tex. 2005).   Moreover, she described the manner in which Harron diagnosed plaintiffs as a "distressing and disgraceful procedure [that] does not remotely resemble reasonable medical practice."   *Id.* at 638.

63.     In particular, Judge Jack noted almost 2,000 instances where Harron first found that a plaintiff exhibited signs of asbestosis and then later concluded that the plaintiff exhibited signs of silicosis:

> Finally, the Defendants offered, and Plaintiffs have not disputed, a chart showing all of the Plaintiffs in this MDL who were read by Dr. Harron for silicosis, and who also have an asbestosis claim in the Manville Trust based upon a prior B-read by Dr. Harron.   This chart, attached as Exhibit 25, shows that after December 31, 2000 (when N&M changed its focus from asbestos to silica litigation), Dr. Harron  found "P", "Q" and "R" opacities (consistent with silicosis) in 99.69% of the 6,350 B-reads he performed for MDL Plaintiffs.   But prior to December 31, 2000 (when N&M was focused on asbestos litigation), Dr. Harron performed B-reads on 1,807 of the same MDL Plaintiffs for asbestos litigation, and he found some combination of only "S", "T" and/or "U" opacities (consistent with asbestosis but not silicosis) 99.11% of the time.   In short, when Dr. Harron first examined 1,807 Plaintiffs' x-rays for asbestos litigation (virtually all done prior to 2000, when mass silica litigation was just a gleam in a lawyer's eye), he found them all to be consistent only with asbestosis and not with silicosis.   But upon re-

examining these 1,807 MDL Plaintiffs' x-rays for silica litigation, Dr. Harron found evidence of silicosis in every case.

*Id.* at 607-8.   In Judge Jack's words, "a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis."   *Id.* at 603.

64.     Judge Jack further noted that Harron effectively invoked his Fifth Amendment privilege against self-incrimination when confronted by defense counsel regarding his so-called "reversals."   *Id.* at 607-8.   Harron formalized his invocation of the Fifth Amendment in a brief filed on November 5, 2005.

65.     Following Judge Jack's discovery of Harron's rampant misconduct in the silica litigation, the United States Attorney for the Southern District of New York convened a grand jury to investigate possible criminal charges against Harron.   The Attorney General of the State of Texas also commenced an investigation into Harron's practices.

66.     On September 12, 2005 the claims administrator for the Johns Manville Trust, Claims Resolution Management Corporation ("CRMC"), announced that it would no longer pay claims based on medical reports prepared by Harron and the other doctors involved in the silica litigation:

> The reliability of reports prepared by the[se] doctors and screening facilities . . . has been challenged and is the subject of federal grand jury and congressional investigations into alleged fraud.   Based upon evidence presented in the silica Multidistrict Litigation (MDL), the challenge is credible and compels suspension of acceptance of these reports.   In the two months since Judge Janis Graham Jack issued her June 30, 2005 Order in the silica MDL, CRMC has received no information or evidence to support continued acceptance of reports prepared by these doctors and facilities.   Pending completion of the grand jury and congressional investigations and the litigation in which the reports were challenged, CRMC will no longer accept reports prepared by these doctors and facilities.

*(See* CRMC Memo., Sept. 12, 2005 (attached as Exhibit O).)

67.     Since the Manville Trust's announcement, the Celotex Trust, the Eagle-Picher Personal Injury Settlement Trust, the United States Gypsum Personal Injury Settlement Trust,

13

the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust and the Babcock & Wilcox Asbestos Personal Injury Settlement Trust have all declared that they will no longer pay claims based on medical reports prepared by Harron.   (*See* Celotex policy, Oct. 18, 2005 (attached as Exhibit P); Eagle-Picher policy, Oct. 19, 2005 (attached as Exhibit Q); United States Gypsum policy, Feb. 16, 2007 (attached as Exhibit R); Armstrong World Industries, Inc. policy, May 11, 2007 (attached as Exhibit S); and Babcock & Wilcox policy, Aug. 29, 2007 (attached as Exhibit T).)

68.     Moreover, since Judge Jack's opinion, Harron has consistently invoked his Fifth Amendment privilege against self-incrimination when deposed regarding his diagnostic practices in occupational illness cases.   For example, when deposed in connection with the W.R. Grace bankruptcy proceedings on December 15, 2005, Harron invoked the privilege 392 times in just 146 pages of testimony.   Harron refused to answer questions regarding whether he had a medical degree and in which states he was licensed to practice medicine, as well as whether he was familiar with the American Thoracic Society's guidelines for the diagnosis of nonmalignant disease related to asbestos and whether he followed such guidelines.   (*See* Ray Harron Dep., Dec. 15, 2005 (attached as Exhibit U).)

69.     On December 18, 2006, when deposed in connection with asbestos-related litigation pending in Kanawha County, West Virginia, Harron repeatedly invoked his Fifth Amended privilege, including when questioned regarding asbestos-related diagnoses prepared for Defendants Raimond and the Peirce firm.   (*See* Ray Harron Dep. 60:7-75:24, Dec. 18, 2006 (relevant portions attached as Exhibit V).)

70.     On March 8, 2006, after being subpoenaed to testify before the Oversight and Investigations Subcommittee of the Energy and Commerce Committee of the United States House of Representatives, Harron informed the Committee chairman that he intended to assert his Fifth Amendment privilege in response to all questions that might be asked.   (*See* Ray Harron Test., March 8, 2006 (attached as Exhibit W).)

71.     More recently, Harron invoked his Fifth Amendment privilege and refused to answer questions regarding his diagnostic practices when deposed in connection with an asbestos-related case previously pending in this Court.   *See Ayers v. Cont'l Cas. Co*, 2007 U.S. Dist. LEXIS 47963, *4 (N.D. W. Va. 2007) ("Defendant took the deposition of Dr. Harron. However, Dr. Harron refused to answer questions about his interpretations of x-rays, instead pleading his Fifth Amendment right against self-incrimination.").

