**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:05-CV-202 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT N. PEIRCE, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CSX TRANSPORTATION, INC.'S COMBINED OPPOSITION TO THE LAWYER
DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT**

Comes now Plaintiff CSXT Transportation, Inc. ("CSXT"), by and through its counsel,
and respectfully submits its Combined Opposition to Defendants Peirce's, Raimond's and
Coulter's (collectively, "the Lawyer Defendants") Motions to Dismiss the Third Amended
Complaint.

**I.      WITH ONE EXCEPTION, THE LAWYER DEFENDANTS' ARGUMENTS ARE
BARRED BY THE FOURTH CIRCUIT'S MANDATE.**

This is not the first time this Court has been asked to determine the legal sufficiency of
CSXT's RICO and common law claims against the Lawyer Defendants.  Rather, the Lawyer
Defendants' currently pending motions to dismiss represent their third round of pre-answer
challenges to the sufficiency of CSXT's claims.  (*See* Doc. 230 (Lawyer Defs.' Mot. to Dismiss
Am. Compl.); Doc. 281 (Lawyer Defs.' Opp. to CSXT's Mot. for Leave to File 2d Am. Compl.).)
In addition, Defendants Peirce and Raimond previously moved for summary judgment on
CSXT's Baylor-related claims based on what they apparently believed was a fully developed
evidentiary record.  (*See* Doc. 536.)  All of the foregoing motions practice occurred prior to
CSXT's appeal to the Fourth Circuit, which resulted in a judgment reinstating all of CSXT's
claims.  (*See* Doc. 818 (judgment); Doc. 821 (mandate).)

"Few legal precepts are as firmly established as the doctrine that the mandate of a
higher court is 'controlling as to matters within its compass.'"  *United States v. Bell*, 5 F.3d 64,

66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)).  Lower

courts are "bound to carry the mandate of the upper court into execution and may not consider

the questions which the mandate laid at rest."  *Id.*

In particular, the mandate rule "forecloses litigation of issues decided by the district court

but foregone on appeal or otherwise waived, for example because they were not raised in the

district court."  *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481

(4th Cir. 2007) (quoting *Bell*, 5 F.3d at 66).  As the court below in *Volvo Trademark* observed:

> ***Remand is not an opportunity for parties to assert new arguments or legal***
> ***theories that were raised neither in the district court originally nor on***
> ***appeal. Were the rule otherwise, there would be no end to any case.***

*Volvo Trademark Holding Aktiebolaget v. AIS Constr. Equip. Corp.*, 416 F. Supp. 2d 404, 409

(W.D.N.C. 2006) (emphasis added) (citing *United States v. Bell*, 988 F.2d 247, 252 (1st Cir.

1993)); *see also Volvo Trademark*, 510 F.3d at 481 ("[U]nder the mandate rule a remand

proceeding is not the occasion for raising new arguments or legal theories.").  The mandate rule

also "compels compliance on remand with the dictates of a superior court and forecloses

relitigation of issues expressly or impliedly decided by the appellate court."  *Volvo Trademark*,

510 F.3d at 481; *see also Charleston Area Med. Ctr., Inc. v. Parke-Davis*, No. 5:00CV132, 2006

U.S. Dist. LEXIS 25239, at *6 (N.D. W. Va. Feb. 2, 2006) (same).

Here, with the exception of their argument concerning the RICO pattern requirement, the

Lawyer Defendants did not previously raise in this Court or on appeal any of the arguments or

legal theories set forth in their currently pending motions to dismiss.  (*See* Doc. 231 (Lawyer

Defs.' Mem. in Supp. of Mot. Dismiss Am. Compl.); Doc. 281 (Lawyer Defs.' Opp. to CSXT's

Mot. for Leave to File 2d Am. Compl.); Doc. 537 (Defs. Peirce's and Raimond's Mem. in Supp.

of Mot. for Summ. Judg. on Counts 3 & 4); Br. of Appellees, Case No. 09-2315 (Doc. 91).)  As a

result, those arguments and legal theories are barred by the mandate rule.  *See Volvo*

*Trademark*, 510 F.3d at 481.

Indeed, the circumstances of the present case are similar to—though more extreme than—those of *Volvo Trademark. See* 416 F. Supp. 2d at 406-410.  There, Volvo initially obtained summary judgment on all claims against it in the district court.  *Id.* at 406.  One of Volvo's opponents, Clark, appealed to the Fourth Circuit and was successful in having one of its claims reinstated.  *Id.*  On remand, Volvo and Clark filed cross motions for summary judgment on the lone remaining claim.  *Id.* at 407.  Volvo based its motion on a legal argument that it had not raised in the district court "in the first proceeding and apparently did not [raise] before the Fourth Circuit."  *Id.* at 409.  As a result, the district court rejected the argument as barred by the mandate rule.  *Id.*  The district court further held that the newly raised argument had been impliedly decided by the Fourth Circuit and was barred by the mandate rule for that reason as well.  *Id.*  In the subsequent appeal, the Fourth Circuit affirmed on both grounds.  *See* 510 F.3d at 481.

In the case at bar, the Lawyer Defendants have raised not just one new argument, but *five*—each of which includes numerous sub-arguments—in an effort to defeat CSXT's longstanding legal theories.  (*See, e.g.,* Doc. 888, Sec. III(A)-(D), (F).)[1]  This situation is the paradigmatic example of why the mandate rule exists—without it, litigants dissatisfied with appellate judgments would raise wave after wave of new legal theories upon remand and "there would be no end to any case."  *Volvo Trademark*, 416 F. Supp. 2d at 409; *see also Doe v. Chao*, 511 F.3d 461, 465-466 (4th Cir. 2007) ("The mandate rule in fact serves the interest of finality in litigation. Repetitive hearings, followed by additional appeals, waste judicial resources and place additional burdens on hardworking district and appellate judges.") (internal quotations and citations omitted).

---

[1] To avoid lengthy record citations, when an argument or other proposition is contained in each of the Lawyer Defendants' motions to dismiss or memoranda of law in support, CSXT will hereinafter only cite to Defendants Peirce's papers as the representative example.

Moreover, to the extent the Lawyer Defendants contend that their newly raised Rule 9(b) and common law "reliance" arguments (*see* Doc. 888, Sec. III(A) and (C)) somehow fall within the ambit of their prior arguments in this Court, those arguments were either rejected by this Court and not raised on appeal or rejected by the Fourth Circuit on appeal.  Specifically, with respect to Rule 9(b), this Court previously held that "CSX has set forth a claim for common law fraud with sufficient specificity and has stated a claim upon which relief can be granted" (Doc. 264 at 11) and the Lawyer Defendants did not challenge the Court's holding concerning Rule 9(b) compliance on appeal (*see* Br. of Appellees).  And with respect to reliance, the Fourth Circuit expressly rejected the notion that CSXT had not pled or proven it:

> Obviously, CSX would have "relied" on the representation by filing the Baylor claim that all elements of the cause of action were met as CSX would have had no reason to know of the alleged act of fraud.***

> Consequently, a reasonable jury could find CSX relied to its detriment on the defendants' alleged fraud as the basis of the Baylor claim.

(Doc. 818 at 23-24.)

Thus, even assuming the Lawyer Defendants' newly raised arguments concerning Rule 9(b) and common law reliance somehow fall within the ambit of their prior arguments, they are still barred by the mandate rule because they were "decided by the district court but foregone on appeal" or "expressly or impliedly decided by the appellate court."  *Volvo Trademark*, 510 F.3d at 481; *see also Doe*, 511 F.3d at 466; *Directv, Inc. v. Rawlins*, 523 F.3d 318, 329 (4th Cir. 2008).  In fact, *any* contention that Counts 3 (common law fraud) and 4 (common law conspiracy) of the Third Amended Complaint fail to state a claim for which relief can be granted was impliedly rejected by the Fourth Circuit's reversal of summary judgment on CSXT's Baylor claims, which were and are premised on the causes of action set forth in Counts 3 and 4.  *See Black v. Lane*, 22 F.3d 1395, 1398 n.5 (7th Cir. 1994) ("The *Black I* court, in reviewing the grant of summary judgment for the defendants, determined that there existed genuine issues of

material fact. In doing so the court implicitly held that the plaintiff's complaint stated a cause of action.").

The Lawyer Defendants also cannot point to any "extraordinary circumstances" justifying departure from the mandate rule. *Bell*, 5 F.3d at 67. A district court's "limited discretion to reopen" issues on remand is confined to the following "very special situations:"

> (1) a showing that controlling legal authority has changed dramatically; (2) that significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or (3) that a blatant error in the prior decision will, if uncorrected, result in a serious injustice.

*Id.* (internal quotations and citations omitted). None of these situations is present here. For instance, while the Lawyer Defendants cite two relatively recent Supreme Court cases in support of their RICO proximate cause argument (*see* Doc. 888 at 14), neither of those cases constitutes a "dramatic change" in "controlling legal authority" insofar as RICO proximate cause is concerned. To the contrary, the RICO proximate cause requirement has remained substantively the same since it was first announced by the Supreme Court in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267 (1992). Furthermore, while it is true that some of the facts concerning the procedural history of the fraudulent claims were not present in the original Amended Complaint, the overwhelming majority of them were present in the proposed Second Amended Complaint (*see* Doc. 278, Ex. 1 ¶¶ 85-128) and the remainder were easily "obtainable in the exercise of due diligence" during discovery related to CSXT's Baylor claims. Indeed, they are matters of public record in proceedings in which the Peirce Firm was involved. There also were no "blatant errors" in the Fourth Circuit's opinion, as evidenced by the denial of the Lawyer Defendants' petition for rehearing and rehearing *en banc* (*see* Case No. 09-2135, Doc. 119), as well as their petition for writ of certiorari (*see* Doc. 849).

