IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:05-cv-202 |
| | ) | |
| v. | ) | Assigned to: |
| | ) | The Hon. Frederick P. Stamp |
| ROBERT N. PEIRCE, JR., | ) | |
| LOUIS A. RAIMOND, | ) | |
| MARK T. COULTER; | ) | |
| and RAY HARRON, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MOTION IN LIMINE NO. 8 BY DEFENDANTS ROBERT N. PEIRCE, JR. AND LOUIS A. RAIMOND SEEKING TO EXCLUDE TESTIMONY OF PLAINTIFF CSX'S EXPERT WITNESS PROFESSOR LESTER BRICKMAN</u>**

Pursuant to Federal Rules of Evidence 702, 802, 401, 402, 403 and 404, Defendants Robert N. Peirce, Jr. and Louis A. Raimond hereby move to exclude Professor Lester Brickman from offering expert testimony on behalf of CSX at trial. Professor Brickman is a law professor who has repeatedly advocated on behalf of the American Tort Reform Association in past proceedings, including advocating for reform of asbestos litigation, but has never prosecuted, defended or tried a case, let alone an FELA asbestos case. 2009 Brickman Dep. 12-20 (excerpts attached as Exhibit 1). He only once had a client – 30 years ago. 2012 Brickman Dep. 96-97 (excerpts attached as Exhibit 2). In this case, CSX seeks to use him as an improper summary witness, using this lawsuit as a forum to talk about his theories of tort reform while casting the Defendants as the villains – despite failing to base his testimony on the particular facts of the eleven specific claims at issue here.

Expert testimony is admissible only if relevant, reliable, and offered by a "qualified" expert. Fed. R. Evid. 702. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Professor Brickman's proposed testimony fails all three criteria, and CSX cannot meet its burden of establishing the admissibility of his testimony. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of the testimony must establish its admissibility by a preponderance of proof.") (citing *Daubert*, 509 U.S. at 592 n.10).

Essentially, CSX seeks to use Prof. Brickman as an improper summary witness, brought in to offer an additional closing argument in the midst of Plaintiff's case -- supposedly from a learned expert, despite his admission that he is not an expert in plaintiffs' trial law, medicine, industrial hygiene, occupational health, epidemiology, statistics or any scientific discipline. Ex. 1, 2009 Brickman Dep. 39-40; Ex. 2, 2012 Brickman Dep. 38-40. As pertains to this case, Prof. Brickman has no professional or scientific expertise. He has simply read a lot of lay materials and information and drawn conclusions from them, ultimately determining that asbestos litigation typically involves fraud based on his "entrepreneurial model." That is not proper expert testimony. The jury is equally capable of being presented with admissible materials and drawing its own conclusions from them. There is no need for Prof. Brickman's purported expert testimony here as it will not aid the jury, which is fully capable of drawing its own inferences and conclusions from the evidence.

In closing argument, CSX's counsel will be entitled to argue to the jury the inferences that can be drawn from the trial evidence and to explain how that evidence and any reasonable inferences from it fit together with each other to demonstrate liability. But Prof. Brickman may not be deployed to do that for CSX from the witness stand under the guise of expert testimony.

*See In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004) ("It is for counsel to make the arguments about the significance of [the defendant's] conduct or omissions . . . and not for an expert to testify as to whether the company did or did not do something." An expert lacking personal knowledge "may only testify about the underlying facts if he [is] actually bringing to bear his scientific expertise.") (internal quotation marks omitted). Allowing a law professor to testify that he has concluded that conduct is unlawful usurps the Court's function to instruct on the standards for determining illegality and is highly prejudicial to Defendants. Prof. Brickman's testimony should be excluded.