72.     As a result of Harron's medical misconduct in the silica litigation, at least seven state medical licensing agencies have instituted disciplinary proceedings against him.   In California and Florida, Harron agreed to voluntarily surrender his medical license.   In Mississippi, New Mexico and Texas, Harron entered into agreed orders not to practice medicine until his license expired and not to renew it thereafter.   Finally, North Carolina and New York permanently revoked Harron's medical license.   (*See* Orders from State Med. Licensing Agencies: Med. Bd. of Cal. (June 11, 2008); Fla. Bd. of Med. (June 19, 2008); Miss. State Bd. of Med. Licensure (Nov. 8, 2007); N.M. Med. Bd. (June 20, 2008); N.C. Med. Bd. (Dec. 14, 2007); Tex. Med. Bd. (April 13, 2007); and N.Y. State Bd. for Prof'l Med. Conduct (Dec. 30, 2008) (collectively Exhibit X).)

73.     In affirming the findings of the New York State Board of Professional Medical Conduct, the New York Administrative Review Board stated:

> "[T]he Respondent had inadequate information about the reliability of exposure histories and . . . made inadequate efforts to rule out causes other than silicosis for what x-rays showed.   ***This conduct constituted [a] repeated failure to follow accepted medical practice or negligence on more than one occasion***.   After a time, the Respondent did not review or edit reports that went out under his name and the reports indicated that the Respondent relied on physical examinations in making a diagnosis, even if the physical examinations added nothing to a diagnosis.   ***This conduct amounted to intentional misrepresentation and leads to the inference that the Respondent intended to deceive.   This constitutes fraud in the practice of medicine. . . . The record demonstrates that the Respondent used his medical license to engage in ongoing fraud on the courts***.

(*See* Determination & Order No. 09-02, N.Y. Dept. of Health, Admin. Rev. Bd. for Prof. Med. Cond. (July 10, 2009) (emphasis added) (attached as Exhibit Y).)

### C. Prosecution of Claims Using Dishonest, Fraudulent and Deceptive Practices

74.     The impropriety of the lawyer Defendants' misconduct, however, was not limited to the screening process.

75.     Once the lawyer Defendants received a positive diagnosis from Defendant Harron or their other doctors, they continued upon a course of intentionally fraudulent and unlawful conduct to ensure that all claims, regardless of their objective merit and validity, were filed and settled.

76.     Specifically, the lawyer Defendants sent or caused to be sent letters to their clients stating:

> It is also important to remember that you never suspected you had asbestosis and/or silicosis until you got the results back from the recent screenings.  This is important because if you tell a doctor, or someone else, that you have thought that you may have had some pulmonary disease for over three years, then the statute of limitations will preclude you bringing a lawsuit and being compensated for your on-the-job exposure at the railroad.

*(See*, *e.g.*, Letter from Robert Peirce, Jr. to James F. Blocker (July 15, 1999) (attached as Exhibit Z).)

77.     Furthermore, the lawyer Defendants "coached" their clients regarding the sources of their alleged asbestos exposure.   For example, on October 25, 2001, the lawyer Defendants, by and through Danielle Daley, the Peirce firm's "Railroad Project Manager," caused a letter to be mailed to Gene R. Sanders stating, in part, as follows: "I am enclosing a 'Sample Questionnaire,' that I filled out, so that you would be able to see examples of how the questions [regarding sources of asbestos exposure] should be answered."   (*See* Letter from Danielle Daley to Gene R. Sanders (Oct. 25, 2001) (attached as Exhibit AA).)

78.     The lawyer Defendants also furnished their clients with pre-printed, boilerplate asbestosis diagnosis forms, which they encouraged their clients to have endorsed by a

16

cooperating physician.   (*See*, *e.g.*, Exemplar Form (attached as Exhibit BB).)   The lawyer Defendants then submitted these diagnoses to the various asbestos bankruptcy settlement trusts (and in some cases, to CSXT as well) on behalf of their clients, and used the fees from these claims in part to fund their mass asbestos scheme against CSXT.

79.     The Honorable Arthur M. Recht of the Circuit Court of Ohio County, West Virginia, who has presided over the lawyer Defendants' asbestos cases against CSXT in West Virginia since 2002, has concluded in a formal written order that Defendant Peirce's communications with his asbestos clients were "misleading and inaccurate."   (*See* Dismissal Order, *Chambers v. CSX Transp., Inc.*, Civil Action No. 02-C-9500 (Kanawha Cir Ct., Nov. 19, 2009) at 5, ¶ 2 (attached as Exhibit CC).)

80.     Throughout the foregoing process, the lawyer Defendants acted with virtually no guidance from or communication with their clients.

## II.     <u>WEST VIRGINIA'S ASBESTOS CRISIS AND THE MASS LITIGATION PANEL</u>

81.     "Asbestos cases such as those we are now considering present a complex pattern of legal, social, and political issues that threaten to cripple the common law system of adjudication, if for no other reason by the sheer volume of cases."   *State ex rel. Appalachian Power Co. v. MacQueen*, 198 W. Va. 1, 4 (1996).

82.     In response to the crisis it confronted in *MacQueen*, the West Virginia Supreme Court of Appeals implemented Trial Court Rule 26.01 on July 1, 1999.   Rule 26.01 established a six member Mass Litigation Panel responsible for developing and implementing case management and trial methodologies for mass litigation and fairly and expeditiously disposing of civil litigation which may be referred to it by the Chief Justice.

83.     Rule 26.01 provides that any party, judge, or the Administrative Director of the Courts may seek a referral to the Panel for transfer of actions by filing a Motion to Refer to Mass Litigation Panel in any circuit court in which a qualified case is pending.

84.     On June 27, 2000, pursuant to Rule 26.01, the Honorable A. Andrew MacQueen and the Honorable Arthur M. Recht of the Mass Litigation Panel filed a motion with the Chief Justice of the Supreme Court of Appeals requesting the referral of all asbestos-based personal injury cases pending in West Virginia state courts to the Mass Litigation Panel.

85.     CSXT filed an opposition to the referral contending that the cases against it did not meet the requirements of Rule 26.01.   This opposition was argued before the Mass Litigation Panel on November 8, 2000.

86.     On November 17, 2000 the Supreme Court entered an Order granting Judges MacQueen's and Recht's June 27, 2000 Motion to Refer.   (*See* Order, Nov. 17, 2000 (attached as Exhibit DD).)   On December 20, 2000 the Supreme Court transferred all asbestos cases referred to the Mass Litigation Panel to the Circuit Court of Kanawha County and designated Judge MacQueen to preside over them.