Finally, the fact that CSXT has filed an amended complaint post-remand does not change any of the foregoing analysis. As illustrated above, the amendment of a pleading is not, in and of itself, one of the expressly enumerated "special situations" where departure from the

mandate rule is permitted.  *See Bell*, *supra*.  And, as a practical matter, CSXT's original

Amended Complaint—which was the target of the Lawyer Defendants' prior motion to dismiss—

relied upon the same legal theories and asserted the same substantive causes of action against

the Lawyer Defendants as does the Third Amended Complaint (and as did the proposed

Second Amended Complaint) and used the same phrase "the Lawyer Defendants" to describe

their collective actions.  The Amended Complaint differed from the Third Amended Complaint

(and the proposed Second Amended Complaint) only in that it contained *less* factual detail and

identified *fewer* fraudulently filed claims and related predicate acts of mail and wire fraud.  Any

and all of the arguments the Lawyer Defendants currently are making could have been raised—

likely with greater force—in their motion to dismiss the Amended Complaint, their opposition to

CSXT's proposed Second Amended Complaint, in their motion for summary judgment on the

Baylor-related claims, or on appeal.  As a result, those arguments are barred by the mandate

rule irrespective of CSXT's post-remand amendment, which did not alter the nature of CSXT's

causes of action or legal theories.[2]

## II.     THE LAWYER DEFENDANTS' ARGUMENTS ARE WITHOUT MERIT.

### A.     The Third Amended Complaint sufficiently pleads reliance for purposes of CSXT's common law counts.

The Lawyer Defendants first contend that CSXT's common law fraud and conspiracy

claims fail because CSXT "has not and cannot plead reliance on any allegedly false

representation" by each of the Lawyer Defendants.  (Doc. 888 at 5.)  As a threshold matter, this

argument fails because it does not address or even acknowledge the false representations and

reliance *actually* alleged in the Third Amended Complaint, which are as follows:

> Pursuant to the West Virginia Rules of Civil Procedure, Professional Conduct and
> other applicable law, by filing and prosecuting [the claims described in Paragraph

---

[2] Even in the absence of a mandate from a superior court, the Fourth Circuit has held that "an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading."  *Rowley v. McMillan*, 502 F.2d 1326, 1333 (4th Cir. 1974).  Therefore, mandate rule aside, it is clear that the Lawyer Defendants' newly raised arguments are procedurally improper.

147], the lawyer Defendants represented to CSXT that there existed a colorable and good faith basis for the claims, when in fact they knew or recklessly disregarded that there existed no such basis for the claims . . .***

[A]lthough CSXT disputed the subject claims, it reasonably relied on the lawyer Defendants' representations that the claims had some good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law" and "expend[ed] substantial money and resources to process, defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should never have been filed in the first place.

(3d Am. Compl. ¶¶ 157, 164-165 (re-alleged at ¶¶ 173 and 177).)

The Lawyer Defendants do not dispute the legal sufficiency of the foregoing alleged false representations and reliance, nor can they.  The filing of a lawsuit in a West Virginia court constitutes a representation that the claims and allegations contained in the complaint are "'well grounded in fact and . . . not interposed for any improper purpose." *Pritt v. Suzuki Motor Co., Ltd.*, 513 S.E.2d 161, 170 (W. Va. 1998) (internal quotations omitted) (citing W. Va. R. Civ. P. 11 and W. Va. R. Prof. Cond. 3.1).  Furthermore, litigants such as CSXT are entitled to reasonably and justifiably rely on such representations.  As the Fourth Circuit held when it reinstated CSXT's Baylor-related fraud claim: "Obviously, CSX would have 'relied' on the [Lawyer Defendants'] representation by filing the Baylor claim that all elements of the cause of action were met as CSX would have had no reason to know of the alleged act of fraud."  (Doc. 818 at 23; *see also id.* at 24 ("Consequently, a reasonable jury could find CSX relied to its detriment on the defendants' alleged fraud as the basis of the Baylor claim.").[3]  Thus, any challenge to the legal sufficiency of CSXT's alleged reliance on the false representations made by or caused to be made by the Lawyer Defendants is without merit.

---

[3] The Fourth Circuit's holding is in accord with numerous other authorities, which CSXT previously cited and discussed in its opposition to Defendant Harron's motion to dismiss the Amended Complaint.  (*See* Doc. 262 at 3-4, n.4.)  Those authorities include, among others, *Raymark v. Stemple*, 1990 U.S. Dist. LEXIS 6710, at *4, *75 (D. Kan. 1990) (in context of RICO and fraud claims premised on fabricated asbestos claims, holding that corporation "reasonably assumed, given the defendant attorneys' professional responsibilities and Rule 11 compliance, that they would only submit claims of at least some merit [and] surely would not recklessly acquiesce in the filing of a constant, steady flow of faulty claims").

Moreover, to the extent the Lawyer Defendants are attempting to argue that CSXT failed to plead that it was "damaged because [it] relied upon" the Lawyer Defendants' false representations, *see, e.g.*, *Poling v. Pre-Paid Legal Servs.*, 575 S.E.2d 199, 207 (2002), that argument also is without merit.  Under West Virginia law, a "plaintiff's measure of damages" in an action for fraud consists of "*any* injury incurred as a result of the defendant's fraudulent conduct," including "annoyance and inconvenience."  *Persinger v. Peabody Coal Co.*, 976 F. Supp. 1038, 1040 (S.D. W. Va. 1997) (emphasis in original) (quoting *Persinger v. Peabody Coal Co.*, 196 W. Va. 707, 719 (1996)).  Furthermore, "it is not necessary that the fraudulent representations complained of should be the *sole* consideration or inducement moving the plaintiff.  If the representations contributed to the formation of the conclusion in the plaintiff's mind, that is enough."  *Croye v. GreenPoint Mortg. Funding, Inc.*, 740 F. Supp. 2d 788, 795 (S.D. W. Va. 2010) (quoting *Horton v. Tyree*, Syl. Pt. 3, 139 S.E. 737 (W. Va. 1927) (emphasis in original)).

The allegations set forth in CSXT's Third Amended Complaint, as well as the reasonable inferences they support, establish that CSXT "was damaged because it relied upon" the Lawyer Defendants' false representations in that CSXT treated the fraudulently filed claims like any other and expended resources "to process, defend and/or settle" them.  (*See, e.g.*, 3d Am. Compl. at ¶¶ 176, 179.)  This theory of recovery is manifestly "plausible on its face," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009), and has been affirmed as legally sufficient in cases involving similar claims.  For example, in *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076 (S.D.N.Y. 1994), which involved common law fraud and RICO claims based on fraudulent occupational hearing loss claims, the District Court for the Southern District of New York held as follows:

> Plaintiffs contend that as a result of defendants' alleged fraud, they have incurred the significant medical and legal costs required to defend the claims in front of the Board. Without attempting to rule on the scope of plaintiffs' damages at this stage, expenses of this nature, which foreseeably and directly result from

defendants' alleged violative conduct, constitute injury by reason of a RICO violation.

*Id.* at 1100.

Importantly, the Lawyer Defendants do not contend that the allegations contained in the Third Amended Complaint somehow affirmatively establish that CSXT incurred *no* damages as a result of the fraudulently filed claims, nor can they—such a contention is as illogical as it is unsupported by the face of the complaint.  CSXT paid $25,000.00 to settle the claim of Morris Collier.[4]  The claims of Miledge Hill, James Petersen, A. Lewis Schabow, Aubrey Shelton and Donald Wiley were pending for over *seven years*, during which time they were subjected to extensive motions practice before being dismissed.  (*See* 3d Am. Compl. ¶¶ 112-123, 136, 138-142, 147(b).)  The claims of Earl Baylor, Archie Wilkins, Nelson Andrews, Hubert Harrison and Herman Lincoln were—over a period of *three years*—subjected to motions practice and dismissed once, appealed to the Supreme Court of Appeals where their dismissals were affirmed, *re-filed*, again subjected to motions practice and then *dismissed for a second time*. (*See id.* at ¶¶ 125-132, 134-145, 137, 147(c)-(d).)  Moreover, in addition to attorneys' fees and litigation costs, CSXT expended internal resources to "process" the fraudulently filed (and, in some cases, fraudulently re-filed) claims.  (*See, e.g.*, *id.* at ¶ 176.)  At an absolute minimum, the foregoing allegations establish that CSXT experienced "annoyance and inconvenience" as a result of the Lawyer Defendants' fraudulent filing and prosecution of the claims at issue.