## I. PROFESSOR BRICKMAN'S PROPOSED TESTIMONY

Professor Brickman is a Professor of Law at Benjamin N. Cardozo School of Law in New York City, where he teaches legal ethics. Brickman Rep. ¶ 1 (attached as Ex. 3). Professor Brickman has written about lawyers' contingent fees, the history of asbestos litigation, and tort reform. *Id.* He has previously been retained in four bankruptcy matters about the history of asbestos litigation and its impact on the bankrupt entity and in one dispute over legal fees, but he has never previously testified about a defendant's alleged liability for fraud or any other tort. Ex. 1, 2009 Brickman Dep. 12-20. He has never prosecuted, defended or tried an asbestos case. Thus, he has no practical professional experience from which to draw on as a basis for his proposed testimony. No court addressing circumstances similar to those at issue here has accepted Prof. Brickman as an expert witness, nor, for reasons that will become apparent below, should any court ever do so.

Professor Brickman's report states that he intends to offer an opinion that an "entrepreneurial model for the development of nonmalignant asbestos claims" existed, Brickman Rep. ¶ 6, under which:

3

- "screening enterprises working for lawyers systematically recruited hundreds of thousands of workers who may have had some occupational exposure to asbestos," *id.*;
- "hired doctors who reliably manufactured hundreds of thousands of x-ray reports and diagnoses of asbestosis for money despite the fact that these workers were mostly asymptomatic and most had no injury recognized by medical science," *id.*;
- used witness preparation techniques that amounted to "implanting false memories" in order to ensure that deep-pocket defendants' products were implicated, *id.* at ¶¶ 18-19;
- filed mass claims in select jurisdictions that would "overwhelm" defendants due to the manner in which the courts and juries typically addressed asbestos claims. *id.* at ¶¶ 21-24.

Further, Prof. Brickman asserts that, in accordance with his model, doctors sold "a 'signature' percentage of positive x-ray readings" as "their stock-in-trade." *Id.* ¶ 12. He claims (again, despite not being a medical expert) that these doctors "virtually always contravene[d] published guidelines and protocols for reading chest x-rays," *id.* ¶ 10, and that the "large majority" of pulmonary function tests to "fail[ed] to comply with American Thoracic Society standards," *id.* ¶ 17. In Prof. Brickman's view, "[t]his model has accounted for substantially all of the hundreds of thousands of nonmalignant asbestos claims filed in the past twenty years which comprise approximately 80%-90% of all asbestos claims filed in that period." *Id.* at ¶ 6. He asserted that this model explains the claims brought by the Lawyer Defendants against CSX. *Id.* at ¶¶ 30-76.

Here, Professor Brickman's testimony boils down to an unsubstantiated argument that the Peirce Firm routinely files asbestos claims based on B-reads that it knows to be erroneous. Based simply on his reading of non-expert materials, Prof. Brickman in summary posits that an entrepreneurial model of asbestos litigation exists that results in the filing of fraudulent claims. His entrepreneurial model consists of screenings, use of litigation experts to read x-rays from screenings, alleged improper coaching of witnesses and the filing of mass claims. Not surprisingly, those are the same bases on which CSX tries to build its fraud claims against Mr.

4

Peirce and Mr. Raimond. Prof. Brickman then, again based on evidence that a laymen is capable of evaluating, concludes that the Peirce Firm employed his entrepreneurial model and, therefore, that its claims are fraudulent. Such an argument (or purported "fact" for consideration by the jury) lies well within a jury's competence and understanding and, therefore, cannot be offered in "expert" testimony. *See, e.g.*, *United States v. Ojeikere*, No. 03-581, 2005 WL 425492, at *5 (S.D.N.Y. Feb. 18, 2005).

Moreover, Prof. Brickman provides no independently valuable expert testimony about the specific claims at issue and whether the Lawyer Defendants had a proper basis for asserting them, other than passing references to them in four paragraphs (out of 76 total). *See* Report ¶ 34 (claiming without citation that 30 percent of x-rays taken by Mr. Corbitt of the eleven claimants at issue "were of poor quality"); ¶ 56 ("The eleven claimants identified in ¶ 147 of the Complaint had their x-rays taken by Mr. Corbitt and read by Dr. Harron. Ten of the eleven x-rays were re-read by Drs. Breyer and/or Mezey or Krainson. Each of the eleven had one or more diagnostic reports signed by Drs. Cohen, Cassoff or other doctors that the lawyer defendants had hired."); ¶¶ 60-61 (criticizing the "claimed exposure" sections from asbestos questionnaires of seven claimants at issue, and suggesting that the Peirce firm added information for Mr. Baylor without input from him, without citing the testimony of Peirce firm employee Ms. Shannon Zeto to the contrary).