87.     On July 9, 2001 the Supreme Court entered an Order appointing the Honorable Martin J. Gaughan to preside over the asbestos cases referred to the Mass Litigation Panel. (*See* Order, July 9, 2001 (attached as Exhibit EE).)   The Order also referred "all asbestos personal injury cases filed subsequent to the Motion to Refer on June 27, 2000" to the Mass Litigation Panel, and stated that "any asbestos personal injury litigation filed subsequent to the entry of this order, may, upon appropriate order, be transferred to the Mass Litigation Panel for consideration of assignment to the appropriate trial group upon a motion of a party, or upon a motion of a member of the Mass Litigation Panel, or upon a motion of the Honorable Martin J. Gaughan, or the judge subsequently assigned by the Chief Justice of the Supreme Court of Appeals of West Virginia to hear any case or trial group."   (*Id.*)

88.     On July 9, 2002 the Supreme Court entered an Order assigning Judge Recht "to replace the Honorable Martin J. Gaughan as the Supervising Judge to preside in Asbestos cases referred to the Mass Litigation Panel."   (*See* Order, July 9, 2002 (attached as Exhibit FF).)

III.    **THE LAWYER DEFENDANTS OVERWHELM CSXT WITH MASS ASBESTOS LAWSUITS IN WEST VIRGINIA**

89.    As described herein, beginning in 2000 the lawyer Defendants embarked upon a concerted campaign to overwhelm CSXT with thousands of asbestos-related occupational illness claims in courts across West Virginia.   Specifically, the lawyer Defendants caused to be filed no less than six mass lawsuits asserting claims on behalf of more than 5,300 plaintiffs, the vast majority of whom were not West Virginia residents, nor did their claims have any nexus to the State.   The lawyer Defendants deliberately filed these claims in mass lawsuits in an overburdened court system in an effort to conceal fraudulent claims and to leverage higher settlements based on the threat of mass trials.

90.    On March 20, 2000 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *Ronald Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 00-C-64 ("*Ronald Abbott*"), in the Circuit Court of Marshall County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit GG).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States.   Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on March 22, 2000 via certified United States mail.   (*See* Notice of Service (attached as Exhibit HH).)

91.    *Ronald Abbott* asserted claims for occupational illness on behalf of approximately 2,012 plaintiffs, 1,822 of whom were not West Virginia residents.   The out-of-state plaintiffs resided in virtually every state in which CSXT operates, including Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, North Carolina, New York, Ohio, Pennsylvania, South Carolina, Tennessee and Virginia.

92.    The *Ronald Abbott* Complaint contained no individualized allegations and instead generally averred, in pertinent part:

> While working for the defendant, the plaintiffs were exposed to and caused to inhale asbestos fibers, free silica, diesel fumes, solvent fumes, gasoline fumes, fibrogenic materials, carcinogenic materials and/or other substances deleterious to the respiratory system.
>
> As a proximate result direct and proximate result of the defendant's negligence, the plaintiffs have developed asbestosis, asbestos related pleural disease, silicosis, mixed dust pneumoconiosis, chronic obstructive pulmonary disease, occupational asthma, occupational bronchitis, cancer, and increased risk of cancer and/or other serious and severe respiratory diseases, and have suffered other bodily injuries, including a greatly increased risked of developing mesothelioma, bronchogenic carcinoma, or other cancerous conditions, and suffer difficulty breathing, as well as other serious and severe injuries which may be permanent.

(*See* Exhibit GG at ¶¶ 2025, 2029.)   Thus, the Complaint failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based, including the substance or substances to which they claimed exposure and the disease or diseases they claimed to have developed as a result of their exposure.   Moreover, the Complaint contained no allegations regarding the manner in which the plaintiffs were diagnosed with their alleged diseases, or by whom those diagnoses were made.

93.   *Ronald Abbott* was transferred to the Mass Litigation Panel by operation of the Supreme Court's November 17, 2000 Order described in Paragraph 86.

94.   On August 1, 2001 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *Charles Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 01-C-162 ("*Charles Abbott*"), in the Circuit Court of Marshall County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit II).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on August 6, 2001 via certified United States mail.   (*See* Notice of Service (attached as Exhibit JJ).)

95.   *Charles Abbott* asserted claims for occupational illness on behalf of approximately 917 plaintiffs, 736 of whom were not West Virginia residents.   The out-of-state

20

plaintiffs resided in Florida, Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Pennsylvania, Tennessee and Virginia.

96.    Aside from the plaintiffs, the *Charles Abbott* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based.   (*See* Exhibit II at ¶¶ 924, 928.)

97.    Although the lawyer Defendants never formally moved to refer *Charles Abbott* to the Mass Litigation Panel, as was their unilateral right under Trial Court Rule 26.01, at all relevant times it has been treated by the lawyer Defendants and the Mass Litigation Panel as if it had been.

98.    On September 6, 2001, in response to the "overcrowding of the circuit courts' dockets in this State caused by the overwhelming number of asbestos cases now in litigation," Judge Gaughan entered a "Mediation Order Governing Railroad Cases" (the "Mediation Order"). (*See* Report, Sept. 6, 2001 at 1, 4 (attached as Exhibit KK).)   This Order applied to all asbestos cases referred to the Mass Litigation Panel pending between CSXT and plaintiffs represented by the Peirce firm as of September 6, 2001.   (*See* Mediation Order at ¶ 2 (attached as Exhibit LL).)   By its terms, the Mediation Order did not apply to lawsuits filed after September 6, 2001.

99.    The Mediation Order established a mandatory three-step process: 1) initial settlement negotiations between the parties, 2) monthly settlement conferences, and 3) monthly mediation sessions for claims not settled at the conferences.   (*See* Exhibit LL at ¶¶ 6-11.)   In place of the discovery normally permitted under West Virginia law, the Order required each plaintiff to produce an x-ray in support of their claim, an authorization to obtain medical records, an authorization to obtain records maintained by the Railroad Retirement Board, and a written questionnaire describing their work and medical histories.   (*Id.* at ¶¶ 13-14.)   It also permitted the railroads "to conduct one hour depositions on an as needed basis."   (*Id.* at ¶ 15.)   Finally, the Order provided, "Any cases which cannot be resolved through the three stages of the

settlement/mediation program . . . will be transferred to a trial docket, to be resolved at a later date.   When cases are transferred to the trial docket and upon permission of the court, full discovery of the case can begin."   (*Id.* at ¶ 11.)