---

[4] With respect to Morris Collier, the Lawyer Defendants contend that "CSX's entire case is premised on the alleged filing of fraudulent asbestosis cases . . . [b]ut, CSX settled a cancer case with Mr. Collier for $25,000." (Doc. 888 at 6.)  This argument is meritless.  First, nowhere in the Third Amended Complaint does it state that CSXT's fraud claims only apply to allegations of "asbestosis."  (*See, e.g.*, 3d Am. Compl. ¶ 148 (referencing "asbestos related disease" generally).)  Rather, CSXT pled that the Lawyer Defendants filed asbestos lawsuits with no good faith basis in fact, which, in the case of Morris Collier, involved allegations of asbestos-related bladder cancer in addition to asbestosis.  (*See id.* Ex. MM ¶ 11 ("As a direct and proximate result of the defendant's negligence, the plaintiffs have developed asbestosis . . . ***cancer***. . .").)  Second, to the extent it matters, it is clear that the Lawyer Defendants' allegation that Morris Collier's bladder cancer was related to asbestos was based, at least in part, on Harron's determination that Collier had asbestosis.  (*See id.* Ex. NNN.)

*Persinger*, 976 F. Supp. at 1040.  This is sufficient to withstand the Lawyer Defendants' challenge.

In truth, the Lawyer Defendants merely dispute the extent to which certain motions referenced in the Third Amended Complaint related to or were attributable to the fraudulently filed claims.  (*See* Doc. 888 at 6.)  As an initial matter, this argument is unavailing because it conflicts with the requirement that the Court construe the facts pled "in the light most favorable to the plaintiff," *Nemet Chevrolet*, 591 F.3d at 255, and that it "draw all reasonable . . . inferences from those facts in the plaintiff's favor," *Corbett v. Duerring*, 780 F. Supp. 2d 486, 491 (S.D. W. Va. 2011) (internal quotations omitted).  Furthermore, arguments of this kind do not go to the legal sufficiency of CSXT's claims, but rather the scope of damages CSXT may be entitled to recover based on a fully developed evidentiary record.  *See, e.g., infra* at 22.  And, in any event, the Lawyer Defendants' position ignores that (1) even where a particular motion pertained to more than one plaintiff, it still required individualized investigation and analysis as to each plaintiff (*see, e.g.*, 3d Am. Compl. ¶ 117(a)), and (2) CSXT's damages claim is not limited to the particular motions referenced in the Third Amended Complaint, but also includes any and all costs associated with "processing, defending and/or settling" the fraudulently filed claims, (*see id.* ¶¶ 176, 179).  For all of these reasons, the Lawyer Defendants' arguments concerning reliance fail.[5]

---

[5] The Lawyer Defendants also contend, without any citation to the Third Amended Complaint or case law, that "CSX could not have reasonably relied on any allegedly fraudulent claim supported by a Dr. Harron B-read after Judge Jack's opinion; yet, five of the claims at issue were filed after this opinion."  (Doc. 888 at 6.)  This argument fails because, among other reasons, there are no allegations in the Third Amended Complaint establishing that CSXT knew at the time those claims were filed that they were based in whole or in part on a Harron B read.  The Lawyer Defendants' argument is also inconsistent with the Fourth Circuit's reinstatement of CSXT's Baylor-related claims (*see supra* at 4), which were and are premised on a claim that was supported, in whole or in part, by a Harron B read and that was filed after Judge Jack's opinion (*see* 3d Am. Compl. ¶¶ 144, 145, 147(c)).

B.   Pursuant to 30 year-old Fourth Circuit precedent, the filing of pleadings and related letters can be predicate acts of mail and wire fraud.

The Lawyer Defendants next contend that CSXT's racketeering claims fail "because the filing of pleadings and related letters cannot be predicate acts of mail and wire fraud." (Doc. 888 at 7.) This argument ignores 30 year-old Fourth Circuit precedent.[6]  In *United States v. Murr*, 681 F.2d 246 (4th Cir. 1982), *cert. denied* 459 U.S. 973 (1982), the Fourth Circuit affirmed a mail fraud conviction based on the defendant's filing of a fraudulent lawsuit, holding as follows:

> While utilization of the mail fraud statute to prosecute the filing of a false § 1983 petition is apparently a case of first impression, a survey of recent mail fraud prosecutions from this circuit alone shows that the statute has had varied use. The common element of such cases is that the accused attempted to use the mail as an instrument of his crime.
>
> It is apparent to us that the elements of the statutory offense have been demonstrated here. . . . Murr's placing of the § 1983 petition in the mail with its accompanying papers was a sufficient connection with the mail system to satisfy the statute.

*Id.* at 248 (internal citations omitted); *see also United States v. Pritt*, No. 99-4581, 2000 U.S. App. LEXIS 29115 (4th Cir. Nov. 14, 2000) (affirming mail fraud convictions based on "various fraudulent discovery responses in the [defendant's] fraudulent lawsuit against Suzuki").

If, as *Murr* instructs, the fraudulent filing of a lawsuit is indictable—indeed, convictable—under the federal mail fraud statute, then, by definition, such conduct constitutes "racketeering activity" for purposes of 18 U.S.C. § 1962.  *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" as "any act which is indictable under any of the following provisions of title 18, United States Code," including "section 1341 (relating to mail fraud)").  It logically and necessarily follows that the transmission of other pleadings and correspondence related to a fraudulently-filed lawsuit may also be indictable as mail or wire fraud and, therefore, constitute racketeering activity as well.  *See Pritt*, *supra*; *see also United States v. Lebovitz*, 669 F.2d 894, 897-899 (3d

---

[6] Judge Posner of the Seventh Circuit recently observed that the "ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless."  *Gonzalez-Servin v. Ford Motor Co.*, 2011 U.S. App. LEXIS 23670, at *5 (7th Cir. Nov. 23, 2011) (quoting *Mannheim Video, Inc. v. County of Cook*, 884 F.2d 1043, 1047 (7th Cir. 1989)).

Cir. 1982), *cert denied* 456 U.S. 929 (1982) (affirming mail fraud convictions based on correspondence related to fraudulent lawsuits, including a letter enclosing the plaintiff's pretrial statement and two letters relating to settlement); *United States v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992), *cert denied* 507 U.S. 1029 (1993) (affirming RICO convictions of multiple lawyers alleged to have fabricated personal injury claims where a "number of the mail fraud predicates in the indictment" involved "misrepresentations in pleadings and pretrial submissions [that] were made in the hope of fraudulently inducing a settlement before trial"); *G-I Holdings v. Baron & Budd*, 238 F. Supp. 2d 521, 539 (S.D.N.Y. 2002) (denying motion to dismiss civil RICO claims against law firm and individual lawyers involving predicate acts of mail fraud based on the falsification of product identification affidavits in asbestos litigation).[7]

This is true whether or not the pleadings and correspondence themselves were false or fraudulent, *see Murr*, 681 F.2d at 248-249 ("The use of the mails need not in and of itself be fraudulent to constitute an offense under the statute. . . . the mailed material may be totally innocent, and yet it still may be found that a scheme to defraud exists."), so long as they were "incident to an essential part of the scheme, or a step in the plot," *United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005) (quoting *Schmuck v. United States*, 489 U.S. 705, 710-711 (1989)); *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2138 (2008) (internal citations and quotations omitted) ("The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information.").  Thus, the Lawyer Defendants' categorical contention that "the filing of pleadings and related letters cannot be predicate acts of

---

[7] CSXT previously has identified numerous cases where courts affirmed the legal sufficiency of civil RICO claims based on fabricated personal injury claims and related mailings.  (*See, e.g.*, Doc. 234 at 3-6.)

mail and wire fraud," which unsurprisingly relies entirely on authorities[8] from outside the Fourth Circuit, is incorrect and unavailing.

Furthermore, there can be no disputing that each of the predicate acts identified in the Third Amended Complaint was, at a minimum, "incident to an essential part of [the Lawyer Defendants'] scheme, or a step in [their] plot." *Pierce*, 409 F.3d at 232.  The Third Amended Complaint alleges the existence of the following "scheme to defraud" for purposes of the mail and wire fraud statutes:

> Specifically, the lawyer Defendants gained access to potential clients through unlawful means, retained clients and procured medical diagnoses for them through intentionally unreliable mass screenings, prosecuted clients' claims using dishonest, fraudulent, and deceptive tactics and, ultimately, fabricated and prosecuted asbestos claims with no basis in fact. Moreover, the lawyer Defendants deliberately filed the claims they manufactured in mass lawsuits in overburdened courts to deprive CSXT of access to meaningful discovery, which in turn concealed fraudulent claims and leveraged higher settlements based on the threat of mass trials.

(3d Am. Compl. ¶ 19; *see also id.* at ¶ 156 ("[T]he lawyer Defendants devised and implemented a scheme to defraud CSXT and/or obtain money by false pretenses by fabricating, filing and prosecuting objectively baseless personal injury claims . . .").)  Obviously, the filing of the fraudulent claims themselves was an integral part of this scheme (*see* 3d Am. Compl. ¶¶ 105, 112, 125, 129, 134), as was Harron's letter purporting to diagnose Morris Collier with asbestosis and asbestos-related bladder cancer (*see id.* ¶159(a) and Ex. NNN).