## II. ARGUMENT

A.  **Professor Brickman's Proposed Expert Testimony Must Be Excluded Under Rules 702, 802, 401, 402, 403 and 404, Because It Concerns Irrelevant, Prejudicial Matters that Would Not Assist the Trier of Fact And Inadmissible, Prejudicial Allegations About Character and State of Mind**

Professor Brickman's "opinions" amount to an argument setting forth his personal opinion as to the Peirce Firm's character and general state of mind. *See United States v. Wilson*,

5

484 F.3d 267, 276-77 (4th Cir. 2007) (noting that "the district court erred in failing to exclude [the expert's] testimony when that testimony either interpreted language that needed no interpretation, or when [the expert] did not adequately explain his methodology in reaching a questionable interpretation") (footnote omitted); *Miller ex rel. Miller v. Ford Motor Co.*, No. 01-545, 2004 WL 4054843, at *10 (M.D. Fla. July 22, 2004) (In excluding deposition testimony of fact witness concerning unrelated litigation and excluding expert testimony referring to such depositions and unrelated litigation, explaining that "Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion.") (internal quotation marks omitted); *Taylor v. Evans,* No. 94-8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) ("[M]usings as to defendants' motivations would not be admissible if given by any witness—lay or expert."). Such testimony is inadmissible under Fed. R. Evid. 702, 802, 401, 402, 403 and 404.

***First***, Prof. Brickman's testimony amounts to an impermissible closing argument delivered from the witness stand, which is generally not permitted, because such summary arguments are not proper expert testimony in that they do not aid the jury as is required by Rule 702; rather, they usurp the role of the jury. *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (stating that conveyance to the jury of sweeping conclusions is a violation of Rules 403 and 702); *see also SEC v. Big Apple Consulting USA, Inc.*, No. 09-CV-1963, 2011 WL 3753581, at *4 (M.D. Fla. Aug. 25, 2011) ("Expert opinions that offer nothing more than what lawyers for the parties can argue in closing arguments generally do not assist the trier of fact.") (internal quotation marks omitted). A witness may not summarize a party's arguments or "give a legal opinion that necessarily determines the guilt of a defendant or instructs the jury on controlling legal principles." *United States v. Frantz*, No 02-01267, 2004 WL 5642909, at *18 (C.D. Cal. Apr. 23, 2004) (internal quotation marks omitted); *see also Cook ex rel. Estate of Tessier v.*

6

*Sheriff of Monroe Cty,*, 402 F.3d 1092, 1108 (11th Cir. 2005) (finding that an expert planning to parrot a party's theory of the case was properly excluded in large part because, in so doing, the expert would violate Rule 702). A plain reading of Prof. Brickman's opinions shows that is exactly what he is doing.

Here, as in *Cook*, the expert testimony is based on improper source material and impermissibly summarizes the Plaintiff's theory of the case by parroting the complaint and delivering sweeping conclusions. The report cites the complaint on numerous occasions. *See, e.g.*, Brickman Rep. ¶¶ 32, 33, 34, 68, 72. It delivers conclusions principally by asserting that an individual who has some connection to the Peirce Firm has committed fraud, then using propensity reasoning and the logic of guilt-by-association to suggest that the Lawyer Defendants should be held similarly liable. An example is the treatment of James Corbitt, who Prof. Brickman calls a "felon . . . guilty [of] fraud [who] habitually and pervasively violated state laws," before stating that the Peirce Firm did some business with Corbitt. *Id.* at ¶ 34. Based simply on his reading of non-expert materials, Prof. Brickman in summary posits that an entrepreneurial model of asbestos litigation exists that results in the filing of fraudulent claims. His entrepreneurial model consists of screenings, use of litigation experts to read x-rays from screenings, alleged improper caching of witnesses and the filing of mass claims. He then, again based on evidence that a laymen is capable of evaluating, concludes that the Peirce Firm employed his entrepreneurial model and, therefore, that its claims are fraudulent. Prof. Brickman's report is a textbook example of delivering argument from the witness stand. This is the not the proper role of an expert and the court should not allow it.