100.    In a report issued in conjunction with the Mediation Order, Judge Gaughan indicated that any claims not resolved through the mediation process were to be tried in a single mass trial scheduled for October 29, 2002.   (*See* Exhibit KK at 5.)   Thus, in the event CSXT did not settle the claims brought by the lawyer Defendants, it faced expedited mass discovery followed by a mass trial of approximately 3,000 individual plaintiffs, each with different work and medical histories, alleged injuries and alleged damages.

101.    The first court mandated settlement conference between CSXT and plaintiffs represented by the Peirce firm occurred in October 2001.

102.    Due to the massive number of plaintiffs involved, the conferences continued on a monthly or bi-monthly basis until approximately May 2004.   Defendant(s) Peirce and/or Raimond attended the conferences on behalf of the plaintiffs and conducted negotiations with CSXT.

103.    Prior to each settlement conference, CSXT was forced to evaluate the claims of as many as 150 plaintiffs, which imposed an overwhelming burden on CSXT and its attorneys.

104.    Seizing upon the overburdened state of the West Virginia court system and the ongoing mediation process with respect to the approximately 3,000 *Ronald Abbott* and *Charles Abbott* plaintiffs, the lawyer Defendants continued to file new mass asbestos lawsuits against CSXT in West Virginia.   As with *Ronald Abbott* and *Charles Abbott*, the overwhelming majority of the plaintiffs in the new lawsuits were not residents of West Virginia, nor did their claims have any nexus to the State.

105.    On April 9, 2002 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *William T. Amos, et al. v. CSX Transp., Inc.*, Civil Action No. 02-C-93 ("*Amos*"), in the Circuit Court of Marshall County, West Virginia.   (*See* Compl. (relevant portions

attached as Exhibit MM).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States.   Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on April 11, 2002 via certified United States mail.   (*See* Notice of Service (attached as Exhibit NN).)

106.   *Amos* asserted claims for occupational illness on behalf of approximately 100 plaintiffs, 77 of whom were not West Virginia residents.   The out-of-state plaintiffs resided in Kentucky and Ohio.

107.   Aside from the plaintiffs, the *Amos* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based.   (*See* Exhibit MM at ¶¶ 107, 111.)

108.   Although the lawyer Defendants never formally moved to refer *Amos* to the Mass Litigation Panel, as was their unilateral right under Trial Court Rule 26.01, at all relevant times it has been treated by the lawyer Defendants and the Mass Litigation Panel as if it had been.

109.   As a result of the overwhelming burdens imposed by the ongoing mediation process with respect to the approximately 3,000 *Ronald Abbott* and *Charles Abbott* plaintiffs, CSXT was unable to commence discovery in *Amos* until no earlier than the conclusion of the settlement conferences on or about May 2004.   In this respect, the lawyer Defendants succeeded in their scheme to deprive CSXT of access to discovery by repeatedly filing mass lawsuits in an overburdened court system.

110.   Moreover, prior to commencing discovery and consistent with reasonable litigation practice, CSXT intended to – and did in fact – move to dismiss *Amos* based on the doctrine of forum non conveniens.   Pursuant to applicable law at the time, this motion required CSXT to conduct:

a.  A review and analysis of internal medical and personnel records for each of the 100 plaintiffs to determine whether their claims had any nexus to the State of West Virginia.

b.   An analysis of the Marshall County Circuit Court's docket, which was hampered by the fact that, at the time, the Marshall County Circuit Court only reported the number of complaints filed and not the number of plaintiffs included in those complaints.   As a result, CSXT was forced to manually calculate the number of plaintiffs with cases pending in Marshall County.

c.  An analysis of the dockets in the localities in Kentucky and Ohio where the plaintiffs resided to determine whether their claims could be tried substantially more inexpensively and expeditiously in those forums than in Marshall County.

111.    CSXT filed its motion to dismiss based on forum non conveniens in *Amos* on October 7, 2004.   The motion was argued before Judge Recht on February 10, 2005 and denied by order dated May 24, 2005.

112.    On May 19, 2003 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *George E. Abel, et al. v. CSX Transp., Inc.*, Civil Action No. 03-C-208 ("*Abel*"), in the Circuit Court of Harrison County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit OO).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States.   Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on May 22, 2003 via certified United States mail.   (*See* Notice of Service (attached as Exhibit PP).)

113.    *Abel* asserted claims for occupational illness on behalf of approximately 1,438 plaintiffs, 1,326 of whom were not West Virginia residents.   The out-of-state plaintiffs resided in virtually every state in which CSXT operates and several in which it does not, including Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland,

Michigan, Missouri, Mississippi, North Carolina, New York, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas and Virginia.

114.    Aside from the plaintiffs, the *Abel* Complaint was substantially the same as the *Ronald Abbot* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based.   (*See* Exhibit OO at ¶¶ 1374, 1378.)

115.    *Abel* was referred to the Mass Litigation Panel by Order of the Supreme Court dated July 25, 2003.   (*See* Order, July 25, 2003 (attached as Exhibit QQ).)

116.    As a result of the overwhelming burdens imposed by the ongoing mediation process with respect to the approximately 3,000 *Ronald Abbott* and *Charles Abbott* plaintiffs, CSXT was unable to commence discovery in *Abel* until no earlier than the conclusion of the settlement conferences on or about May 2004.   In this respect, the lawyer Defendants succeeded in their scheme to deprive CSXT of access to discovery by repeatedly filing mass lawsuits in an overburdened court system.

117.    Moreover, prior to commencing discovery and consistent with reasonable litigation practice, CSXT intended to – and did in fact – move to dismiss *Abel* based on the doctrine of forum non conveniens.   Pursuant to applicable law at the time, this motion required CSXT to conduct:

    a.   A review and analysis of internal medical and personnel records for each of the 1,438 plaintiffs to determine whether their claims had any nexus to the State of West Virginia.

    b.    An analysis of the Harrison County Circuit Court's docket.

    c.   An analysis of the dockets in the localities in the approximately 22 different states where the plaintiffs resided to determine whether their claims could be tried substantially more inexpensively and expeditiously in those forums than in Harrison County.

118.     CSXT filed its motion to dismiss based on forum non conveniens in *Abel* on October 7, 2004.   The motion was argued before Judge Recht on February 10, 2005 and denied by Order dated May 24, 2005.