The other predicate acts identified in the Third Amended Complaint (*see id.* ¶¶ 90, 94, 119, 133, 139, 159(b)-(g)[9]) relate to the Lawyer Defendants' efforts to "deprive CSXT of access

---

[8] Many of the authorities relied upon by the Lawyer Defendants involved actions for malicious prosecution and not fraud, as is the case here.  (*See* Doc. 888 at 8-9.)  It is not surprising that such actions could not support claims for civil RICO because, unlike fraud, malicious prosecution is not a specifically enumerated predicate act under 18 U.S.C. § 1961(1).  And, of course, the Lawyer Defendants' cavalier attempt to recast the Third Amended Complaint "as nothing more than a trumped up abuse of process claim" (Doc. 888 at 8) is contrary to the causes of actions *actually* set forth in the Third Amended Complaint.  There is also no basis for the Lawyer Defendants' apparent suggestion that all causes of action brought against lawyers necessarily must be for malicious prosecution or abuse of process.  If that were the case, the Supreme Court of Appeals of West Virginia presumably would not have gone out of its way to explicitly hold that "the litigation privilege does not apply to claims of malicious prosecution **and fraud**."  *Clark v. Druckman*, 624 S.E.2d 864, 872 (W. Va. 2005) (emphasis added).

to meaningful discovery [and thereby] conceal[] fraudulent claims and leverage[] higher settlements," which, as set forth above, was also an integral part of their scheme to defraud CSXT.  (*Id.* ¶ 19; *see also id.* ¶¶ 109, 116 (alleging that the Lawyer Defendants' earlier filing of the *Ronald Abbott* and *Charles Abbott* mass suits impaired CSXT's ability to pursue discovery with respect to the *Amos* and *Abel* suits and thereby furthered their "scheme to deprive CSXT of access to discovery by repeatedly filing mass lawsuits in an overburdened court system"); ¶ 119 (alleging that the Lawyer Defendants' filing of the June 23, 2005 Motion to Refer Cases to Mediation "represented a continuation of [their] strategy to deprive CSXT of access to full discovery in individual cases in order to conceal fraudulent claims and to leverage higher settlements"); ¶ 133 (alleging that Lawyer Defendants' filing of "yet another motion to refer cases to mediation" on November 30, 2007 was a further continuation of "their deliberate strategy to deprive CSXT of access to discovery in individual cases in order to conceal fraudulent claims.").)[10]  Accordingly, those uses of the mails also clearly fall within the scope of the mail fraud statute.  *See, e.g., Pierce*, 409 F.3d at 233 n.2 (affirming mail fraud conviction where the "mailings 'helped cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue.'") (quoting *United States v. Lack*, 129 F. 3d 403, 408 (7th Cir. 1997)).

The Lawyer Defendants' cavalier characterization of certain mailings as "routine" or "innocuous" *(see* Doc. 888 at 2-3, 7-11, 13, 17, 18, 23-25) is plainly contrary to CSXT's allegations, which must be accepted "as true and construe[d] . . . in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  *Nemet Chevrolet*, 591 F.3d at

---

[9] On their face, the letters referenced in paragraph 159(b)-(g) relate to the Lawyer Defendants' efforts to compel mandatory mass mediation of all pending claims (*see* Exs. PPP-TTT) or otherwise obtain settlements (*see* Ex. OOO).  Defendant Peirce personally authored Exhibits OOO and SSS, was copied on Exhibits QQQ and RRR and is referenced by name in Exhibit TTT.

[10] Although the November 30, 2007 motion discussed in paragraph 133 is not referenced in paragraph 158, that paragraph does not purport to be a complete listing of all of the Lawyer Defendants' uses of the mails in furtherance of their fraudulent scheme.  (*See* 3d Am. Compl. ¶ 158.)  And there can be no disputing that the November 30, 2007 motion is identified with specificity.  (*See id.* at ¶ 133 and Ex. XX.)

255.  And, in any event, the Supreme Court has held that "*any* mailing that is incident to an essential part of the scheme satisfies the mailing element, *even if the mailing itself contains no false information*."  *Bridge*, 128 S. Ct. at 2138 (emphasis added).

Finally, to the extent the Lawyer Defendants contend that certain uses of the mails or wires are insufficient because they were effectuated by persons other than themselves, that argument also is contrary to decades old precedent.  As the Fourth Circuit held in *United States v. Perkal*, 530 F.2d 604 (4th Cir. 1976), *cert. denied*, 429 U.S. 821 (1976), which, like the present case, involved a scheme, "participated in by lawyers and doctors," to defraud through the submission of fraudulent personal injury claims:

> The defendant urges that, though he may have been a participant in the scheme, he did not place in any post office or authorized depository for mail matter the fraudulent doctors' bills and reports in execution of the scheme and thus did not violate the statute. However, *it was declared years ago by Judge Learned Hand the terms "place" and "cause to be placed" in the statute did not mean that a defendant, to violate the statute, must personally deposit the critical matter in the mails or "must specifically authorize its deposit, it is enough if he knows that in the execution of the scheme letters are likely to be mailed, and if in fact they are mailed*."

*Id.* at 606, 607 (emphasis added) (internal citation omitted).  The allegations contained in, and exhibits to, the Third Amended Complaint are clearly sufficient to support the inference that each of the Lawyer Defendants knew the mails were likely—indeed, necessarily—going to be used in furtherance of their fraudulent scheme.  (*See, e.g.*, 3d Am. Compl. ¶ 170 (alleging that the Lawyer Defendants "agreed that [they] would cause personal injury claims to be filed" and they "each agreed to assist in the prosecution of [the fraudulent] claims through the *transmission of misleading communications to clients*, participation in settlement negotiations with CSXT, *communications with the courts* and other fraudulent means") (emphasis added).)

Furthermore, "once agreement to a scheme has been adequately established, any party to the agreement is responsible for the acts and declarations of another party in furtherance of the common scheme, whether or not he knew of or agreed to any specific mailing."  *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974) (cited with approval in *Perkal*, *supra*.)

Here, the Lawyer Defendants have not challenged the sufficiency of CSXT's allegations concerning the existence of a conspiracy between them.  As a result, they are jointly responsible for each other's acts and any other foreseeable uses of the mails or wires in furtherance of their scheme to defraud; it matters not that some or all of their names do not appear on each and every alleged mailing.

      C.    The Third Amended Complaint satisfies Rule 9(b).

The Lawyer Defendants next contend that the Third Amended Complaint violates Rule 9(b) of the Federal Rules of Civil Procedure because it uses the collective phrase "the Lawyer Defendants" when referring to actions collectively taken by or collectively caused to be taken by Defendants Peirce, Raimond and Coulter.  (*See* Doc. 888 at 10-12.)  This argument is without merit.  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Fourth Circuit has interpreted this provision as requiring that a complaint identify the "time, place and contents of the false representation, as well as the identity of the person making the representation and what he obtained thereby."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  The primary purpose of Rule 9(b) is to ensure "that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of."  *Id.*

As an initial matter, the Lawyer Defendants should not—at this advanced stage in this case—be heard to complain that CSXT's current use of the phrase "the Lawyer Defendants" fails to provide them with adequate notice of their individual roles in the fraud.  (*See* Doc. 888 at 11-12.)  Not only did the Lawyer Defendants not object to CSXT's use of this phrase in the original Amended Complaint, they, along with the Peirce Firm, filed a joint Answer in which they referred to themselves collectively as the "Peirce Firm Defendants."  (*See* Doc. 269 at 1.)  They similarly did not object to CSXT's use of "the Lawyer Defendants" in the proposed Second Amended Complaint or in response to CSXT's motion for leave to file its Third Amended Complaint, nor have they ever—in reference to any of the amended complaints—requested a

more definite statement under Rule 12(e).  Moreover, Defendants Peirce and Raimond were able to formulate substantive and individualized defenses in their prior joint motion for summary judgment and on appeal to the Fourth Circuit.  Thus, the allegations in the Third Amended Complaint (like the first and second amended complaints that came before) are indisputably sufficient to permit the Lawyer Defendants—individually and collectively—to mount a defense, which is all that Rule 9(b) requires.  *See Harrison*, 352 F.3d at 921 ("[A] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied [] that the defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial. . .") (internal quotation omitted); *see also Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1199 (S.D.N.Y. 1996) (denying motion to dismiss pursuant to Rule 9(b) where the "Defendant ha[d] filed a responsive pleading . . . [and] had ample opportunity through discovery to ascertain the full factual basis of plaintiff's fraud claim" and "to grant defendant's motion . . . would be to reward defendant for not bringing its Rule 9(b) motion in a more timely manner").

And, in any event, the Third Amended Complaint clearly sets forth the "time, place and contents of [each] false representation, as well as the identity of the person making the representation" as required by Fourth Circuit precedent.  *Harrison*, 176 F.3d at 784. Specifically, it identifies the date when each fraudulent claim was filed and the court in which it was filed (*see* 3d Am. Compl. ¶¶ 105, 112, 125, 129; 134); identifies the person who signed the complaint and who caused the complaint to be filed (i.e., the Lawyer Defendants) (*see id.*);[11] identifies the circumstances, including the date, of each complaint's service on CSXT (*see id.*); and, attaches the relevant portions of each fraudulently filed complaint and the notices of service as exhibits (*see id.* at Exs. MM, NN, OO, PP, TT, UU, VV, WW, YY, ZZ).  The Third Amended Complaint provides similar detail for each additional predicate act of mail or wire fraud

---

[11] As previously discussed, in order to be indictable under the mail and wire fraud statutes, it is not necessary for the defendant to have personally sent or received the mailings.  *See supra* at 15-16. Similarly, under West Virginia law, an action for fraud will lie where "the act claimed to be fraudulent was the act of the defendant *or induced by him*."  *Poling*, 575 S.E.2d at 207 (emphasis added).

alleged.  (*See id.* at ¶¶ 90, 94, 119, 133, 139, 159(a)-(g) and Exs. GG, HH, II, JJ, RR, XX, FFF, GGG, OOO-TTT.)  None of the complaints in the cases relied upon by the Lawyer Defendants sets forth this level of specificity and, as such, those cases are easily distinguishable from the case at bar.  *See, e.g.*, *Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 778 (7th Cir. 1994) ("The amended complaint states neither who made the misrepresentation nor on what date it was made.").