Thus, rather than "assist the trier of fact to understand the evidence or to determine a fact in issue," as encouraged by Rule 702, Professor Brickman impermissibly seeks to offer an

advocate's argument that merely recites inadmissible hearsay such as what he gathered regarding the so-called "entrepreneurial model" of lawyers and "litigation doctors," discusses matters well within the jury's competence without expert testimony, and attempts to usurp the role of the jury by offering testimony as to the Peirce Firm's knowledge and intent. *See, e.g., AstraZeneca LP v. TAP Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (expert not permitted to testify as to intent of company and employees in structuring ad campaign); *In re Rezulin Prods.*, 309 F. Supp. 2d at 547 ("[T]he question of intent is a classic jury question and not one for the experts") (internal quotation marks omitted).

Further, Professor Brickman's testimony rests in large part on conclusions about the expected level of asbestos-related diseases among workers and on the accuracy of a physician's B-reads, which are derived from inadmissible hearsay and flawed statistical analysis, even though he is admittedly not an occupational health expert, epidemiologist, statistician, or scientist of any kind. *See* 2009 Brickman Dep. 39-40; 2012 Brickman Dep. at 38-41. Nor does Prof. Brickman claim to be an expert in West Virginia law, or the West Virginia Rules of Professional Conduct. *See id.* at 54-55; 65-66. He is plainly not "qualified as an expert by knowledge, skill, experience, training, or education" to offer such opinions. Fed. R. Evid. 702.

In view of his use of statistically flawed methods and recitation of irrelevant hearsay, Professor Brickman's testimony does not become admissible simply because he has been proffered as an "expert." Although Fed. R. Evid. 703 generally permits an expert witness to rely upon (but *not* disclose to the jury) inadmissible evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data," it "is not an open door to all inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987); *see also United States v. Mejia*, 545 F.3d 179, 197 (2nd Cir. 2008) (An expert may not

simply transmit hearsay to the jury: "Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever.") (citation, internal quotation marks omitted).

Here, CSX apparently hopes to use Professor's Brickman's testimony to introduce patently inadmissible evidence. Much of Professor's Brickman's proposed testimony simply recites inadmissible hearsay, such as the opinion of Judge Jack in *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005), which involved neither asbestos-related claims nor anyone from the Peirce Firm, as well as evidence from other cases likewise not involving the Peirce Firm or the Lawyer Defendants and information about other law firms. *See* Brickman Rep. ¶¶ 26-28, 36-37, 76 (citing Judge Jack's own "knowledge of medicine (Judge Jack had been a nurse and her husband is a cardiologist)"); 2009 Brickman Dep. 115 ("Of course, as I indicate in my expert report, I'm also relying on some of the analysis by Judge Jack and Dr. Harron's testimony in the *Daubert* proceeding before Judge Jack.").[1] Such testimony is inadmissible double hearsay and, even if it were admissible, it is not expert testimony but merely the regurgitation of findings by a different fact-finder, in a different proceeding that did not involve Mr. Peirce or Mr. Raimond or the Peirce Firm. The jury — not Judge Jack, Judge Jack's cardiologist husband, or Prof. Brickman parroting Judge Jack — is and should be the fact-finder here. *See Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) (findings by state circuit court excluded as inadmissible hearsay); *Blue Cross and Blue Shield of N.J., Inc. v. Phillip Morris,*

---

[1] Defendants are filing a separate motion in limine (No. 5) seeking to preclude introduction into evidence of Judge Jack's opinion under Rules 401, 402, 403, 404 and 802. Even in a bankruptcy matter where Prof. Brickman's testimony might be relevant, he has been prohibited from discussing "the holdings of any court decisions, published or unpublished, or of the substance of legislative history." *In re W. Asbestos Co.*, Nos. 02-46284, -46285, 2003 WL 23741860, at *1 (Bankr. N.D. Cal. Oct. 31, 2003).