119.     On June 23, 2005 the lawyer Defendants caused to be filed a Motion to Refer Cases to Mediation in *Amos*, *Abel* and several other lawsuits. (*See* Mot. to Refer Cases to Med. (attached as Exhibit RR).)   This motion represented a continuation of the lawyer Defendants' strategy to deprive CSXT of access to full discovery in individual cases in order to conceal fraudulent claims and to leverage higher settlements.

120.     Between July and December 2005, CSXT filed multiple briefs in opposition to the lawyer Defendants' motion for mediation.

121.     Additionally, following Judge Jack's exposure of Defendant Harron's misconduct in the silica litigation as described in Paragraphs 62 - 65, CSXT attempted to depose Harron regarding his involvement with the claims filed by the lawyer Defendants, but the lawyer Defendants refused to make Harron available.

122.     Thereafter, CSXT moved to dismiss *Amos*, *Abel* and several other lawsuits on the basis that the claims asserted therein were filed without admissible evidentiary support and therefore violated Rule 11 of the West Virginia Rules of Civil Procedure.

123.     On February 3, 2006 Judge Recht entered an order denying the lawyer Defendants' motion for mediation and CSXT's motion to dismiss.   (*See* Order, Feb. 3, 2006 (attached as Exhibit SS).)   Additionally, the order scheduled three groups of 50 plaintiffs each for trial on July 10, 2006, October 10, 2006 and January 8, 2007.   (*See id.*)   With respect to these plaintiffs, the order permitted written discovery and examinations under Rule 35 of the West Virginia Rules of Civil Procedure.   However, it did not authorize depositions absent the mutual agreement of the parties, which provided the lawyer Defendants with the unilateral ability to continue hiding the true nature of the fraudulent claims they filed.    (*See id.*)   Moreover, the Order did not authorize any form of discovery with respect to non-trial group plaintiffs.

124.    <u>Even after the publication of Judge Jack's opinion discussing Defendant Harron's</u> <u>misconduct in the silica litigation, the commencement of criminal and congressional</u> <u>investigations into his practices, and the rejection of his diagnoses by most major asbestos</u> <u>settlement trusts, the lawyer Defendants continued to file mass asbestos lawsuits against CSXT</u> <u>in West Virginia based in whole or in part on Harron B-reads.   However, at the time these suits</u> <u>were filed, CSXT did not know and could not reasonably have known that some or all of the</u> <u>claims were based in whole or in part on Harron reads.</u>

125.    On February 21, 2006 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Charles Adams, et al. v. CSX Transp., Inc.* ("*Charles Adams*"), Civil Action No. 06-C-72, in the Circuit Court of Harrison County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit TT).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on May 15, 2006 via certified United States mail.   (*See* Notice of Service (attached as Exhibit UU).)

126.    *Charles Adams* asserted claims for occupational illness on behalf of approximately 253 plaintiffs, all but two of whom were not West Virginia residents.   The out-of-state plaintiffs resided in Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, Texas and Virginia.

127.    Aside from the plaintiffs, the *Charles Adams* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based.   (*See* Exhibit TT at ¶¶ 260, 264.)

128.    On June 13, 2006 CSXT filed a motion to dismiss *Charles Adams* on the basis that it violated West Virginia Code § 56-1-1.   On September 11, 2006 Judge Recht entered an order granting CSXT's motion and dismissing *Charles Adams*, which was later affirmed by the

West Virginia Supreme Court of Appeals.   *See In re FELA Asbestos Cases*, 222 W. Va. 512 (2008).   Although the lawyer Defendants attempted to file a petition for a writ of certiorari with the United States Supreme Court, it was rejected as untimely.

129.     On July 27, 2006 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Herbert Adams, et al. v. CSX Transp., Inc.* ("*Herbert Adams*"), Civil Action No. 06-C-182, in the Circuit Court of Harrison County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit VV).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on August 11, 2006 via certified United States mail.   (*See* Notice of Service (attached as Exhibit WW).)

130.     *Herbert Adams* asserted claims for occupational illness on behalf of approximately 605 plaintiffs, only 70 of whom lived or worked in West Virginia.

131.     Aside from the plaintiffs, the *Herbert Adams* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based.   (*See* Exhibit VV at ¶¶ 612, 616.)

132.     On October 19, 2006 CSXT filed a motion to dismiss *Herbert Adams* on the basis that it violated West Virginia Code § 56-1-1.   On December 14, 2006 Judge Recht entered an order granting CSXT's motion and dismissing *Herbert Adams*, which was later affirmed by the West Virginia Supreme Court of Appeals.   *See In re FELA Asbestos Cases*, 222 W. Va. 512 (2008).   Although the lawyer Defendants attempted to file a petition for a writ of certiorari with the United States Supreme Court, it was rejected as untimely.

133.     On November 30, 2007 the lawyer Defendants caused to be filed yet another motion to refer cases to mediation, thereby further evidencing their deliberate strategy to deprive CSXT of access to discovery in individual cases in order to conceal fraudulent claims

and leverage higher settlements.   (*See* Pls.' Renew. Mot. to Refer Cases to Med., *In re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir Ct.) (attached as Exhibit XX).) Among others, this motion covered the *Amos* and *Abel* cases pending since 2002 and 2003, respectively.   CSXT opposed the motion, which was denied by Judge Recht.

134.   On October 28, 2008 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Jerry Abbott, et al. v. CSX Transp., Inc.* ("*Jerry Abbott*"), Civil Action No. 08-C-2120 *et seq.*, in the Circuit Court of Kanawha County, West Virginia.   (*See* Compl. (relevant portions attached as Exhibit YY).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on February 4, 2009 via United States mail.   (*See* Notice of Service (attached as Exhibit ZZ).)