CSXT's theory of the case is that "the lawyer Defendants, *collectively and in concert*, embarked upon a calculated and deliberate strategy to participate in and conduct the affairs of the Peirce firm through a pattern and practice of unlawful conduct" (3d Am. Compl. ¶ 18 (emphasis added)), so it is inevitable that the Third Amended Complaint alleges that many actions were collectively taken by or collectively caused to be taken the Lawyer Defendants.  As the District Court for the Southern District of New York concluded under somewhat similar circumstances:

> The fact that plaintiffs allege that each of the unions engaged in certain of the same actions does not "collectivize" the unions improperly; plaintiffs have merely alleged that each of the three unions engaged in the same conduct in some instances, and that, in other instances, each union engaged in one or more specific acts in furtherance of the scheme which were different from acts engaged in by the other two unions.

*Tribune*, 869 F. Supp. at 1091.  The same is true here.  (*See, e.g.*, 3d Am. Compl. ¶¶ 18-19, 24, 39, 58, 89, 168, 170.)

Moreover, the Third Amended Complaint clearly identifies "each defendant's participation in the alleged fraud."  *Haley v. Corcoran*, 659 F. Supp. 2d 714, 721 (D. Md. 2009). Indeed, this is not a case where the complaint attempts to "lump together" numerous wholly disparate and unconnected defendants in a single scheme to defraud.  Rather, the Third Amended Complaint alleges that "the lawyer Defendants were at all times relevant herein partners, members or shareholders of, or otherwise employed by or associated with, the law firm Robert Peirce & Associates, P.C.," which is the entity alleged to constitute the RICO

enterprise in this case (*see* 3d Am. Compl. ¶¶ 13, 154), and describes in detail each Lawyer

Defendants' role in the fraudulent scheme:

- Raimond is alleged to have "orchestrated and implemented the screening process . . . specifically intended to attract potential clients and manufacture diagnoses of asbestos-related diseases regardless of whether the subject individuals actually exhibited signs of those diseases." (*Id.* ¶ 168.)  Each of the fraudulently filed claims identified in paragraph 147 resulted from that screening process.  (See *id.* ¶¶ 144-147.)

- Peirce is alleged to have assisted Raimond with the implementation of the screening process, including by retaining James Corbitt and Defendant Harron to participate in the screenings due to their willingness to violate established medical protocols, in addition to numerous other specific acts.  (*See id.* ¶¶ 39, 58, 168.)

- Coulter is alleged to have personally filed four of the underlying mass tort suits (*see id.* ¶¶ 90, 94, 105, 112) in accordance with the Lawyer Defendants' collective agreement to cause fraudulent suits to be filed (*see id.* ¶ 170).  Each of those suits is alleged to be a predicate act in support of the overall fraudulent scheme.  (*See id.* ¶ 160.)

- All three of the Lawyer Defendants are alleged to have "agreed to assist in the prosecution of [the fraudulently filed] claims through the transmission of misleading communications to clients, participation in settlement negotiations with CSXT [and] communications with the courts." (*Id.* ¶ 170.)

Thus, the Third Amended Complaint not only meets, but surpasses the level of particularity

required by Rule 9(b).

The Lawyer Defendants' related argument that "[a]s a result of its improper group

pleading, CSX's Complaint also fails to allege . . . that **each** named individual committed at least

two predicate acts that proximately caused an injury" (Doc. 888 at 12 (emphasis in original))

also fails because, as just discussed, CSXT's use of the phrase "the Lawyer Defendants" does

not violate Rule 9(b).  The Third Amended Complaint properly alleges that the Lawyer

Defendants collectively caused the filing of each of the 11 fraudulent claims at issue, which

injured CSXT by causing it to expend "money and resources to process, defend and/or settle . .

. claims . . . that should never have been filed in the first place."  (3d Am. Compl. ¶ 165.)  It

further alleges that the Lawyer Defendants caused the transmission of various other pleadings

and correspondence in connection with and furtherance of their fraudulent scheme.  (*See id.* ¶

160); *see also Wilson*, *supra* ("[A]ny party to the agreement is responsible for the acts and

declarations of another party in furtherance of the common scheme, whether or not he knew of or agreed to any specific mailing.").

Importantly, there is no requirement, as the Lawyer Defendants seem to imply, that CSXT allege or prove that *each* predicate act committed by *each* individual Lawyer Defendant proximately caused an injury to CSXT.  *See Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) (emphasis in original) ("[N]o requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from *all* of the predicate acts. Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury.") (internal citation omitted); *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1004 (7th Cir. 2004) ("[A] plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim.").  The lone case cited by the Lawyer Defendants in support of their position —*Palmetto State Medical Ctr. v. Operation Lifeline*, 117 F.3d 142 (4th Cir. 1997)—merely held that the court below properly granted *summary judgment* on the plaintiff's RICO claim because there was "**no evidence**" that "**any** of" the defendants "conducted **any** of [the alleged enterprise's] affairs **whatsoever** on the dates in question." *Id.* at 149.  This is a far cry from any sort of purportedly "fundamental" requirement that a RICO plaintiff plead "that **each** named individual committed at least two predicate acts that proximately caused an injury."  (Doc. 888 at 12 (emphasis in original).)  Accordingly, for all of the foregoing reasons, the Lawyer Defendants' arguments premised on Rule 9(b) should be rejected, just as they were over three years ago in connection with their prior motion to dismiss.  (*See* Doc. 264 at 11.)

      D.    <u>The Third Amended Complaint properly alleges that CSXT was injured in its business or property by reason of the Lawyer Defendants' RICO violations.</u>

18 U.S.C. § 1964(c) authorizes recovery by "[a]ny person injured in his business or property by reason of a" RICO violation.  The Supreme Court has interpreted the statute's "by reason of" language to mean that a plaintiff must show that its claimed injury was proximately caused by the claimed RICO violation.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258,

267 (1992).  In order to meet this requirement, there need only be "some direct relation between the injury asserted and the injurious conduct alleged."  *Id.*[12]

Here, CSXT alleges it was injured in its "business or property by reason of" the Lawyer Defendants' RICO violations because it was forced "to expend substantial money and resources to process, defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should never have been filed in the first place."  (3d. Am. Compl. ¶¶ 165, 172.)  There can be no disputing the existence of a "direct relation between" the Lawyer Defendants' filing and prosecution of fraudulent claims and CSXT's need to expend resources in response to those claims.  As the District Court for the Southern District of New York held in rejecting a Rule 12(b)(6) challenge to a nearly identically alleged RICO injury:

> Plaintiffs contend that as a result of defendants' alleged fraud, they have incurred the significant medical and legal costs required to defend the claims in front of the Board. Without attempting to rule on the scope of plaintiffs' damages at this stage, ***expenses of this nature, which foreseeably and directly result from defendants' alleged violative conduct, constitute injury by reason of a RICO violation***.

*Tribune Co.*, 869 F. Supp. at 1100 (emphasis added).  Thus, the Third Amended Complaint clearly pleads RICO proximate cause.

Attempting to escape this inevitable conclusion, the Lawyer Defendants argue that "[n]o expenditure of money was 'by reason' of the fraudulent claims" because 10 of the 11 claims were "dismissed on procedural grounds as part of motions attacking the larger FELA complaints as a whole."  (Doc. 888 at 16.)  This argument fails for three reasons.  First, CSXT's claimed injury is not limited to the filing of the motions selectively referenced by the Lawyer Defendants.

---

[12] Oddly, the Lawyer Defendants assert that "in cases like the instant one that involve first-party reliance, RICO's causation requirement is similar to the detrimental reliance required for fraud," citing, among other cases, *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008).  (Doc. 888 at 14-15.)  However, as recently noted by the Fourth Circuit: "In *Bridge*, the Supreme Court held that "'***no*** showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.'" *Biggs v. Eaglewood Mortg., LLC*, 353 Fed. Appx. 864, 866 (4th Cir. 2009) (emphasis added) (quoting *Bridge*, 128 S. Ct. at 2139)).  And, in any event, as set forth in Section II(A) above, CSXT has sufficiently pled reliance.

Rather, it includes any and all "money and resources" that CSXT was forced to expend in connection with "processing, defending and/or settling" the fraudulently filed claims.  (*See id.* ¶¶ 165, 176.)  The Lawyer Defendants do not and cannot argue, based solely on the face of the Third Amended Complaint, that CSXT expended *no* such money or resources "by reason" of the 11 fraudulent claims at issue.  Indeed, any such argument would be directly contrary to CSXT's allegation, which must be accepted as true, that it *did* expend "money and resources to process, defend and/or settle the deliberately fabricated claims outlined in Paragraph 147."  (*See id.*)

Second, even with respect to the motions referenced by the Lawyer Defendants that purportedly "attack[ed] the larger FELA complaints as a whole, the Third Amended Complaint pleads facts establishing that those motions generally required at least some individualized investigation and analysis as to each plaintiff in the complaints.  (*See, e.g.*, 3d Am. Compl. ¶ 117(a).)  Construing these facts in the light most favorable to CSXT and drawing all reasonable inferences they support in CSXT's favor, it would be inappropriate to conclude at this stage that no portion of the resources expended in connection with the various motions referenced in the Third Amended Complaint were "by reason" of the fraudulent claims.  Indeed, the Fourth Circuit has held that the "best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount [of damages]."  *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001).  In that case, the Court concluded that, even at the *summary judgment* stage, it was inappropriate to dismiss the plaintiff's RICO claims "on the basis of inability to prove the amount of damages" because the record established that "some amount of damage likely is present, even if [the plaintiff] cannot prove the amount, and a nominal amount of damage is adequate to support liability."  *Id.* at 266.