*Inc.*, 141 F. Supp. 2d, 320, 325 (S.D.N.Y. 2001) (same); *see also Johnson v. Colt Indus. Operating Corp.,* 797 F.2d 1530, 1534 (10th Cir. 1986) (holding that lower court improperly admitted prior court opinion as proof of defendant's knowledge of product defect, and noting that "[i]t is possible that a jury might be confused into believing that the opinion's findings are somehow binding in the case at bar"); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 690 n.7 (5th Cir. 1992) (noting that decision in prior case was "probably inadmissible hearsay," and posed a risk that the jury would place "exaggerated importance" on the prior case"). In effect, CSX seeks, through Professor Brickman's testimony, to circumvent the Defendants' due process rights by offering a judicial opinion from a case, **involving Dr. Harron, and other lawyers**, in which Mr. Peirce and Mr. Raimond had no role. Such testimony is plainly improper. *See Mejia*, 545 F.3d at 197.

To the extent Professor Brickman relies on any methodology to support his opinion, as discussed below, he draws unreliable and invalid conclusions from his own flawed statistical analysis of epidemiological studies that he is not qualified to evaluate and on which CSX should not be allowed to offer him at trial. At its heart, Prof. Brickman's opinion is based on no expertise other than the ability to read documents that a layman can understand and draw conclusions from them or to read documents that he is not qualified to interpret and to draw conclusions from them. Neither is proper expert testimony and neither will aid the jury in its fact-finding. Just because the conclusions Prof. Brickman draws form the materials he has read are favorable to CSX's theories does not make him a proper expert witness for CSX. CSX should be required to convince the jury that its theories are correct based on the record evidence and its counsel's arguments to the jury, not have its theories foisted onto the jury by way of purported expert testimony that lacks a proper foundation.

Rule 702 provides that expert testimony is admissible only if needed "to assist the trier of fact." Here, Professor Brickman's testimony boils down to an unsubstantiated argument that the Peirce Firm routinely files asbestos claims based on B-reads that it knows to be erroneous. Such an argument (or purported "fact" for consideration by the jury) lies well within a jury's competence and understanding and, therefore, cannot be offered in "expert" testimony. *See, e.g.*, *Ojeikere*, 2005 WL 425492, at *5.

**Second**, the testimony also is inadmissible under both Rule 702 and Rule 403 because of its potential to unfairly prejudice and confuse the jury. For example, in *Ojeikere*, the prosecutors proposed to offer expert testimony substantially similar to Professor Brickman's proposed testimony. Specifically, the prosecution proposed to offer expert testimony by a U.S. Postal Inspector concerning common frauds involving Nigerian nationals. The Inspector was to testify to "the structure of 'advance payment schemes,' particularly 'advance fraud schemes,'" including explanations of "the stages of these schemes and . . . how victims are solicited and persuaded to participate." *Id.* at *5. The proposed expert was not expected to testify "to an ultimate issue of fact, but [would] be limited to describing the 'hallmarks' and patterns of [the suspect group's] fraud." *Id.*

In rejecting such expert testimony, the *Ojeikere* court relied on both Rule 702 and 403, explaining:

> There is nothing about Inspector Wright's proposed testimony in this case that would assist the jury in understanding the evidence about the specific fraud alleged in this case or to determine a fact issue. Indeed, the Government represented that Inspector Wright would not testify about any of the specific documents in this case. There is nothing so sophisticated about the alleged advance fee fraud that expert testimony would be useful for the jury. The testimony proffered by Inspector Wright thereby fails the requirement of Rule 702, that it would be helpful to the jury in developing a clear understanding of the witness's testimony or the determination of a fact in issue. . . .

11

> \* \* \* \*
>
> In addition to failing the requirements established by Rule 702, Inspector Wright's testimony should also be excluded under Federal Rule of Evidence 403 because any probative value is outweighed by the danger of unfair prejudice, namely, that the jury would generalize from her testimony that these defendants were involved in such a scheme. There is a danger that Inspector Wright's testimony is offered largely to suggest that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that kind of behavior.

*Id.* at *5-6 (internal quotation marks omitted); *see also United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990) (In excluding expert testimony concerning organized crime, explaining "[w]e do not believe that a New York jury needs expert testimony to understand that those who facilitate or broker kickback schemes may expect a commission from the proceeds.").