135.   *Jerry Abbott* re-asserted the claims of most, if not all, of the former *Charles Adams* and *Herbert Adams* plaintiffs.   (*See* Mem. of Op. & Order, *Jerry Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 08-C-2120 *et seq.* at 2 (Kanawha Cir Ct., July 11, 2009) (attached as Exhibit AAA).)   Subsequent to its filing, *Jerry Abbott* was transferred to the Mass Litigation Panel.   (*See id.*)

136.   On March 19, 2009 CSXT moved Judge Recht for the entry of a case management order applicable to all remaining Peirce firm non-malignant asbestos cases against CSXT in West Virginia.   At that time, virtually all of the *Amos*, *Abel* and *Jerry Abbott* claims, as well as various other cases, were still pending.   CSXT argued there was substantial evidence showing:

> the Peirce firm systematically employed unreliable methods of determining the health status of its clients, leading on numerous occasions to lawsuits against CSXT brought on behalf of plaintiffs who either do not suffer from the conditions alleged, have not been formally diagnosed with the conditions alleged, or do not themselves believe they suffer from the conditions alleged.

(CSXT's Mot. for Entry of Case Mgmt. Order, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) at ¶ 3 (attached as Exhibit BBB).)   Accordingly, CSXT requested "that the Court take steps to ensure the legitimacy of all pending and future claims brought by the Peirce firm."   (*Id.* at 4.)

137.    On July 11, 2009 Judge Recht dismissed *Jerry Abbott* on preclusion grounds. (*See* Exhibit CCC.)   Only 36 plaintiffs appealed this decision and their petition was unanimously denied by the Supreme Court of Appeals.   (*See* denial (attached as Exhibit DDD).)

138.    On September 17, 2009 Judge Recht entered a slightly modified version of the case management order ("CMO") CSXT proposed in connection with its March 19, 2009 motion referenced in Paragraph 136.   (*See* Rev. Case Mgmt. Order, *In re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir Ct., Sept. 9, 2009) (attached as Exhibit EEE).)   The first phase of the CMO required each claimant to, among other things, certify in writing to the court and CSXT that he or she "is aware of his or her lawsuit" and "believes that his or her claims and the assertions contained within the complaint are well-founded in fact."   (*Id.* at 1, Sec. III.)   In other words, the CMO required each claimant to verify that their claim meets the requirement of Rule 11 of the West Virginia Rules of Civil Procedure.

139.    Rather than attempt to comply with this basic procedural requirement, the lawyer Defendants caused to be filed a motion to vacate the CMO and a motion to voluntarily dismiss, without prejudice, all but two of the approximately 1,400 claims they identified as being subject to the CMO.   (*See* Peirce Firm Pls.' Mot. to Vac. CMO, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) (attached as Exhibit FFF); Peirce Firm Pls.' Mot. to Dismiss, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) (attached as Exhibit GGG).)   Among others, the motion to dismiss covered nearly 1,200 of the *Abel* claims pending since 2003, including the claims of Miledge Hill, James Peterson, A. Lewis Schabow, Aubrey Shelton and Donald Wiley discussed in Paragraph 147(b) below.

140.    The lawyer Defendants' motions to vacate and to dismiss, which sought to avoid even the most basic certification and disclosure requirements of the CMO, further prove the claims at issue were baseless.

141.    CSXT opposed the lawyer Defendants' motions to vacate and to dismiss and moved for the dismissal, with prejudice, of all claims subject to the CMO.

142.    On June 14, 2010, Judge Recht entered an order dismissing, with prejudice, all but two of the over 1,400 claims subject to the CMO. (*See* Order of Dismissal with Prejudice, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct., June 14, 2010) (attached as Exhibit HHH).)   The remaining two cases were later dismissed with prejudice as well.

## IV.    HARRON AND THE LAWYER DEFENDANTS FABRICATE AND PROSECUTE OBJECTIVELY UNREASONABLE ASBESTOS CLAIMS WITH NO BASIS IN FACT

143.    As previously discussed, the lawyer Defendants deliberately filed mass lawsuits in an overburdened court system in an effort to deny CSXT access to meaningful discovery and thereby conceal fraudulent claims.

144.    Based on materials obtained through discovery in this case, CSXT has identified numerous instances in which Harron first determined that a Peirce firm screening attendee did not exhibit signs of asbestosis, but then later, based on a second x-ray, determined that the individual exhibited signs of asbestosis despite the objectively unchanged condition of the individual's lungs.

145.    Eleven specific examples of this conduct, including the names of the individuals, the dates and locations of the relevant x-rays – all taken by Corbitt – and the dates of Harron's reads, are listed in Exhibit III.   Harron's ILO forms are attached as Exhibit JJJ.

146.    In each of the eleven examples listed in Exhibit III, Harron's determination that the individual exhibited signs of asbestosis was medically unreasonable and not the product of inter-reader or intra-reader variability, or random mistake.   Instead, Defendant Harron either

deliberately misrepresented or recklessly disregarded the content of the subject individuals' x-rays in furtherance of his and the lawyer Defendants' scheme to fabricate meritless asbestos claims against CSXT.

147.   Furthermore, in each instance, the lawyer Defendants knew or should have known that Harron's determinations were medically unreasonable.   Nevertheless, the lawyer Defendants filed or caused to be filed personal injury claims on behalf of each of the eleven individuals, the circumstances of which are as follows:

    a.  Morris Collier was a plaintiff in *Amos*.   (*See* Exhibit MM at ¶ 19.)   On September 18, 2003, by and through an email from Danielle Daley to Bo Bobersky the lawyer Defendants caused Collier's claim to be settled for $25,000.00.   (*See* Email from Danielle Daley to Bo Bobersky (Sept. 18, 2003) (attached as Exhibit KKK).)

    b.  Miledge Hill, James Petersen, A. Lewis Schabow, Aubrey Shelton and Donald Wiley were plaintiffs in *Abel*.   (*See* Exhibit OO at ¶¶ 499, 860, 974, 992, 1215.) Each of these individuals' claims remained pending until June 14, 2010, when they were dismissed with prejudice pursuant to Judge Recht's mass dismissal order.

    c.  Earl Baylor and Archie Wilkins were plaintiffs in *Charles Adams* and, subsequently, *Jerry Abbott*.   (*See* Exhibit TT at ¶¶ 13, 241; Exhibit YY.)   As noted above, *Charles Adams* was dismissed on September 11, 2006, with said dismissal being affirmed by the Supreme Court of Appeals on July 2, 2008.   Earl Baylor's subsequent *Jerry Abbott* claim was voluntarily dismissed, without prejudice, on December 26, 2008.   (*See* Notice of Voluntary Dismissal, *Earl Baylor v. CSX, Transp., Inc.*, Case No. 08-C-2155 (Kanawha Cir. Ct.) (attached as Exhibit LLL).)   Archie Wilkins' subsequent *Jerry Abbott* claim was dismissed pursuant to Judge Recht's July 11, 2009 order.