Third, at an absolute minimum, CSXT paid $25,000.00 to settle Morris Collier's claim referenced in paragraph 147(a).  (*See id.*)  Obviously, this settlement was in direct response to his lawsuit.  (*See id.*)  Perhaps acknowledging this, the Lawyer Defendants attempt to argue that CSXT's allegations of fraud are somehow confined to cases where the claimant was only

seeking damages for asbestosis.  (Doc. 888 at 17.)  The problem with this argument—as already discussed in footnote 4—is that the Third Amended Complaint contains no such limitation.  Quite the opposite, paragraph 148 states that the Lawyer Defendants had no good faith basis to file suit alleging that the claimants at issue had "*an asbestos related disease.*"  (3d Am. Compl. ¶ 148 (emphasis added).)  And, in any event, it is clear that the Lawyer Defendants' allegation that Morris Collier's bladder cancer was related to asbestos was based, at least in part, on Harron's determination that Collier had asbestosis.  (*See id.*, Ex. NNN ("On the basis of the history of occupational exposure to asbestos and my B-reading of his chest x-ray, I feel within a reasonable degree of medical certainty that Mr. Morris L. Collier has asbestosis. Cancer of the bladder shows an increased incidence in asbestos exposed persons and therefore, his occupational exposure to asbestos contributed to the development of his bladder cancer. . .").)  Thus, even assuming that CSXT's fraud claims were limited to allegations of asbestosis, which they are not, it is reasonably inferable that some portion of the settlement CSXT paid Morris Collier was attributable to his alleged asbestosis.

Finally, even if CSXT's "injury by reason of" the Lawyer Defendants' RICO violations is limited to some or all of the money it paid to settle Morris Collier's claim, that alone would be sufficient to confer standing to sue under 18 U.S.C. § 1864(c).  As set forth above:

> [N]o requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from all of the predicate acts. Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury.

*Deppe*, 863 F.2d at 1366.  Thus, for all of the foregoing reasons, the Lawyer Defendants' arguments concerning RICO proximate cause are without merit.

E.   The Third Amended Complaint Adequately Pleads that the Lawyer Defendants Engaged in a Pattern of Racketeering Activity.

The Lawyer Defendants next argue that the Third Amended Complaint fails because it has not sufficiently alleged that the Lawyer Defendants engaged in a pattern of racketeering activity.  (*See* Doc. 888 at 18-24.)  According to the Lawyer Defendants, "[i]t would be legal error

to allow a RICO case to proceed where 99.8% of the activity of [the] alleged racketeering enterprise has not been alleged to be fraudulent."  (*Id.* at 19.)

As an initial matter, this argument is without merit because it ignores or fundamentally misapprehends the fraudulent scheme alleged in the Third Amended Complaint for purposes of CSXT's RICO claims.  Contrary to what the Lawyer Defendants would lead the Court to believe, the fraudulent scheme and associated predicate acts of mail and wire fraud alleged in the Third Amended Complaint encompass far more than just the *filing* of the 11 allegedly fraudulent claims.  Specifically, the Third Amended Complaint alleges that the Lawyer Defendants (1) "retained [the clients whose claims are at issue] and procured medical diagnoses for them through intentionally unreliable mass screenings"; (2) "fabricated and prosecuted asbestos claims with no basis in fact"; and, (3) "deliberately filed the claims they manufactured in mass lawsuits in overburdened courts to deprive CSXT of access to meaningful discovery, which in turn concealed fraudulent claims and leveraged higher settlements based on the threat of mass trials."  (*Id.* ¶ 19.)  The third prong of this scheme is further discussed in paragraph 89:

> As described herein, beginning in 2000 the lawyer Defendants embarked upon a concerted campaign to overwhelm CSXT with thousands of asbestos-related occupational illness claims in courts across West Virginia. Specifically, the lawyer Defendants caused to be filed no less than six mass lawsuits asserting claims on behalf of more than 5,300 plaintiffs, the vast majority of whom were not West Virginia residents, nor did their claims have any nexus to the State. The lawyer Defendants deliberately filed these claims in mass lawsuits in an overburdened court system in an effort to conceal fraudulent claims and to leverage higher settlements based on the threat of mass trials.

(*Id.* ¶ 89.)  Moreover, once the mass lawsuits were filed, the Lawyer Defendants repeatedly filed motions to compel mandatory "mediation" of all pending claims (including the 11 fraudulent claims) (*see id.* ¶¶ 119, 133), which "represented a continuation of [their] strategy to deprive CSXT of access to full discovery in individual cases in order to conceal fraudulent claims and to leverage higher settlements" (*see id.*).  Indeed, each of the Lawyer Defendants' "mediation" proposals imposed severe limitations on CSXT's ability to investigate the veracity of the pending claims.  (*See id.* Exs. RR, QQQ, RRR, XX.)

Thus, the Lawyer Defendants' scheme to defraud and associated predicate acts of mail and wire fraud were not confined to just the *filing* of the 11 allegedly fraudulent claims, but rather included *all* of the steps they took before and after filing to generate medical evidence in support of the fraudulent claims (*see, e.g.*, 3d Am. Compl. ¶¶ 145-147, 159(a) and Exs. III, JJJ, NNN) and to impair and restrict CSXT's ability to investigate the veracity of the fraudulent claims.  The latter aspect of the scheme was accomplished via the Lawyer Defendants' repeated filing of mass lawsuits comprised almost entirely of non-resident plaintiffs in a court system known to already be overwhelmed by asbestos claims (*see id.* ¶¶ 90, 94, 104-105, 109, 112, 116, 125, 129, 134) and the Lawyer Defendants' ensuing attempts to impose "mediation" regimes that formally and severely restricted CSXT's ability to conduct discovery (*see id.* ¶¶ 119, 133, 139, 159(b)-(g)).

In this sense, **_one hundred percent_** of the Lawyer Defendants' conduct related to the mass suits described in the Third Amended Complaint was racketeering activity in furtherance of their fraudulent scheme.  Indeed, whether or not CSXT has alleged that each and every claim included within the mass suits was fraudulent, it *has* very extensively alleged that the mass suits themselves, as well as the Lawyer Defendants' other predicate acts, were deliberately constructed vehicles to advance and conceal the 11 fraudulent claims for which CSXT is seeking damages.

Because the Lawyer Defendants have fundamentally failed to address the actual pattern of racketeering activity pled in the Third Amended Complaint, their argument concerning the absence of a pattern necessarily fails.  Nevertheless, CSXT will address the "substance" of their argument below.

　　　　　　　1.　　　The RICO pattern requirement

Any evaluation of a RICO claim must be conducted with an eye toward the statute itself. 18 U.S.C. § 1962(c), the relevant provision of RICO, states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Pattern of racketeering activity" is a defined term in the statute; it "requires at least two acts of racketeering activity . . .  the last of which occurred within ten years [] after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).[13]  The statutory requirements for a scheme constituting a pattern of racketeering activity, therefore, are simple: in order to be liable, the defendant must have committed two acts of racketeering activity within a 10-year period.  *See id.*  The Lawyer Defendants do not seriously contest that CSXT has met this statutory pattern requirement.  (*See* Doc. 888 at 18-24.)

Instead, the Lawyer Defendants hang their argument on later court decisions that have added an additional gloss to RICO.  In particular, the Lawyer Defendants rely on the "relatedness" and "continuity" requirements as set forth by the Supreme Court's in *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989).  (Doc. 888 at 19-20.)  While the concepts of relatedness and continuity are linked, they require separate analysis.  Therefore, CSXT will address each in turn.

       2.      The predicate acts alleged in the Third Amended Complaint satisfy RICO's relatedness requirement.

Under the Supreme Court's test, predicate acts are "related" if they embrace the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J. Inc.*, 492 U.S. at

---

[13] It is clear from the statute, and the Lawyer Defendants do not contest, that mail and wire fraud constitute "racketeering activity."  *See id.* at § 1961(1).  The Lawyer Defendants also do not appear to contest that each use of the mails or wires is a separate offense under the mail and wire fraud statutes.  *See, e.g.*, *U.S. v. Calvert*, 523 F.2d 895, 914 (8th Cir. 1975) ("It is well settled that each use of the mails is a separate offense under the mail fraud statute, notwithstanding the fact that the defendant may have been engaged in one fraudulent scheme.  The same is true of the use of the wires under the wire fraud statute.").