Indeed, Professor Brickman's testimony is worse than the Postal Inspector's proposed testimony in *Ojeikere,* because Professor Brickman has no direct knowledge of *any* alleged fraud by the Lawyer Defendants with respect to the eleven claims at issue, but simply theorizes that law firms have filed fraudulent asbestosis claims based on his own flawed methods and inadmissible hearsay. The jury will be fully capable of determining whether or not fraud occurred based on the trial evidence. It does not need expert help in understanding whether or not fraud occurred or guidance from Prof. Brickman's entrepreneurial model in reaching that determination. Like the excluded testimony in *Ojeikere*, "[t]here is nothing sophisticated about the alleged [fraud] that expert testimony would be useful to the jury." *Id*. at *5-6. And, like the excluded testimony in *Ojeikere*, allowing Prof. Brickman to give his mini-closing argument from the witness stand creates a clear danger of unfair prejudice "namely, that the jury would generalize from [his] testimony that these defendants were involved in such a scheme." *Id.*

**Third**, Professor Brickman must be excluded for the additional reason that "it is axiomatic that no expert witness may provide a legal opinion or conclusion that the defendants'

12

actions constituted fraud." *Rahemtulla v. Hassam*, No. 05-0198, 2008 WL 2247195, at *2 (M.D. Pa. May 30, 2008); *see also United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible: "'It is, therefore, apparent that testimony offering nothing more than a legal conclusion—i.e., testimony that does little more than tell the jury what result to reach—is properly excluded under the Rules.'") (quoting *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997)). Thus, in *Apotex Corp. v. Merck & Co.*, No. 04-7312, 2006 WL 1155954, at *8 (N.D. Ill. 2006), *aff'd*, 507 F.3d 1357 (Fed. Cir. 2007), the court explained:

> The Court, not an expert, must determine whether Merck's statements rise to the level of fraud under Rule 60(b), and the fact finder, not an expert, must determine whether Apotex has offered evidence that Merck committed common law fraud. Because Apotex has not shown how these experts' testimony would assist us in doing so, the testimony is inadmissible under Rule 702.

*See also Commercial Bank v. Breedlove (In re Breedlove)*, No. 04-1116, 2007 WL 2034143, at *6 (Bankr. N.D. Okla. July 9, 2007) (In excluding expert testimony about fraud, explaining that "to the extent that Ms. Sparks purports to render legal conclusions as to what constitutes fraud, embezzlement, and breach of fiduciary duty, the Court is well equipped to discern the legal principles relevant to this proceeding. Further, the Court does not require expert assistance in applying the law to the facts, and thus Ms. Sparks' opinions do not assist the Court.") (citation omitted). These holdings fit Prof. Brickman's testimony perfectly – he is trying to set forth what he claims amounts to fraud (his entrepreneurial model) and then he collects and testifies about evidence related to the Defendants drawing inferences from that evidence so that the evidence here fits his model, i.e. the Defendants committed fraud. That is the jury's job, not his.

Here, Brickman's proposed testimony is especially pernicious, because his proposed testimony is based, at most, on speculative guilt by association with Dr. Harron. *See* Ex. 1, 2009

13

Brickman Dep. 150-151 ("Q. What I'm asking you is how the Peirce firm knew that [Dr. Harron would provide a very high positive read rate]. A: Well, it selected Harron. There had to be some basis. . . . Q: I'm asking you how the Peirce firm knew that. A. I think that the way you could find out is to ask them."). That is not proper expert testimony.[2]

*Fourth*, the testimony should be excluded under Rule 404(b), since Prof. Brickman's opinion is based upon an impermissible, and irrelevant fallacy—that a determination of whether the eleven claims at issue were or were not fraudulent depends upon whether Dr. Harron was generally good (or truthful) at reading x-rays. Even if, as Professor Brickman asserts (based upon methods and analysis admittedly outside of his expertise), Dr. Harron misread the majority of his B-reads or made mistakes, Dr. Harron's errors or faults would be irrelevant to CSX's specific claims of fraud, and Prof. Brickman's testimony would be misleading to the jury. Instead, CSX's claims must depend on (i) whether a proper basis existed to assert a particular claim that a particular client had asbestosis, *and* (ii) whether Mr. Peirce and Mr. Raimond knew of and were involved in the claimed fraud. If, for example, the x-ray of Mr. Schabow evidences disease, then it cannot be a fraud to have sued to recover damages for that disease. Other cases and issues related to Dr. Harron have no bearing on the claims in this case.