> d. Nelson Andrews, Hubert Harrison and Herman Lincoln were plaintiffs in *Herbert Adams* and, subsequently, *Jerry Abbott*.   (*See* Exhibit VV at ¶¶ 8, 212, 318; Exhibit YY at .)   As noted above, *Herbert Adams* was dismissed on December 14, 2006, with said dismissal being affirmed by the Supreme Court of Appeals on July 2, 2008.   Each individual's subsequent *Jerry Abbott* claim was dismissed pursuant to Judge Recht's July 11, 2009 order.

148.   At the time the lawyer Defendants filed or caused to be filed the claims on behalf of these eleven individuals, the lawyer Defendants knew or recklessly disregarded the fact that the individuals did not have an asbestos-related disease and that there existed no good faith basis in fact for the claims, making them objectively unreasonable.

149.   Moreover, by retaining possession of the subject individuals' prior negative x-rays and reads, the lawyer Defendants rendered those materials undiscoverable by CSXT during the course of the lawsuits in which the individuals' claims were filed.

150.   CSXT only obtained, and only could have obtained, the prior negative x-rays and reads through discovery it propounded on the Peirce firm in connection with this lawsuit. Specifically, CSXT received those materials on November 14, 2006.   (*See* Receipt of Original X-Rays (attached as Exhibit MMM).)

151.   Additionally, prior to Judge Jack's June 30, 2005 opinion in the silica litigation, CSXT did not know and could not reasonably have known that Defendant Harron intentionally misrepresented or recklessly disregarded the contents of the x-rays he read for the lawyer Defendants, nor did CSXT know nor could it reasonably have known that the lawyer Defendants were aware of this practice and utilized Harron specifically because of it.

152.   In short, the fabrication and prosecution of the eleven claims listed in Paragraph 147 constituted a deliberate effort by the lawyer Defendants and Harron to defraud CSXT.

## COUNT 1: CIVIL RICO AGAINST THE LAWYER DEFENDANTS

153.     The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 152 as if set forth verbatim herein.

154.     The Peirce firm constitutes an enterprise engaged in or the activities of which affect interstate commerce for purposes of 18 U.S.C. § 1962(c).

155.     The lawyer Defendants, who were at all relevant times employed by or associated with the Peirce firm, directly conducted and participated in the business and affairs of the Peirce firm through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

156.     Specifically, the lawyer Defendants devised and implemented a scheme to defraud CSXT and/or to obtain money by false pretenses by fabricating, filing and prosecuting objectively baseless personal injury claims, including the eleven claims described in Paragraph 147.

157.     Pursuant to the West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law, by filing and prosecuting these claims, the lawyer Defendants represented to CSXT that there existed a colorable and good faith basis for the claims, when in fact they knew or recklessly disregarded that there existed no such basis and that their clients did not suffer from asbestosis.   Furthermore, the lawyer Defendants specifically intended CSXT to rely on their representations and settle the claims.

158.     In furtherance of this scheme, the lawyer Defendants repeatedly used or caused their agents to use the mails and wires, including but not limited to, the specific instances identified in Paragraphs 90, 94, 105, 112, 119, 125, 128-129, 134 and 139.

159.     Additional specific uses of the mail and wires in furtherance of the lawyer Defendants' scheme include:

   a.   Letter dated August 13, 2003 from Defendant Harron addressed to Robert F. Daley regarding Morris Collier's asbestosis diagnosis. (attached as Exhibit NNN.)

b.  Letter dated January 4, 2005 from Defendant Peirce addressed to Fred Adkins, Esq. and Heath Wheldon.   (attached as Exhibit OOO.)

c.  Letter dated June 23, 2005 from Robert F. Daley addressed to the Honorable Arthur M. Recht.   (attached as Exhibit PPP.)

d.  Letter dated September 28, 2005 from Robert F. Daley to Fred Adkins, Esq. (attached as Exhibit QQQ.)

e.  Letter dated August 5, 2005 from Robert F. Daley addressed to Fred Adkins, Esq. (attached as Exhibit RRR.)

f.  Letter dated November 28, 2005 from Defendant Peirce addressed to the Honorable Arthur M. Recht.   (attached as Exhibit SSS.)

g.  Letter dated November 28, 2005 from R. Scott Marshall addressed to Fred Adkins, Esq.   (attached as Exhibit TTT.)

160.   Each of the acts described or referred to in Paragraphs 90, 94, 105, 112, 119, 125, 128-129, 134, 139 and 159 (a-g) constitutes a violation of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) and is therefore a predicate act of racketeering activity under 18 U.S.C. § 1961(1).

161.   These predicate acts are related in that they shared the same or similar purposes, results, participants, victims, methods of commission and were otherwise interrelated by distinguishing characteristics and were not isolated events.   Specifically, each predicate act was committed in furtherance of the lawyer Defendants' deliberate scheme to fabricate asbestosis claims through their purposefully unreliable screening process, overwhelm CSXT with mass lawsuits in an overburdened court system in order to deny CSXT access to full discovery, and then defraud CSXT by prosecuting objectively baseless claims, including the eleven claims described in Paragraph 147, with the full knowledge that there existed no good faith basis in fact for those claims.   The predicate acts were not isolated events, but rather

regular and integral steps in furtherance of the lawyer Defendants' scheme to defraud CSXT through objectively baseless personal injury claims.

162.     Further, the predicate acts were continuous in that they occurred on a regular basis since 2000 and affected at least six different civil actions pending in multiple courts in West Virginia.

163.     Accordingly, the lawyer Defendants' criminal acts of mail and wire fraud constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

164.     Finally, although CSXT disputed the subject claims, it reasonably relied on the lawyer Defendants' representations that the claims had some good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law.

165.     By reason of the lawyer Defendants' violations of 18 U.S.C. § 1962(c), CSXT was repeatedly injured in its business and property.   Specifically, the lawyer Defendants' violations of § 1962(c) caused CSXT to expend substantial money and resources to process, defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should never have been filed in the first place.