240.  Certainly, and as the Lawyer Defendants tacitly recognize, the predicate acts pled in the

Third Amended Complaint share similar:

- Purposes and results – defrauding CSXT through the manufacturing, filing and prosecution of fraudulent asbestos claims;

- Participants – the Lawyer Defendants and Dr. Harron;

- Victims – CSXT;

- Methods of commission – the inclusion of the fraudulent claims in mass lawsuits, which were filed using the same vague, boilerplate complaints in the same overburdened court system, and the subsequent repeated filing of motions and other proposals to compel mandatory mass mediation of the claims, all of which was specifically intended to "deprive CSXT of access to discovery in individual cases in order to conceal [the] fraudulent claims and leverage higher settlements"; and,

- Distinguishing characteristics – each of the fraudulent claims was a product of the Lawyer Defendants' deliberately unreliable mass screenings and was based, in whole or in part, on an x-ray taken by the same radiologic technologist (Corbitt) and interpreted by the same doctor (Harron)).

(*See* 3d. Am. Compl. at ¶¶ 17-19, 89-165); *see also D'Addario v. Geller*, 264 F. Supp. 2d 367,

400 (E.D. Va. 2003) (relationship established by pleading showing that "the Takeover

Defendants" used a scheme of fraud and obstruction to loot a company and defraud

shareholders).

Accordingly, the Lawyer Defendants hinge their argument on the last factor in the

relatedness analysis: whether the predicate acts were "isolated events."  (Doc. 888 at 21.)  The

Lawyer Defendants' argument in this regard is premised on their contention that the 11

fraudulent claims represent a small percentage of the total number of claims included within the

mass lawsuits discussed in the Third Amended Complaint.  (*See* Doc. 888 at 21.)  As noted

above, however, this contention misses the mark.  Whether or not each and every claim

included within the mass suits was fraudulent, the Third Amended Complaint alleges that the

mass suits themselves were predicate acts specifically designed and intended to advance and

conceal the allegedly fraudulent claims.  (*See, e.g.*, 3d Am. Compl. ¶¶ 19, 89); *see also supra* at

13-14, 24-25.

Furthermore, contrary to the Lawyer Defendants' apparent contentions, there is no statutory or judicially-imposed requirement that, in order to constitute a pattern, the racketeering activity must represent a certain percentage of the enterprise's total business.  *See, e.g., United States v. Pryba*, 900 F.2d 748, 753 (4th Cir. 1990), *cert. denied* 498 U.S. 924 (1990) (upholding business operators' RICO convictions for sale of $105.30 worth of obscene material out of "more than $2,000,000" in total sales.)  If that were true, then it would be nearly impossible to bring a RICO claim against any racketeer who operated through an ongoing business concern, which is plainly not the case.  *See, e.g., Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F. Supp. 2d 970, 985-986 (S.D. Iowa 2006) (RICO claim against life insurance company).  Indeed, the entire concept of RICO is the co-opting of an erstwhile legitimate "enterprise"—in this case, the Peirce Firm—by racketeers who then use the enterprise to further their own illicit objectives.

Unsurprisingly, at least one federal circuit court of appeals has explicitly rejected a proportionality argument similar to that of the Lawyer Defendants.  *See United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991).  That case involved a scheme by a number of Department of Motor Vehicles clerks to "process applications for driver's licenses, non-driver identification cards and registrations for vehicles -- all absent the proper documentation and in return for cash payments." *Id.* at 545.  On appeal after their RICO conviction, the clerks argued that the United States had failed to prove that their fraudulent application grants constituted a pattern of racketeering based on the number of proper applications they also had granted.  *See id.* at 552-553.  The Second Circuit, in affirming the clerks' convictions, held that "[t]he fact that the clerks processed many applications that did not result in fraudulent licenses and registrations . . . does not negate the inference that the clerks made themselves available to process applications for those people who could not legally obtain licenses and vehicle registrations."  *Id.* at 553; *see also Eisen*, 974 F.2d at 251 (affirming criminal RICO convictions of multiple lawyers affiliated with "a large Manhattan law firm that specialized in bringing personal injury suits on behalf of plaintiffs" based on their roles in as a few as three fraudulent suits).

Moreover, the relatedness inquiry is not dependent on a strict numerical analysis.  *See Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990) (two acts committed in slightly over a year were related); *Eisen*, 974 F.2d at 251 (involvement in as few as three fraudulent suits sufficient to sustain criminal RICO convictions).  Instead, the question is whether the racketeering acts—in respect to the nature of the scheme—suggest that the racketeering activity in question had "become a regular way of conducting business."  *See Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450-451 (9th Cir. 1991) (three episodes in a 13-month period); *see also United States v. Brandao*, 539 F.3d 44, 55 (1st Cir. 2008) (relatedness analysis is flexible and should take the nature of the enterprise into account);

The facts alleged in the Third Amended Complaint demonstrate that the Lawyer Defendant's predicate acts were related.  Over a six-year period, the Lawyer Defendants filed or caused to be filed five separate lawsuits in the same jurisdiction containing fraudulent claims against CSXT.  (*See* 3d Am. Compl. ¶¶ 105, 112, 125, 129, 134, 147, 160.)  One of those lawsuits re-asserted fraudulent claims that had already been dismissed once.  (*Id.* ¶ 134.)  Moreover, over a nearly ten-year period, the Lawyer Defendants committed numerous other acts of mail and wire intended to advance and conceal the fraudulent claims.  (*See id.* at ¶ 159-60.)  While the particular claims alleged to have been fraudulent may have been a relatively small percentage of the total number of claims included in the mass lawsuits of which they were a part, that is not the relevant inquiry.  *See Alkins*, 925 F.2d at 553.  Instead, the question is whether *all* of the predicate acts alleged represent more than "isolated" or "sporadic" criminal activity.  *See Ticor Title*, 937 F.2d at 450-51.  The filing of five separate lawsuits containing 11 fraudulent claims and the commission of a no less than a dozen other acts of mail and wire fraud in furtherance of those claims is far from isolated or sporadic activity.  Thus, contrary to the Lawyer Defendants' argument, the allegations in the Third Amended Complaint meet the relatedness requirement of pleading a pattern of racketeering activity.

3.    The fraudulent acts alleged in the Third Amended Complaint satisfy RICO's continuity requirement.

In addition to being related, a series of predicate acts must demonstrate continuity in order to fulfill RICO's pattern requirement.  *See H.J. Inc.*, 492 U.S. at 240-41.  A series of predicate acts is continuous under the meaning of RICO if they constitute "a closed period of repeated conduct, or . . . past conduct that by its nature projects into the future with a threat of repetition."  *Id.*  The Lawyer Defendants argue that the Third Amended Complaint fails to allege a series of predicate acts that demonstrates either closed or open-ended continuity.  (*See* Doc. 888 at 22-24.)  To the contrary, the facts as alleged in the Third Amended Complaint demonstrate both.

Open-ended continuity is established either when the series of predicate acts presents a specific threat of continuing into the future or when it is shown that the predicates have become a regular part of the defendant's ongoing business.  *See Bloodstock Research Info. Servs. v. edbain.com, LLC*, 622 F. Supp. 2d 504, 514-515 (E.D. Ky. 2009) (upholding civil RICO case based on fraudulent misuse of business information).  The fact that the predicate acts cease when the plaintiff's lawsuit is filed does not indicate a lack of open-ended continuity, but a continuation of the scheme after the complaint is filed is relevant to finding the existence of open-ended continuity.  *See id.*; *see also Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 633 F. Supp. 2d 214, 227 (E.D. Va. 2008) (noting that RICO extortion scheme continued even after filing of complaint).  Courts should examine the nature of the predicate acts and the underlying scheme in determining whether open-ended continuity is present.  *See United States v. Bustamante*, 45 F.3d 933, 941-942 (5th Cir. 1995) (upholding RICO indictment of congressman based on two predicate acts when evidence showed scheme was likely to continue).

The facts pled in the Third Amended Complaint demonstrate that the Lawyer Defendants' scheme was likely to continue.  As an initial matter, the Lawyer Defendants

continued to prosecute the fraudulent claims even after CSXT filed its original Amended Complaint in this case.  (*See* 3d Am. Compl. ¶¶ 133-139.)  In fact, during that time period, the Lawyer Defendants *re-filed* five of the fraudulent claims that had already been dismissed once. (*Id.* at ¶ 134.)  Furthermore, Dr. Harron—an integral part of the Lawyer Defendants' scheme— has continued to obfuscate the record and defend his fraudulent medical findings.  (*See id.* at ¶¶ 71-73.)  There is nothing intrinsic to the fraud that suggests a natural end-point to the scheme; to the contrary, the Lawyer Defendants presumably could continue filing fraudulent lawsuits against CSXT and other defendants as long as they can find prospective plaintiffs willing to join and doctors willing to fabricate results.  (*See id.* at ¶¶ 17-19, 124.)  Finally, as discussed in the previous section, the allegations contained in the Third Amended Complaint, accepted as true, indicate that the filing of fraudulent lawsuits had become part of the Peirce firm's regular business practice.  Taken together, these facts establish a threat of continued conduct and, therefore, open-ended continuity.  *See State Farm Mut. Auto. Ins. Co. v. Makris*, No. 01-5351, 2003 U.S. Dist. LEXIS 3374, at *25-26 (E.D. Pa. Mar. 4, 2003) (finding open-ended continuity in a RICO case based on fraudulent insurance claims).