For all of the above reasons, Prof. Brickman should be precluded from testifying. As applied to this case, he is not offering proper expert testimony. He is merely collecting facts and drawing conclusions from them in the form of a mini-closing argument to be made on behalf of

---

[2] In addition, Prof. Brickman relies on a simple comparison of his estimate that Dr. Harron's "positive rate was approximate 70%," as "as compared with two clinical studies of railroad workers which found that radiographic evidence of fibrosis for those in the study was 1.6%-2.0%." Report ¶ 40. This is a bogus comparison, since the underlying studies are hearsay, Prof. Brickman lacks the statistical expertise necessary to rely on them, and for the reasons discussed in Motion in Limine No. 10 and elsewhere, the underlying studies cited (and relied on by CSX's other experts) and CSX's other expert testimony on this point should be excluded.

14

CSX from the witness stand. That is improper. The jury will hear and evaluate the evidence and determine if fraud occurred. The jury does not need Prof. Brickman or his entrepreneurial model to assist it in its work.

### B. Even if Professor Brickman Is Allowed to Testify, The Court Should Exclude any Testimony on Medical/Epidemiology subjects

Put simply, the law requires that an expert possess expertise in the precise matter at issue, and limits testimony to the matter at issue. *See, e.g.*, *In re TMI Litig.*, 193 F.3d 613, 671, 678 (3d Cir. 1999) (affirming disqualifications of an expert meteorologist seeking to testify about radioactive material dispersion because meteorologist was not an expert in radiation dose reconstruction, and of an expert in radiation's impact on plants from qualifying on radiation's impact on people); *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1264 (5th Cir. 1986) (preventing an expert in physical organic chemistry from testifying about the toxicity of a substance to people because he was "not a toxicologist"); *Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (finding use of asbestos detection test for buildings improper for detection in human tissue); *Kuiper v. Givaudan, Inc.*, 602 F. Supp. 2d 1036, 1051 (N.D. Iowa 2009) (stating that a "witness's qualifications must correspond to the subject matter of his or her proffered testimony"); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999) (stating "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony"). This court should bar an expert in the impact of asbestos litigation on a bankrupt entity from speculating about unrelated matters like medical subjects, including epidemiology of asbestosis in railroaders.

As in the examples above, while Prof. Brickman claims broad knowledge, he has no basis from which to opine on the precise matters at issue. For example, he cannot opine about the

15

levels of occupational exposure to asbestos sustained by railroad employees generally, or the claims at issue in particular. This lack of information renders his criticism of the claims of those railroad workers that attended screenings generally, and the claims of CSX employees that became Peirce Firm clients in particular, unsubstantiated. Brickman Rep. ¶¶ 6-7. Since this criticism is essential to his assertion that the screening process fraudulently generates Plaintiffs that lack medical injury, *id.* at ¶ 6, and the screening process is the "core of the entrepreneurial model," *id.* at ¶ 7, 30, the application of his model to railroad litigation is suspect.

During his 2009 deposition, Prof. Brickman states that "with regard to trackmen, I presume they're probably exposed, but I have no idea what the level of exposure are [sic], and that would be critical in determining the propensity of their developing an asbestos-related disease." Ex. 1, 2009 Brickman Dep. 101. He then goes a step further, speculating that he would "expect to see patterns" in asbestos exposure levels in trackmen based on their specific duties, but ultimately admits that he "would not formulate an opinion" because "I don't have that data." *Id.* at 102.