### COUNT 2: CIVIL RICO CONSPIRACY
### AGAINST THE LAWYER DEFENDANTS AND HARRON

166.     The Plaintiff realleges the allegations set forth in Paragraphs 1 through 165 as if set forth verbatim herein.

167.     As outlined above, beginning in the late 1990s, the lawyer Defendants and Harron (hereinafter collectively referred to as "the Conspirators") entered into an agreement to conspire to violate 18 U.S.C. § 1962(c) by devising and implementing a scheme to defraud CSXT by fabricating, filing and prosecuting objectively baseless personal injury claims against it, including the eleven claims described in Paragraph 147.   At all relevant times, each conspirator

knew of and participated in this scheme through specific overt acts intended to further its objective of defrauding CSXT.

168.     Specifically, Defendants Peirce and Raimond orchestrated and implemented the screening process outlined above, which they specifically intended to attract potential clients and manufacture diagnoses of asbestos-related diseases regardless of whether the subject individuals actually exhibited signs of those diseases.   (*See* Exhibit L133:11-135:23.)   In furtherance of this objective, they deliberately hired technicians and doctors, including Corbitt and Harron, who they knew to be unreliable and whom they believed would maximize the likelihood of false positive diagnoses.   (*See id.* at 196:23-197:3; *see also* Exhibit H 80:3-7; and Exhibit G.)

169.     Harron, in turn, agreed to read unusually high numbers of x-rays with reckless or deliberate disregard for their true content and to identify signs of asbestos-related disease where no such signs existed, with the full knowledge that the lawyer Defendants intended to file personal injury claims based solely on his B-reads.   Harron further understood that the purpose of his reads were to mislead CSXT and cause it to settle objectively baseless claims.

170.     Further, the lawyer Defendants agreed that one or all of them, particularly Defendant Coulter, would cause personal injury claims to be filed based on Harron's fraudulent diagnoses.   Additionally, they each agreed to assist in the prosecution of these claims through the transmission of misleading communications to clients, participation in settlement negotiations with CSXT, communications with the courts and other fraudulent means.

171.     Finally, some or all of the lawyer Defendants agreed to share the fees and settlement monies generated by the objectively baseless claims they manufactured and prosecuted.   (*See* Exhibit L 24:7-25:1.)

172.     The foregoing concerted conduct by the Conspirators constitutes a violation of 18 U.S.C. § 1962(d).   This violation caused CSXT to be repeatedly injured in its business or property, specifically, by forcing CSXT to expend substantial money and resources to process,

defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should never have been filed in the first place.

## COUNT 3: COMMON LAW FRAUD AGAINST THE LAWYER DEFENDANTS

173.    The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 172 as if set forth verbatim herein.

174.    As previously explained, by filing or causing to be filed each of the eleven fabricated personal injury claims described in Paragraph 147, the lawyer Defendants represented to CSXT that there existed some good faith basis in fact for the claims when, in reality, they knew no such basis existed.   Moreover, the lawyer Defendants specifically intended CSXT to rely on these representations and settle the claims.

175.    Although CSXT disputed the subject claims, it reasonably relied on the lawyer Defendants' representations that the claims had some good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure and Professional Conduct.

176.    As a proximate result of the lawyer Defendants' intentional and fraudulent misrepresentations and CSXT's reasonable reliance thereon, CSXT suffered damages in the amount of the money it spent to process, defend and/or settle the fabricated claims.

## COUNT 4: CIVIL CONSPIRACY AGAINST
## THE LAWYER DEFENDANTS AND HARRON

177.    The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 176 as if set forth verbatim herein.

178.    The Conspirators agreed to combine through concerted action to unlawfully defraud CSXT as outlined in Counts 1, 2, and 3 above.

179.    As a proximate result of this conduct, CSXT suffered damages in the amount of the money it spent to process, defend and/or settle the fabricated claims.

## COUNT 5: PUNITIVE DAMAGES AGAINST THE LAWYER DEFENDANTS AND HARRON

180.    The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 179 as if set forth verbatim herein.

**181.**    That the Defendants' conduct toward the Plaintiff was intentional, willful, wanton, malicious, and reckless and justifies an award of punitive damages.

**WHEREFORE**, Plaintiff CSX Transportation, Inc. respectfully requests:

1.    Compensatory damages jointly and severally against the Defendants in an amount sufficient to fully compensate Plaintiff for the injuries sustained as a result of Defendants' unlawful conduct, including, but not limited to, the cost, including attorneys' fees, of processing, defending and/or settling the fraudulent claims identified in Paragraph 147;

2.    Punitive damages against all Defendants in an amount sufficient to deter the Defendants and others from engaging in this conduct in the future;

3.    The court costs and attorneys' fees incurred by CSX transportation, Inc. in the preparation and prosecution of this action;

4.    Treble damages and attorneys' fees pursuant to 18 U.S.C. 1964(c); and,

5.    Any and all other further relief the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**

                                        **CSX TRANSPORTATION, INC.**


                                        By_____/s/Marc E. Williams_____
                                                    Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
**Nelson Mullins Riley & Scarborough LLP**
949 Third Avenue, Suite 200
Huntington, WV 25701
(304) 526-3501 (Telephone)
(304) 526-3541 (Facsimile)

Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
**McGuireWoods LLP**
One James Center
901 E. Cary Street
Richmond, VA 23219
(804) 775-1000 (Telephone)
(804) 775-1061 (Facsimile)
**COUNSEL FOR THE PLAINTIFF**
**CSX TRANSPORTATION, INC.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

**CSX TRANSPORTATION, INC.,**

         **Plaintiff,**

**v.**                                        **Civil Action No. 5:05-cv-202**

**ROBERT N. PEIRCE, JR.;
LOUIS A. RAIMOND;
MARK T. COULTER;
and RAY HARRON, M.D.,**

         **Defendants.**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he served the foregoing **Third Amended Complaint** upon the following individuals via electronic filing with the Court's CM/ECF system, on the 19th day of October, 2011:

Walter P. DeForest, Esquire
**DEFOREST KOSCELNIK
YOKITIS & KAPLAN**
3000 Koppers Building
Pittsburgh, PA 15219

Ron Barroso, Esquire
5350 S. Staples
Suite 401
Corpus Christi, TX 78411

Jerald E. Jones, Esquire
**WEST & JONES**
360 Washington Avenue P.O. Box 2348
Clarksburg, West Virginia 26302-2348

                                                  /s/Marc E. Williams