The Lawyer Defendants' predicate acts also demonstrate closed-ended continuity, *i.e.*, a closed period of repeated conduct.  *See H.J. Inc.*, 492 U.S. at 240-41.  The Fourth Circuit has found the presence of closed-ended continuity when confronted with a period of repeated conduct similar to that presented here.  *See Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir. 1989) (five-year period of repeated predicate acts); *see also Cooke & Moses, LLC v. QSS-Engineered Sys. Group, LLC*, NO. 1:06-CV-147, 2007 U.S. Dist. LEXIS 63650, at *31-32 (N.D. W. Va. Aug. 28, 2007) (predicate acts in support of a single scheme over a nineteen-month period).

The Lawyer Defendants argue that closed-ended continuity cannot be found when the scheme affects only a single victim.  (*See* Doc. 888 at 22-23.)  As an initial matter, the simple fact that predicate acts were in furtherance of a single scheme with a single victim does not

foreclose the possibility of RICO liability.  *See e.g.*, *Smithfield Foods*, 633 F.Supp.2d at 226-27

(denying motion to dismiss a single-scheme, single-victim case); *Cosmos Forms v. Guardian*

*Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997) (reversing district court's grant of

summary judgment in a single-victim case).  Furthermore, it is reasonably inferable that the

Lawyer Defendants' fraudulent scheme *did* victimize persons in addition to CSXT, including the

claimants who were used as pawns in the scheme, as well as the West Virginia courts where

the fraudulent claims were filed.  As the Supreme Court of Appeals of West Virginia has

observed:

> [U]nfounded claims . . . asserted for vexations, wanton, or oppressive purposes
> place an unconscionable burden upon precious judicial resources already
> stretched to their limits in an increasingly litigious society. In reality, to the extent
> that these claims . . . increase delay or divert attention from valid claims or
> defenses asserted in good faith, they serve to deny the . . . access to the judicial
> system . . .

*Daily Gazette Co. v. Canady*, 332 S.E.2d 262, 265 (W. Va. 1985).  In short, the RICO predicate

acts in support of the Lawyer Defendants' scheme occurred regularly over a nearly a ten-year

period, which is more than sufficient to support a finding of closed-ended continuity.

In arguing against the presence of closed-end continuity, the Lawyer Defendants

principally rely on two cases: *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531 (4th Cir. 1988),

and *Al-Abood v. Elshamari*, 217 F.3d 225 (4th Cir. 2001).  (Doc. 888 at 22-23.)  Those cases,

however, are unhelpful to the Lawyer Defendants.  The animating concern in both cases was

the Fourth Circuit's desire not to see RICO turned into a platform for adjudicating "ordinary

business contract or fraud disputes."  *See Flip Mortgage*, 841 F.2d at 538; *see also Al-Abood*,

217 F.3d at 238 (noting that case was not "outside the heartland of fraud cases").  *Flip*

*Mortgage*, for instance, dealt with a civil RICO claim based on little more than the defendant's

repeated breach of a commercial contract relating to the distribution of revenue from a

computerized mortgage services system.  *See* 841 F.2d at 533.  *Al-Abood* involved a defendant

who induced a widowed family friend to grant her power of attorney, and then, along with her

son, misused her position of trust to swindle the widow out of money in a variety of different ways.  *See* 217 F.3d at 230-31.

The Third Amended Complaint, however, does not present a case involving such run-of-the-mill "dishonest business practices" or "dispute[s] between formerly close family friends." *See Flip Mortgage*, 841 F.2d at 538; *see also Al-Abood*, 217 F.3d at 238.  Instead, it alleges a scheme that, over a period of years, sought to use the judicial machinery of West Virginia and the United States to defraud CSXT.  (*See* Third Am. Compl. at ¶¶ 17-19); *see also Eisen*, 974 F.2d at 251 (upholding RICO conviction against attorneys involved in filing as few as three fraudulent lawsuits).  Therefore, *Flip Mortgage* and *Al-Abood* are not only factually distinct, but the jurisprudential concerns underlying the Fourth Circuit's decisions in those cases are simply not implicated in this case.

In sum, the Third Amended Complaint sets out a pattern of racketeering activity that includes acts that are both related and continuous.  Therefore, the Lawyer Defendants' motions to dismiss based on a purported failure to meet RICO's pattern element should be denied.

F.      RICO's Pattern Requirement is Not Unconstitutionally Vague As Applied to the Lawyer Defendants.

Lastly, the Lawyer Defendants argue that RICO's pattern requirement is, as applied to the facts of this case, unconstitutionally vague.  (Doc. 888 at 24-25.)  In support of this proposition, the Lawyer Defendants point to two district court decisions and dicta from Justice Scalia's concurring opinion in *H.J., Inc.*, 492 U.S. at 255-56.  (*See* Doc. 888 at 25.)

In the wake of *H.J.*, many federal courts were called upon to address whether RICO's pattern requirement survives constitutional vagueness scrutiny, and the "overwhelming body of authority" establishes that it does.  *See Bseirani v. Mahshie*, 881 F. Supp. 778, 787 (N.D.N.Y 1995) (collecting cases); *see also United States v. Walker*, 348 Fed. Appx. 910, 912 (5th Cir. 2009); *United States v. Keltner*, 147 F.3d 662, 667 (8th Cir. 1998) (noting that "[w]e join our sister circuits in holding that the RICO statute is not unconstitutionally vague[]" and collecting

33

cases).  Indeed, the Fourth Circuit has rejected similar challenges on at least four occasions.
*See United States v. Gross*, 199 Fed. Appx. 219, 235 n.4 (4th Cir. 2006), *cert. denied sub nom Wilkes v. United States*, 549 U.S. 1011 (2006); *United States v. Abed*, No. 98-4637, 2000 U.S. App. LEXIS 261, at \*16 n.5 (4th Cir. Jan. 10, 2000), *cert. denied* 529 U.S. 1121 (2000); *United States v. Bennett*, 984 F.2d 597, 605-607 (4th Cir. 1993) (noting that "our sister circuits [] have uniformly rejected vagueness challenges to RICO in the wake of the Court's decision in *H.J. Inc.*" and collecting cases); *Professionals, Inc. v. Berry*, No. 91-1509, 1992 U.S. App. LEXIS 6219, at \*14 (4th Cir. Va. Apr. 2, 1992).

In addition to the legal deficiency of the Lawyer Defendants' vagueness argument, the Lawyer Defendants misconstrue the appropriate factual basis on which this as-applied challenge should be judged.  (*See* Doc. 888 at 25.)  The Lawyer Defendants argue that a RICO suit based on "routine ministerial tasks" would demonstrate the unconstitutional vagueness of RICO's pattern requirement.  (*Id.*)  Even if this were true, that situation is not presented here. Once again, for purposes of this motion, all facts in the Third Amended Complaint must be taken as true, and all reasonable inferences granted to CSXT.  *See Corbett*, 780 F. Supp. 2d at 493.  Thus, the appropriate analysis is not whether an individual executing a series of routine ministerial tasks would be reasonably aware of potential RICO liability, but whether each of the Lawyer Defendants, in executing their fraudulent scheme, would be aware of his potential criminal liability.  *See United States v. Garries*, No. 09-4968, 2011 U.S. App. LEXIS 21637, at \*18-19 (4th Cir. Oct. 25, 2011) (internal quotation omitted) (rejecting vagueness challenge to 18 U.S.C. §§ 1341, 1343).  Certainly, they should have been.  *See, e.g., Eisen, supra*.

## CONCLUSION

Wherefore, for the foregoing reasons, CSXT respectfully requests that the Court deny Defendants Peirce's, Raimond's and Coulter's Motions to Dismiss the Third Amended Complaint.

.

**CSX TRANSPORTATION, INC.**


By____Marc E. Williams_____
               Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
**Nelson Mullins Riley & Scarborough LLP**
949 Third Avenue, Suite 200
Huntington, WV 25701
(304) 526-3501 (Telephone)
(304) 526-3541 (Facsimile)

Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
**McGuireWoods LLP**
One James Center
901 E. Cary Street
Richmond, VA 23219
(804) 775-1000 (Telephone)
(804) 775-1061 (Facsimile)
**COUNSEL FOR PLAINTIFF**
**CSX TRANSPORTATION, INC.**

**Dated: December 16, 2011**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**AT WHEELING**

| | |
|---|---|
| **CSX TRANSPORTATION, INC.,**      ) | |
| ) | |
| **Plaintiff,**      ) | **Civil Action No. 5:05-CV-202** |
| ) | |
| **v.**      ) | **Assigned to:** |
| ) | **The Hon. Frederick P. Stamp** |
| **ROBERT N. PEIRCE, JR.,** *et al.,*      ) | |
| ) | |
| **Defendants.**      ) | |

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that he served the foregoing **Plaintiff CSX Transportation, Inc.'s Combined Opposition to Defendants Peirce's, Raimond's and Coulter's Motions to Dismiss the Third Amended Complaint** upon the following individuals via electronic filing with the Court's CM/ECF system, on the 16th day of December, 2011:

Ron Barroso, Esquire
5350 S. Staples
Suite 401
Corpus Christi, TX 78411

Walter P. DeForest, Esquire
David Berardinelli, Esquire
**DEFOREST KOSCELNIK**
**YOKITIS SKINNER & BERARDINELLI**
3000 Koppers Building
Pittsburgh, PA 15219

Jerald E. Jones, Esquire
**WEST & JONES**
P.O. Box 2348
Clarksburg, West Virginia 26302-2348

_____
     Marc E. Williams
Counsel for CSX Transportation, Inc.