Prof. Brickman attempts to provide relevant testimony by opining that two percent or less of workers in the railroad industry have asbestosis due to occupational exposure. *Id.* at 217; *see also* Report ¶ 40. Not only is this speculation inconsistent with the bulk of Prof. Brickman's testimony and irrelevant because this litigation involves specific occupations like trackmen, rather than all workers in the railroad industry (many of whom work in offices and other places of low exposure) and a self-selected group – those who attended screenings. It is also improper because Prof. Brickman is not qualified to opine. He is not an expert in any field that would allow him to offer expert testimony on exposure levels or prevalence, Ex. 2, 2012 Brickman Dep. at 39-40, and, by his own admission, he has not become such an expert through general

16

means because, as he puts it, "I don't have that data," Ex. 1, 2009 Brickman Dep. at 102. Prof. Brickman has admitted "I don't consider myself a statistician or an expert in statistics." *Id.* at 259. Thus, Prof. Brickman is unqualified to testify on these matters.

Given the above, the cumulative impact of Prof. Brickman's testimony will be to unfairly prejudice the defendant by confusing the issues and misleading the jury, in violation of Rule 403. Fed. R. Evid. 403. The jury will likely be confused as to the matter at issue by irrelevant testimony and misled by Prof. Brickman's inaccurate analysis. If an expert is required to explain the alleged failures to follow medical and x-ray procedures, then plaintiffs should retain experts in the appropriate fields with the appropriate experiences and qualifications to do so, such as it has done with Dr. Parker who will testify about the x-rays of the eleven claimants at issue. If an expert is not required to explain the alleged failures to follow procedure, then Prof. Brickman's expert testimony is not necessary because it would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In either case, Prof. Brickman should not be permitted to testify.

### III. CONCLUSION

Professor Brickman is a law professor who on occasion has advocated on behalf of the American Tort Reform Association, but who admits to not being an expert in industrial hygiene, occupational health, epidemiology, statistics or any scientific discipline. He is not and never has been a practicing lawyer. He has never defended, prosecuted, or tried an asbestos case or any other case. He is not qualified to testify on such matters or to try and turn inadmissible hearsay and non-expert conclusions into expert testimony by relying on such. He has used unreliable and fatally flawed methods in support of his attempt to do so. He has no real expertise applicable to this case but simply draws conclusions from facts. That is the jury's job. Prof. Brickman should

17

not be permitted to give CSX's closing argument from the witness stand under the guise of purported expert testimony. Accordingly, the Peirce Firm respectfully submits that Federal Rules of Evidence 401, 402, 403, 404, 702 and 802, and *Daubert* (and its progeny) all require exclusion of Professor Brickman's testimony from the trial of this matter.

Date: November 13, 2012             s/ Walter P. DeForest
                                    Walter P. DeForest (West Virginia I.D. No. 7388)
                                    David J. Berardinelli (West Virginia I.D. No. 10479)
                                    DEFOREST KOSCELNIK YOKITIS
                                     SKINNER & BERARDINELLI
                                    436 Seventh Avenue
                                    Koppers Building, 30th Fl.
                                    Pittsburgh, PA 15219
                                    Telephone (412) 227-3100
                                    Fax (412) 227-3130
                                    Email:    deforest@deforestlawfirm.com
                                              berardinelli@deforestlawfirm.com

                                    *Attorneys for Defendants*
                                    Robert N. Peirce, Jr. and Louis A. Raimond

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November, 2012, a true and correct copy of the foregoing Motion In Limine No. 8 By Defendants Robert N. Peirce, Jr. And Louis A. Raimond has been served by electronic filing with the Court's CM/ECF system upon the following counsel:

Marc E. Williams
Robert L. Massie
NELSON MULLINS LLP
949 Third Avenue, Suite 200
Huntington, WV 25701
*Counsel for Plaintiff*

Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
MCGUIRE WOODS
One James Center
901 East Cary Street
Richmond, VA 23219-4030
*Counsel for Plaintiff*

Ron Barroso
5350 S. Staples, Suite 401
Corpus Christi, TX 78411
*Counsel for Defendant Harron*

Jerald E. Jones
WEST & JONES
PO Box 2348
Clarksburg, WV 26302-2348
*Counsel for Defendant Harron*

Dan Himmelfarb
Reginald Goeke
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C.
*Counsel for Plaintiff*

                              s/ Walter P. DeForest